

Discovery Deposition of
# Doug Blankenship

**Date:** August 31, 2023

**Case:** Joseph Lucas v. Blankenship Construction Co,; Doug Blankenship; and Nathan Marlen

**No.** 3:23-cv-00056-SMY

**Court Reporter:** Ann Marie Hollo, CSR, RDR, CRR

Paszkiewicz Court Reporting
Phone:  618-307-9320
Toll-Free:  855-595-3577
Fax:  618-855-9513
www.spreporting.com



EXHIBIT

A

Page 1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF ILLINOIS


JOSEPH LUCAS,                          )
                                       )
                 Plaintiff,            )
                                       )
                 vs.                   ) Case No. 3:23-cv-00056-SMY
                                       )
BLANKENSHIP CONSTRUCTION CO.;          )
DOUG BLANKENSHIP; and                  )
NATHAN MARLEN,                         )
                                       )
                 Defendants.           )


DISCOVERY DEPOSITION OF DOUG BLANKENSHIP

TAKEN ON BEHALF OF THE PLAINTIFF

AUGUST 31, 2023


Ann Marie Hollo, CSR, RDR, CRR

Doug Blankenship
August 31, 2023

Page 2

| QUESTIONS BY: | PAGE |
| --- | --- |
| MR. ST. ONGE | 5, 186, 210 |
| MR. BLEYER | 135, 198 |
| MR. DEVORE | 171, 199 |

INDEX OF EXHIBITS

| EXHIBIT | PAGE |
| --- | --- |
| Exhibit 1 | 22 |
| Exhibit 2 | 28 |
| Exhibit 3 | 29 |
| Exhibit 4 | 43 |
| Exhibit 5 | 49 |
| Exhibit 6 | 55 |
| Exhibit 7 | 93 |
| Exhibit 8 | 104 |
| Exhibit 9 | 131 |
| Exhibit 10 | 199 |

Page 4

A P P E A R A N C E S

For the Plaintiff:
Mr. Britton St. Onge
Mr. Jon A. Bierman (pro hac vice pending)
POLSINELLI PC
100 South Fourth Street
Suite 1000
St. Louis, Missouri 63102
(314) 889-8000
bstonge@polsinelli.com
jbierman@polsinelli.com
For the Defendants Blankenship
Construction Company and Doug
Blankenship:
Mr. Thomas G. DeVore
SILVER LAKE GROUP, LTD.
560 Suppiger Way
P.O. Box 188
Highland, Illinois 62249
(618) 654-8341
tom@silverlakelaw.com
For the Defendant Nathan Marlen:
Mr. Daniel G. Hasenstab
BROWN & JAMES, P.C.
Richland Plaza I
525 West Main Street
Suite 200
Belleville, Illinois 62220-1547
(618) 235-5590
and
Mr. Joseph A. Bleyer
BLEYER AND BLEYER
601 West Jackson Street
P.O. Box 487
Marion, Illinois 62959-0487
(618) 997-1331
jableyer@bleyerlaw.com
ALSO PRESENT:  Joseph Lucas, Nathan Marlen
The Court Reporter:  Ann Marie Hollo, CSR, RDR, CRR

Page 3

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF ILLINOIS

JOSEPH LUCAS,                    )
                                 )
            Plaintiff,           )
                                 )
     vs.                         ) Case No. 3:23-cv-00056-SMY
                                 )
BLANKENSHIP CONSTRUCTION CO.;    )
DOUG BLANKENSHIP; and            )
NATHAN MARLEN,                   )
                                 )
            Defendants.          )

            DEPOSITION OF DOUG BLANKENSHIP,
produced, sworn, and examined on AUGUST 31, 2023,
between the hours of ten minutes after nine o'clock
in the forenoon and fifty minutes after one o'clock
in the afternoon of that day, at the office of Brown
& James, P.C., 525 West Main Street, Suite 200,
Belleville, Illinois, before Ann Marie Hollo, CSR,
RDR, CRR, in a certain cause now pending in the
UNITED STATES DISTRICT COURT, SOUTHERN DISTRICT OF
ILLINOIS, wherein JOSEPH LUCAS is the Plaintiff, and
BLANKENSHIP CONSTRUCTION CO.; DOUG BLANKENSHIP; and
NATHAN MARLEN are the Defendants.

Page 5

IT IS HEREBY STIPULATED AND AGREED, by and
between counsel for Plaintiff and counsel for
Defendants that the deposition may be taken in
shorthand by Ann Marie Hollo, RDR/CRR, a Certified
Shorthand Reporter, and afterwards transcribed into
typewriting, and the signature of the witness is
expressly waived.

                    * * * * *

            DOUG BLANKENSHIP,
of lawful age, being produced, sworn, and examined
on behalf of the Plaintiff, deposes and says:
(Starting time of the deposition is:  9:10 a.m.)

            DIRECT EXAMINATION

BY MR. ST. ONGE

     Q.   Would you please state your name for the
record.

     A.   Doug Blankenship.

     Q.   Do you have a middle name, Doug?

     A.   Allen, A-L-L-E-N.

     Q.   We've not met before.  We met just briefly
out in the hallway, just shook hands.  I represent
Joe Lucas here in this lawsuit regarding his
property in Fayette County, Illinois.  It's my
opportunity today to ask you questions about what

Doug Blankenship
August 31, 2023

Page 6

1   you know about the subject matter of this case.
2        Have you had your deposition taken before
3   in any matter?
4   **A.  It's been a long time ago, yes, but, yes.**
5   Q.  And a long time ago -- ballpark it for me.
6   **A.  Ten years.**
7   Q.  Was it a case that you were personally
8   involved in?
9   **A.  No.  It was a class action.**
10  Q.  Okay.  You had your depo taken in a class
11  action?
12  **A.  It was a -- I guess it would be, yes.  It**
13  **was a class action lawsuit over some Syngenta grain**
14  **marketing.**
15  Q.  Were you the named plaintiff?
16  **A.  I was a plaintiff, yes, in a class action**
17  **against Syngenta.**
18  Q.  Okay.  And what happened to that case?
19  Did it settle, go to trial?
20  **A.  I believe it settled.**
21  Q.  Okay.  Okay.  So it's been a little while
22  since you had your depo.  So let's go over a couple
23  of ground rules today.
24       So we have a court reporter here taking

Page 7

1   down everything that both of us say, so we've got to
2   make sure we don't speak over one another.  So
3   please let me finish my question before you give an
4   answer, and I'll do the same before I ask another
5   question; fair?
6   **A.  Mm-hmm, yes.**
7   Q.  And as you've been doing, you've been
8   answering nonverbally.  We've got to make sure we
9   give verbal answers:  "Yes," "no," whatever the case
10  may be, rather than nods of the head, shakes of the
11  head, "uh-uhs" and "huh-uhs."  Is that fair?
12  **A.  Understand.**
13  Q.  All right.  If you don't hear a question,
14  please let me know.  Is that right?
15  **A.  Sure.**
16  Q.  Okay.  Because if you give an answer and
17  you didn't understand, I'm going to assume you
18  understood it.
19  **A.  Okay.**
20  Q.  Lawyers today may make some objections in
21  response to questions, but whatever the objection
22  is, unless they tell you not to answer, you've got
23  to give the answer to the question.  Is that right?
24  **A.  Yes.**

Page 8

1   Q.  If you think of something later today in
2   response to a question I had earlier, will you let
3   me know?
4   **A.  Mm-hmm, sure will.**
5   Q.  And I don't know if we'll be here too
6   terribly long, but anytime you want to take a break,
7   just let me know.  I just ask if I have a question
8   pending, please answer the question before we take a
9   break.
10  **A.  Sure.**
11  Q.  Are you on any medications today that
12  would affect your memory?
13  **A.  No.**
14  Q.  Any reason you can think of why you would
15  not be able to give your best testimony today?
16  **A.  No.**
17  Q.  Did you prepare for your depo today?
18  **A.  Not really.**
19  Q.  Did you meet with your lawyer?
20  **A.  No.**
21  Q.  Are you being represented today by a
22  lawyer?
23  **A.  Yes.**
24  Q.  Sitting next to you?

Page 9

1   **A.  Yeah.**
2   Q.  So you didn't speak with your lawyer.  Did
3   you review any documents?
4   **A.  Well, we didn't meet.  We spoke on the**
5   **phone.**
6   Q.  Okay.  How long did you speak on the
7   phone?
8   **A.  Five minutes.**
9   Q.  Did you speak to anybody else about
10  today's deposition?
11  **A.  No.**
12  Q.  Did you speak to Nate Marlen?
13  **A.  No.**
14  Q.  Did you review any documents to prepare
15  for today?
16  **A.  No.**
17  Q.  Did you speak with anybody -- any
18  employees at Blankenship Construction about today?
19  **A.  No.**
20  Q.  Did you review any text messages or emails
21  with anybody to prepare for today?
22  **A.  No.**
23  Q.  Did you review any of the papers that you
24  have filed in this case to prepare for your depo

3  (Pages 6 to 9)

Doug Blankenship
August 31, 2023

Page 10

1  today?
2      **A.  What was emailed, provided through your**
3  **guys' firm and my attorney.  I read the emails.**
4      Q.  Okay.  And which emails were those?
5      **A.  Those was the questions that was asked to**
6  **all of us and responses.**
7      Q.  All right.  The interrogatories?
8      **A.  Yeah.**
9      Q.  Okay.  Did you review any of Nate Marlen's
10  answers to interrogatories or his answer in the
11  complaint today -- to prepare for today?
12      **A.  Briefly, yes.**
13      Q.  To prepare for today?
14      **A.  Not really to prepare.  I just read them.**
15      Q.  You have read them in the past?
16      **A.  I have read them.**
17      Q.  All right.  Let's talk basically about
18  background.  What's the highest level of education
19  that you've got?
20      **A.  I graduated high school and went to two**
21  **years of college.**
22      Q.  Okay.  When did you stop -- did you go
23  straight into college?
24      **A.  Yes.**

Page 11

1      Q.  When did you stop going?
2      **A.  1987, I graduated high school, and it**
3  **would have been probably somewhere around '89 I**
4  **stopped going to college.**
5      Q.  Okay.  Did you get an associate's degree
6  or any degree from college?
7      **A.  No, didn't finish.**
8      Q.  What did you study?
9      **A.  Construction management.**
10      Q.  Where was that?
11      **A.  It was Belleville Area College.  Now it's**
12  **Southwest area college (sic).**
13      Q.  And when you stopped going to college,
14  what did you start doing then?
15      **A.  I went to -- well, had employment with**
16  **Speed Lube, a quick oil change company.**
17      Q.  Okay.  And how long did you work at Speed
18  Lube?
19      **A.  Five years.**
20      Q.  As a tech changing oil?
21      **A.  Starting out as a tech and then to**
22  **management.**
23      Q.  Okay.  What did you do after Speed Lube?
24      **A.  I went back to work for Blankenship**

Page 12

1      **Construction, a family business.**
2      Q.  When did that start then?
3      **A.  Roughly around '96, I believe.**
4      Q.  Had you worked in the family business
5  before?
6      **A.  Not as an employee, no.**
7      Q.  Okay.
8      **A.  A family business, you know, Sundays, and**
9  **you was expected to do things.**
10      Q.  Understood.
11      Okay.  So you went to work formally for
12  them then full time in '96?
13      **A.  Yes.**
14      Q.  And what did you start doing in 1996?
15      **A.  As an operator, equipment operator.**
16      Q.  What kind of equipment?
17      **A.  Earthmoving excavation equipment.**
18      Q.  Backhoes, dozers?
19      **A.  Yeah, mm-hmm.**
20      Q.  Did you need some sort of certification to
21  run those?
22      **A.  Got trained by the best, my father.**
23  **That's good enough.  I am also a member of Local 520**
24  **Operating Engineers.**

Page 13

1      Q.  Got it.
2      So you've been working as an operator
3  since '96?
4      **A.  Worked as an operator up -- as a**
5  **superintendent underneath my dad's tutelage up until**
6  **2004 when he passed away with cancer.  At that**
7  **point, I assumed the role of manager of Blankenship**
8  **Construction.**
9      Q.  Are you also a vice president of
10  Blankenship Construction?
11      **A.  Correct.**
12      Q.  And what would you consider your title to
13  be currently?
14      **A.  Vice president.**
15      Q.  VP?
16      And when did you become a superintendent?
17  You did that until 2004, but when did you start?
18      **A.  I would say probably employment of**
19  **Blankenship Construction would be '96.**
20      Q.  Okay.  So you were superintendent when you
21  started?
22      **A.  Right.**
23      Q.  Is that -- your first real experience
24  doing superintendent work, was that Blankenship

Doug Blankenship
August 31, 2023

Page 14

1    Construction?
2        **A.   Mm-hmm.**
3        Q.   What do you do as a superintendent?
4        **A.   You manage job sites.**
5        Q.   And what kind of jobs were these,
6    generally speaking?
7        **A.   They was --**
8        Q.   Earthmoving?
9        **A.   Earthmoving, filling ponds.  We ventured**
10   **into moving -- moving dirt for landfill companies,**
11   **building landfills.  We progressed on to several**
12   **different aspects of excavation, construction work.**
13       Q.   How big are these teams that you're
14   managing on average?
15       **A.   They could be anywhere from 3 guys on up**
16   **to 50, 60, depending on a job.**
17       Q.   And when you were superintendent, did you
18   also operate the equipment on these job sites?
19       **A.   Sometimes.**
20       Q.   Would you say the majority of your time
21   was operating the equipment or managing?
22       **A.   I'd say it's split 50-50.**
23       Q.   How about farming, are any of these jobs
24   that Blankenship Construction does farm jobs?

Page 15

1        **A.   Mm-hmm.**
2        Q.   Including building ponds on farms?
3        **A.   Yes.**
4        Q.   Do you still operate the equipment?
5        **A.   Yes.**
6        Q.   Do you still operate equipment today?
7        **A.   Not very much.  I like to do it more**
8    **often, but I don't have a chance.**
9        Q.   And when did you kind of move out of that
10   role?
11       **A.   Probably about 2004.**
12       Q.   And now it's more monitoring the work
13   others are doing?
14       **A.   Correct, yes.**
15       Q.   So when your father passed is kind of
16   where that transition started?
17       **A.   Yes.**
18       Q.   How often do you operate them now?
19       **A.   Not very often.**
20       Q.   Once a year maybe?
21       **A.   I'm going to say maybe a half a dozen**
22   **times a year, six times a year.**
23       Q.   And under what circumstances are you the
24   one doing the operating versus other Blankenship

Page 16

1    Construction --
2        **A.   Typically it's -- whenever I'm operating a**
3    **piece of equipment, it's on my own personal property**
4    **whenever I get to borrow a piece of equipment and do**
5    **some projects with my own.**
6        Q.   Okay.  So you're not operating for
7    Blankenship at this point at all?  All of the work
8    that you're doing --
9        **A.   No.  I'm pretty much managing the company.**
10       Q.   And that's been the case that you only
11   operate on your personal property since around 2004?
12       **A.   I mean, yeah.**
13       Q.   More or less?
14       **A.   There's been times that I have went out on**
15   **job sites when I'm needing to cover for a guy or**
16   **something and got on a machine.**
17       Q.   Okay.  Are you a part owner of Blankenship
18   Construction Company?
19       **A.   Yes.**
20       Q.   How much do you own percentage wise?
21       **A.   I want to say it's like 33 1/3 percent.**
22       Q.   Who are the other owners?
23       **A.   My mother, Suzanna Renee Blankenship.**
24       Q.   How much does she own?

Page 17

1        **A.   She owns the remainder.**
2        Q.   66 2/3rds?
3        **A.   Yes.**
4        Q.   So it's you and your mom?
5        **A.   I'm not exactly sure of that percentage of**
6    **ownership because there was 25 percent that was my**
7    **sister's, and when my father passed away, we**
8    **purchased that off of my sister.  That went into the**
9    **stocks.  So how that mixes up, I'm not really sure**
10   **on numbers.**
11       Q.   So currently are there any other owners
12   apart from you and your mother?
13       **A.   No.**
14       Q.   You know you own 33 percent?
15       **A.   Yes.**
16       Q.   What is Triangle Grain Incorporated?
17       **A.   Triangle Grain Incorporated is a farm**
18   **corporation.**
19       Q.   Who owns that?
20       **A.   My mother and myself.**
21       Q.   And what percentages?
22       **A.   The same percentages of Blankenship**
23   **Construction.**
24       Q.   What is -- what does it do?

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577

Doug Blankenship
August 31, 2023

---

Page 18

1    A.  It's a farming corporation.  They farm
2  ground.
3    Q.  Does it own its own property, own
4  farmland?
5    A.  No.  Triangle does not own any farmland.
6    Q.  It operates farms for others?
7    A.  Correct.
8    Q.  Where?
9    A.  Bond County, Fayette County, Montgomery
10  County.
11    Q.  Does it farm property that's owned by
12  Nathan Marlen or his trust?
13    A.  Yes.
14    Q.  How many acres?
15    A.  Approximately 530.
16    Q.  Where is that located?  Is it all one
17  contiguous lot, or is it broken up?
18    A.  Yeah, it's one contiguous piece of land in
19  Fayette County.
20    Q.  Is that property -- that's the north of
21  Joe Lucas's property?
22    A.  Correct.
23    Q.  Are there other customers or other
24  people's farmland that Triangle Grain farms, or is

---

Page 19

1  it just Nate Marlen's?
2    A.  No.  There's others.
3    Q.  What percentage of the work would you say
4  is Nate Marlen's in terms of maybe acreage?
5    A.  Probably somewhere -- I'm going
6  to -- a rough guess, a third of my acres.
7    Q.  Is done for Nate Marlen?
8    A.  Yes.
9    Q.  Do you have -- how long have you
10  been -- how long have you been doing that for Nate
11  Marlen?
12    A.  Since 2021, I believe.
13    Q.  What part of 2021?
14    A.  Excuse me?
15    Q.  What part?  Like, when did -- what month
16  did it begin?
17    A.  It began in the spring, starting in, like,
18  January 1.  The lease is usually stated January 1.
19    Q.  So you have a written lease with Marlen?
20    A.  Yes.
21    Q.  Or trust, I mean?  Do you know who it was
22  with or with him or his trust?  Do you know?
23    A.  It's with the trust right now.
24    Q.  Did you negotiate that -- that lease?

---

Page 20

1    A.  Yes.
2    Q.  And how long does that lease last?
3    A.  I believe right now we have a five-year
4  lease.  We're into the first year this year.
5    Q.  What kind of crops do you farm on that
6  property?
7    A.  Corn and soybeans.
8    Q.  Did you have a harvest last year?
9    A.  Yes.
10    Q.  Okay.  Was that profitable?
11    A.  Are you talking about in general the whole
12  entire farm corporation or just on Nate Marlen's?
13    Q.  On Nate Marlen's.
14    A.  On Nate Marlen's, there was a loss.
15    Q.  Whose idea was it to start farming on his
16  property?  Did you approach him; did he approach
17  you?
18    A.  We -- actually, Nate contacted me, and we
19  discussed it.  And then we -- from there, we -- I
20  started talking to his father, and it progressed
21  from there to having meetings, sat down, and, I
22  think, worked out a deal.
23    Q.  What is the arrangement for payment for
24  that lease?

---

Page 21

1    A.  Cash rent.
2    Q.  You pay him cash, and you get to keep
3  whatever -- whatever is made on the property?
4    A.  That's correct.
5    Q.  And how much do you pay per year?
6    A.  Oh, I'm not exactly sure the numbers on
7  that as far as per acre cash rent.  I am wanting to
8  say it's somewhere around 240 an acre.
9    Q.  Per year?
10    A.  240 an acre per year, correct.
11    Q.  So Nate contacted you about that.  What
12  made you interested in doing that?
13    A.  Actually, it was first -- it was Nate.
14  When we met, he said the farm was in bad -- bad
15  shape as far as drainage.  He wanted to know about
16  me coming up and taking a look to see what we could
17  possibly do to get drainage work going on there
18  because it had been let go for many years.
19    So then once we got up there and we got to
20  looking at it, we got to talking about farming.
21    He said, "Well, maybe we can work out an
22  arrangement to where if we can get you in here to
23  start some drainage to get some of this water off of
24  the fields, then talk to me about farming it."

---

6  (Pages 18 to 21)

Doug Blankenship
August 31, 2023

Page 22

1    So we worked out a deal, and that's how it
2  all started.
3        (Exhibit 1 was marked for identification.)
4  BY MR. ST. ONGE
5     Q.  So I'm showing you what we've marked as
6  Exhibit 1.
7        Do you recognize this document?  It's
8  called, "Blankenship Construction Company and Doug
9  Blankenship's Combined Response to Plaintiff Joe
10  Lucas's Request to Produce."
11    A.  Yes.
12    Q.  And then that's your signature on the last
13  page there?
14    A.  Yes.
15    Q.  Okay.  So if we turn to number 9, which is
16  on Page 3, your answer there says that Marlen and
17  Defendants.  Do you see where I am on the second
18  line?
19    A.  [Deponent indicated.]
20    Q.  "Marlen and Defendants did, in fact, come
21  to an agreement that in exchange for drainage work
22  done on Marlen, hat Triangle Grain, which is the
23  farming entity for which Doug Blankenship has an
24  owner interest in, would receive a reduced rental

Page 23

1  rate on the farm tenancy between Marlen and Triangle
2  Grain."
3    A.  Mm-hmm.
4    Q.  Okay.  So that's what we've been talking
5  about, the same land, correct?
6    A.  Yes.
7    Q.  You've got to answer verbally my --
8    A.  Yes, yes.
9    Q.  So you said that you received a reduced
10  rental rate.  Do you know what reduction was off of
11  what it normally would have been?
12    A.  I'm wanting to say it was going to be
13  somewhere around $50 an acre reduction.  I'm not
14  exactly sure on that, but somewhere around that
15  neighborhood.
16    Q.  Did you tell him that "I don't want to pay
17  the market rate on this because of the drainage
18  issues"?  Or who brought up the discount?
19    A.  The discount was brought up by myself
20  because we had a contract negotiation or a lease
21  agreement negotiation and in discussing that lease
22  agreement --
23        (Brief interruption.)
24        MR. ST. ONGE:  Is there somebody's

Page 24

1  phone going off?
2        (Whereupon there was a short discussion
3  off the record.)
4  BY MR. ST. ONGE
5     Q.  We were talking about the discount and how
6  it was arranged and how that came up.
7     A.  So whenever the agreed -- or the lease
8  came back up for renegotiation, we had discussed
9  prior to that whenever that next lease came up that
10  we would work out the ditching work into that
11  agreement.  They was wanting X, and I kind of
12  figured out, well, here's where we were at as far as
13  our cost.  Can we subtract that and come up with our
14  new lease agreement rate?
15    Q.  Okay.  You said there was a renegotiation.
16  So you were in a lease with him before this?
17    A.  I believe it was on a one-year lease,
18  yeah.
19    Q.  So when did the -- when did the one-year
20  lease start?
21    A.  I'm -- like I said, I thought that was
22  '21.
23    Q.  That was the first time?
24    A.  I believe so, yes.

Page 25

1    Q.  Okay.  And you had a one-year lease?
2    A.  Right.
3    Q.  Okay.  And that was at the standard rate,
4  and you wanted to bump that down?
5    A.  No.  That was at the -- well, that was at
6  the rate we set that one-year lease, and then when
7  we come back to renegotiate the next one, they was
8  wanting more per acre, and we had some work that was
9  done, which was discussed prior.  So we ended up
10  deciding on this amount here for the next five
11  years.  I wanted a longer term so that I could work
12  out some of the costs that I incurred on doing the
13  drainage work.
14    Q.  Okay.  So when you first saw this
15  property, Nate told you that it didn't drain very
16  well?
17    A.  Correct.
18    Q.  Did you go out there and look at it?
19    A.  Correct.  I did.
20    Q.  With Nate?
21    A.  Yes.
22    Q.  And did you discuss with him what the
23  drainage issue might be and how you could resolve
24  that?

7  (Pages 22 to 25)

Doug Blankenship
August 31, 2023

Page 26

1    **A.  Yes.**
2    Q.  And what did you guys -- what did you tell
3  him?
4    **A.  That we needed to get in here, and we**
5  **needed to start opening up the main-artery ditches**
6  **to get water flowing so it will come out of the**
7  **field, so we won't have drainage issues in the**
8  **fields.**
9    Q.  Okay.  And at that point, did you go onto
10  Joe Lucas's property to look at one of the arteries
11  that you're mentioning?
12    **A.  We looked at all of it, not necessarily**
13  **Joe Lucas's property.  We looked at Nate Marlen's**
14  **property.**
15    Q.  Did it include Joe Lucas's property?
16    **A.  At that point in time, I don't -- I can't**
17  **remember.**
18    Q.  So when you first saw it, he wasn't
19  willing to agree to a reduced rate on the drainage
20  issue?  I'm trying to understand.  You said you had
21  a one-year deal at a standard rate.
22    **A.  We had a one-year deal, a standard rate.**
23    Q.  And what was that rate?
24    **A.  I'm wanting to say that was --**

Page 27

1    Q.  You said it was 240 under the reduced
2  rate?
3    **A.  I want to say it was like one -- $200 an**
4  **acre, I believe, or 205, somewhere in that**
5  **neighborhood.**
6    Q.  Well, when was it at 240?
7    **A.  That's currently now.  The 240 is**
8  **currently now, in the lease we're into now.**
9    Q.  So the price went up?
10    **A.  Yes.**
11    Q.  Okay.  So originally it was 205?
12    **A.  205.  I am wanting to say 205, 210,**
13  **somewhere.  I'm not exactly sure on my numbers.**
14    Q.  And that was a reduced rate under your
15  understanding?
16    **A.  Not then, no.  That was the standard**
17  **rate --**
18    Q.  Okay.
19    **A.  -- before we ever even got started doing**
20  **any ditch work or anything like that.**
21    Q.  And you were on that property.  He said,
22  "Here's the drainage issues."  You walked with him?
23    **A.  Right.**
24    Q.  You checked out these ditches around the

Page 28

1  area?
2    **A.  Correct.**
3    Q.  And you don't know whether or not that
4  included Joe Lucas?
5    **A.  We didn't walk every ditch.  This**
6  **is -- we're talking about this was pretty extensive**
7  **drainage work.  So it was kind of ongoing.  We**
8  **didn't get this all done in one day.  This was over**
9  **a matter of a year, year and a half.**
10    Q.  Was the whole field under water?
11    **A.  Yeah.  There was issues with the drainage,**
12  **and they couldn't keep the crop on the field.**
13    Q.  And did he tell you how long that had been
14  the case?
15    **A.  Several years.**
16    Q.  He told you that?
17    **A.  Yeah.**
18    Q.  I got further than I wanted with you on
19  that, so let's back up a little bit.
20    MR. ST. ONGE:  So let's go to the
21  next one.
22    (Exhibit 2 was marked for identification.)
23  BY MR. ST. ONGE
24    Q.  So you're here today for your deposition.

Page 29

1  Have you seen this document before?  It lists the
2  witness.  This is an amended deposition notice for
3  today.  It lists you personally as the deponent on
4  the first page.  Do you see that?  Have you seen
5  this before?
6    **A.  I believe so.**
7    Q.  Okay.  So you understand that you're here
8  today in your individual, personal capacity because
9  you've got information personally about this case.
10  Do you understand that?
11    **A.  Yes.**
12    (Exhibit 3 was marked for identification.)
13  BY MR. ST. ONGE
14    Q.  Okay.  And then I'll show you what I've
15  marked as Exhibit 3.  You've seen this document
16  before.  This is an amended notice of deposition,
17  and it lists the witness, Blankenship Construction
18  Company.  Have you seen this second depo notice
19  before?
20    **A.  Yes.**
21    Q.  All right.  So you understand that -- I'm
22  sure your lawyer explained it to you, but you are
23  aware that you're here also as a representative of
24  Blankenship Construction Company to offer testimony

8  (Pages 26 to 29)

Doug Blankenship
August 31, 2023

Page 30

1  that it has collectively?
2  **A. Yes.**
3     Q. Okay. And if you turn to the second page,
4  you see under matters of examination, you've read
5  through these topics before; is that right?
6  **A. Briefly, yes.**
7     Q. Okay. And you understand that you're here
8  to testify on all of these topics?
9  **A. Yes.**
10    Q. There's nobody else that's going to be
11  testifying on these topics for Blankenship
12  Construction; is that correct?
13 **A. No.**
14    Q. Is that correct?
15 **A. That's correct.**
16    Q. So are you prepared today to testify on
17  all of these topics for Blankenship Construction
18  Company?
19 **A. Yes.**
20    Q. And what did you do to prepare to get
21  ready to testify on all these topics?
22    **A. I -- basically I know what happened on the**
23 **farm, so I have a memory of it. That's how I**
24 **prepared.**

Page 31

1     Q. You didn't speak with anybody else at
2  Blankenship Construction Company --
3  **A. No.**
4     Q. -- about these topics --
5  **A. No.**
6     Q. -- to get their information or anything
7  like that?
8  **A. No.**
9     Q. Did you talk with Barry Matthews?
10    **A. Barry Matthews is an employee of**
11 **Blankenship Construction and Triangle Grain, and we**
12 **have talked -- the only time I've talked to Barry**
13 **about this issue is whenever we went down and put**
14 **the tube in for Joe on his property.**
15    Q. You didn't talk with him about any of
16  these topics?
17 **A. No.**
18    Q. So all of the information --
19 **A. I don't discuss that with my employees.**
20    Q. So all of the information that Blankenship
21  Construction Company has on these topics is going to
22  come from you today?
23 **A. That's right.**
24    Q. Based on your personal knowledge?

Page 32

1     **A. That's right.**
2     Q. All right. Let's talk just a little bit
3  about Blankenship Construction Company.
4        When was that company started?
5  **A. 1968.**
6     Q. Started by your father?
7  **A. Mm-hmm, yes.**
8     Q. And your mother?
9  **A. Yes.**
10    Q. What was its revenues in 2022?
11 **A. I don't recall that.**
12    Q. Do you know what they were in 2021?
13 **A. I don't recall that either.**
14    Q. 2020?
15 **A. I don't recall that.**
16    Q. Ballpark?
17 **A. It varies from year to year.**
18    Q. So --
19    **A. Blankenship Construction is not only a**
20 **private land company; we also operate on a**
21 **commercial level.**
22    Q. What do you mean by that?
23    **A. Commercial being it would be on**
24 **the -- commercial side would be for larger**

Page 33

1  companies. So I kind of have -- the company does
2  two different aspects. There's a commercial side
3  for larger companies, and then there's what I call
4  "the private side," which will be for
5  farm -- farmers.
6     Q. Individuals as opposed to corporations?
7     **A. Because there's a different set of rules**
8  **with the employees. We are a union-based company on**
9  **the commercial side. We're a nonunion company on**
10 **the agricultural side, private side.**
11    Q. Okay. And what percentage is the
12  personal, individual, versus the commercial? What's
13  the ratio of revenue between those two?
14    **A. Oh, the revenue? Probably somewhere in**
15 **the neighborhood of 10 percent would be the private.**
16    Q. 90 percent is done for commercial --
17 **A. Correct.**
18    Q. -- companies? Okay.
19       Commercial work?
20 **A. Correct.**
21    Q. Is that all farmland?
22 **A. Excuse me?**
23    Q. All farmland, commercial farmland, or is
24  it outside?

9 (Pages 30 to 33)

Doug Blankenship
August 31, 2023

Page 34

1       A.  On the agricultural side?
2       Q.  Okay.  So you've got an agricultural side?
3       A.  Agricultural, personal property side,
4   which will be anything done on the agricultural side
5   as far as for farmers, this, that, and the other.
6   We might go build a pond for a private individual
7   that doesn't have any farm ground.  We may dig a
8   basement for somebody.
9       Q.  I see.
10      A.  It's just --
11      Q.  And the commercial side, is any of that
12  agricultural?
13      A.  No.
14      Q.  I understand.  Thank you for clarifying
15  that.
16          How many employees does Blankenship
17  Construction have?
18      A.  Main staff, which I consider is my
19  full-time employees, somewhere around 25.
20      Q.  You've got part-time folks as well?
21      A.  Part time who we -- when we were on the
22  commercial sites and we hire out the local trades:
23  Operators, laborers, teamsters, whatnot.
24      Q.  These full-time employees, do they all

Page 35

1   know how to operate the equipment?
2       A.  No.
3       Q.  Okay.  And how many operators do you have
4   on staff of those full time -- the 25 full-time
5   folks?
6       A.  Ten, I'd say.
7       Q.  The other ones are office, back office --
8       A.  Correct.
9       Q.  Where is its offices located?
10      A.  Mulberry Grove, Illinois.
11      Q.  Anywhere else?
12      A.  No.
13      Q.  Does it do all work in Southern Illinois
14  or elsewhere?
15      A.  No.  We do work in Missouri.  We have done
16  work in Indiana, Illinois.
17      Q.  Does it own its own equipment?
18      A.  Yes.
19      Q.  Okay.  And it uses its own equipment for
20  all these jobs?
21      A.  Yes.
22      Q.  Does it ever rent or --
23      A.  Oh, yeah, we rent from time to time
24  whenever we run short on the equipment.

Page 36

1       Q.  For the agricultural side, is it all
2   equipment -- you're always able to use your own
3   equipment, or do you ever have to rent for the
4   agricultural side?
5       A.  On doing the earthwork, you mean?
6       Q.  Yes.
7       A.  Yes.  We typically use our own equipment.
8          So during the year, for Blankenship
9   Construction, a lot of the equipment that we own is
10  done -- is used on the commercial side.  So there's
11  very limited equipment available to do anything on
12  the private side until we start getting some of our
13  commercial work done, and some of the equipment
14  starts coming back.  And then I kind of gather up
15  jobs that people want done, and then later on in the
16  year when I have equipment available, we run out and
17  try to knock some of these things out before winter
18  sets.
19      Q.  What are -- give me some of the types of
20  jobs that you do for the agricultural, individual
21  farmer type work.
22      A.  It could be drainage work, it could be
23  brush removal, it could be building ponds.
24      Q.  Do you ever do any work for any of the

Page 37

1   levee districts?
2       A.  Yes.
3       Q.  Do you have contracts with them?
4       A.  No contracts.
5       Q.  And how do they get in touch with you to
6   have you do work?
7       A.  They just give me a call.
8       Q.  And you have no contracts with them at
9   all?
10      A.  No contracts.
11      Q.  How do you get paid?  Just invoice?
12      A.  Invoice.
13      Q.  Who is it over there that you speak with
14  about these jobs?
15      A.  There's board members over there, and
16  typically it's Randy Braun.
17      Q.  How do you spell Randy's last name?
18      A.  B-R-A-U-N.
19      Q.  He's a board member?
20      A.  Correct.
21      Q.  Which agricultural district is that, or
22  which levee district?  Is that the Vandalia?
23      A.  Vandalia Levee District.
24      Q.  Was there anybody else you talk with over

10  (Pages 34 to 37)

Doug Blankenship
August 31, 2023

Page 38

1  there?
2      A.  Not as of lately, no.
3      Q.  Well, not lately, but how about in the
4  past, who have you spoken --
5      A.  In the past, Ken Cripe.  That was years
6  ago.
7      Q.  And any relation to John Cripe?
8      A.  I don't believe.
9      Q.  How much -- I mean, how often do you do
10  work for the Vandalia Levee District?
11      A.  We did a project for them last fall, I
12  believe it was, and it was mowing their levees.  Not
13  mowing grass; mowing grass with a brush removal
14  excavator.
15      Q.  Okay.  So the mowing brush?
16      A.  Oh, and I take that back.  We also did
17  some drainage work for them this past -- no.  That
18  was last spring, yeah.
19      Q.  Where was that?
20      A.  That was in their levee district.
21      Q.  What did you do?  What type of drainage
22  work?
23      A.  Just cleaning out ditches, existing
24  ditches.

Page 39

1      Q.  So how does that usually work?  They call
2  you and say, "Hey, we need some work done"?
3      A.  Yes.
4      Q.  And then do you walk the property with
5  them?
6      A.  We go out, and we look at it, and we try
7  and formulate some kind of a ballpark cost.  You
8  know, when I say "ballpark" -- this is usually what
9  I tell them.
10      I say, "This could be either -- you know,
11  it might go over this goalpost, or it might come
12  under it."
13      But they usually say, "Hey, that's what we
14  want to get done."
15      I come in by the hour and perform the
16  work, and then once we get done, we invoice them.
17      Q.  Did you ever communicate with them in
18  writing?
19      A.  No.
20      Q.  All on the phone?
21      A.  Yes.
22      Q.  Or in person?
23      A.  Or in person.
24      Q.  So you recall mowing brush in the fall of

Page 40

1  2022, and then you did some drainage work.  When was
2  that?
3      A.  I believe the drainage work was in 2022,
4  and the brush work was in '21.  You have to excuse
5  me on my dates -- my fuzziness -- because I have got
6  a lot of stuff that -- you know, multiple jobs going
7  on.  So I don't know exact dates.
8      Q.  Okay.  In the last five years, what are
9  the other jobs that you recall doing in the levee
10  district?
11      A.  That was pretty much it for quite a while.
12  We haven't done anything for them for several years
13  prior to 2021.
14      Q.  How long have you known Nate Marlen?
15      A.  I've known of Nate Marlen for probably 10,
16  15 years.  I really only got to meet him probably
17  five years ago.
18      Q.  So you've -- wait.  You've known him for
19  10 or 15, but you only met him 5 --
20      A.  I knew of him.
21      Q.  Oh.
22      A.  I talked to him maybe once in that time
23  period 10, 15 years ago.  I knew his dad a little
24  bit.  I would talk to his dad a couple of times.  We

Page 41

1  have ground adjoining each other.  We're kind of all
2  down in that river bottom area.
3      Q.  Now, setting aside the work that was done
4  on the 530 acres that Triangle Grain is renting,
5  what other work have you done -- has Blankenship
6  Construction done for Nate Marlen?
7      A.  We helped him out on some other property
8  down in the southern part of the river bottom of
9  south Vandalia, cleaning out some ditches.
10      Q.  A different property altogether?
11      A.  A different property altogether.
12      Q.  Okay.  What else have you done?
13      A.  That's it.
14      Q.  So cleaning ditches and the work on this
15  property north of Lucas's property is the only work
16  that you've done for Marlen?
17      A.  Yes, yes.
18      Q.  How do you get paid?
19      A.  Invoice, a check.
20      Q.  Still have those?
21      A.  I would assume.
22      Q.  How do you communicate with him?
23      A.  Communicate with Nate?
24      Q.  Yep.

11  (Pages 38 to 41)

Doug Blankenship
August 31, 2023

Page 42

1    A.  Either by phone or in person.
2    Q.  You don't text or email?
3    A.  Oh, yeah, we text.
4    Q.  Have you still got a text chain with him
5  on your phone?
6    A.  I might.
7    Q.  The other work that you did cleaning out
8  ditches, do you remember how much he paid you for
9  that?
10    A.  No.
11    Q.  How long ago was that?
12    A.  That would have been probably somewhere
13  around '21, and if I'm not mistaken on that, I don't
14  believe we actually invoiced Nate on that.
15        We worked out a deal where a couple of my
16  guys went down there just to help him out a couple
17  of days, and I believe Nate paid them guys.  Nate
18  put some fuel in my equipment, and pretty much just
19  helped him out.  There was really no invoice, to my
20  knowledge, on that particular work.  It was only a
21  couple of days.
22    Q.  So two days' worth, and he didn't pay you
23  except for filling up your guys' tanks or your
24  tanks?

Page 43

1    A.  He -- well, no, he didn't.  I mean, we
2  just -- we had equipment down there.  I was working
3  on my own farm, which is adjacent to his.  I was
4  to know if he could use it for a little bit and if I
5  had a couple of guys that was available.
6        And I said, "Yeah, go ahead."  Neighborly
7  deal.
8    Q.  So to be neighborly, you let him use the
9  equipment and the labor?
10    A.  Well, he paid the guys himself, and he put
11  fuel in my equipment when it was all said and done.
12    Q.  Any reason why you didn't run that through
13  Blankenship Construction Company rather than --
14    A.  It was just a neighborly deal.
15    Q.  So now you don't think you received
16  invoices or checks on that?
17    A.  I don't believe so on that one, no.
18        (Exhibit 4 was marked for identification.)
19  BY MR. ST. ONGE
20    Q.  Let me show you what we've marked as
21  Exhibit 4.  It's called "Blankenship Construction
22  Company and Doug Blankenship's combined response to
23  Plaintiff Joe Lucas's interrogatories."
24        Have you seen these before?

Page 44

1    A.  Yes.
2    Q.  And the last page, that's your signature?
3    A.  Yes, it is.
4    Q.  You're verifying the answers you've given
5  are true and correct?
6    A.  Yes.
7    Q.  Okay.  If you go to number 2, Page 2, the
8  question was:  "Please provide a description of all
9  services that you have performed on or behalf or at
10  the request of Nathan Marlen at any time between
11  2020 and the present."
12        You referred in -- your answer is:  "Doug
13  Blankenship, on behalf of Blankenship Construction
14  Company, agreed to complete drainage work on the
15  Marlen property.  This drainage work included the
16  removal of an old concrete structure, which was in
17  years past erected by the Marlen family, which was
18  now impeding the natural flow of drainage on the
19  Marlen property."
20        My question is:  What is "Marlen property"
21  referring to?
22    A.  I don't understand your question.
23    Q.  So when you say "Marlen property," where
24  is that located?

Page 45

1    A.  Marlen property.
2    Q.  Is that the one that you did ditches for a
3  couple of years ago?
4    A.  No.
5    Q.  Okay.  Is this the one that you're
6  farming -- Triangle Grain is farming?
7    A.  Correct.
8    Q.  Okay.  You didn't list the other property
9  on this answer.  I'm just curious.  Is that just
10  something you forgot?
11    A.  Yes, I forgot about it.
12    Q.  So by "Marlen property" in this answer,
13  you're referring to the farmland that's north of Joe
14  Lucas's place?
15    A.  Yes, yes.
16    Q.  That drainage work on the Marlen property,
17  is that still work that's still ongoing?
18    A.  Always -- always is.  When you own the
19  farm ground, you always have to keep your ditches
20  maintained.
21    Q.  Okay.  So that's something that you
22  continue to do?
23    A.  Yes.
24    Q.  And there are ditches around that farmland

12  (Pages 42 to 45)

Doug Blankenship
August 31, 2023

Page 46

1  that you're presently maintaining?
2  **A.  Not on a -- not like on a daily basis.**
3  **It's just as needed.**
4  Q.  Okay.
5  **A.  It's just maintenance.**
6  Q.  Once the property gets full of water, then
7  you go and clear out these ditches?
8  **A.  Once the property gets full of silt and**
9  **we're blocking water, then we have to go in and**
10  **remove it.**
11  Q.  Remove what?  The silt?
12  **A.  The silt, right.  Trees that have fallen**
13  **away.**
14  Q.  Okay.  And this drainage work that you
15  refer to in your answer to number 2, who at the
16  company did this work actually?  Who got the
17  equipment and did this work?
18  **A.  That would have -- well, that was a couple**
19  **of guys down there.  Well, Rex Moreland was one.**
20  MR. BLEYER:  Rex Moreland, you said?
21  THE DEPONENT:  Rex Moreland.
22  BY MR. ST. ONGE
23  Q.  You said a couple of guys.  Who else?
24  **A.  And Randy Hoyle.**

Page 47

1  Q.  Okay.  Who else?
2  **A.  I believe Chris Matthews may have been**
3  **there for a small amount of time, and he didn't run**
4  **any excavation -- or I should say he didn't run any**
5  **track hoes.  He just ran a bulldozer, which was not**
6  **in the ditches.**
7  Q.  Okay.  So when you -- these three
8  employees, these are guys that maintained the
9  ditches all around that property, or are you talking
10  about the south side of the property?
11  **A.  They was on the property maintaining the**
12  **existing ditches that was there throughout the whole**
13  **entire property.**
14  Q.  Okay.
15  **A.  That one particular entrance down there,**
16  **down at the concrete structure was Rex Moreland.**
17  Q.  Got it.  Okay.
18  And, again, this work is all encompassed
19  within that lease that you have with Marlen?
20  **A.  Right.**
21  Q.  No separate invoices or contracts for
22  drainage ditch maintenance?
23  **A.  No.  With Triangle Grain --**
24  Q.  Okay.

Page 48

1  **A.  -- not with Blankenship Construction.**
2  Q.  So all the ditch -- you're saying all of
3  the ditch work was done by Triangle Grain and not
4  Blankenship Construction?
5  **A.  Correct.**
6  Q.  And the employees are employees of both?
7  **A.  Both.**
8  Q.  Both Blankenship Construction and Triangle
9  Grain?
10  **A.  Correct.**
11  Q.  And when your guys do this work, do you
12  communicate with Nate Marlen and tell him
13  specifically what's going on and which ditches
14  you're going to be maintaining and when you're going
15  out there?
16  **A.  Yes.  When we looked at the project, we**
17  **basically had an overview of, well, here's what we**
18  **need to do.**
19  **The drain points, there's very few on this**
20  **farm.  The one drain point that is on the**
21  **farms -- on the west side, there's a tube that goes**
22  **to the large levee, and everything on his farm,**
23  **besides maybe the eastern third, drains through this**
24  **one tube.**

Page 49

1  Q.  Okay.  I'm sorry.  Say that again.  All
2  about -- all except for a third goes through that?
3  **A.  Roughly a third of the acres on the Marlen**
4  **farm drains to the east, which would go into the**
5  **Vandalia Levee District system.**
6  Q.  Okay.
7  **A.  The rest of this property drains down**
8  **through a tube that goes through the levee**
9  **district's levee and then drains onto Nate's western**
10  **90 acres.  I believe it's 90.  And then that is**
11  **carried by a ditch that goes down along the levee**
12  **south to -- that goes to Joe.**
13  Q.  So I'll get a map here in a second.
14  **A.  That would be great.**
15  Q.  It's a good time to do that.
16  (Exhibit 5 was marked for identification.)
17  BY MR. ST. ONGE
18  Q.  And when you told Nate about the work that
19  you were going to be doing, that was near Joe
20  Lucas's property?
21  **A.  Mm-hmm.**
22  Q.  What did you tell him you were going to be
23  doing?
24  **A.  I said we were going to clean this ditch**

13  (Pages 46 to 49)

Doug Blankenship
August 31, 2023

Page 50

1  out that comes through the levee.  There's a tube
2  that comes to this main levee that drains all this
3  water off the east side of the levee.
4      Q.  I'm going to give you a marker here.  I've
5  got a black Sharpie marker here, and I want you to
6  make a circle around the property that you're
7  talking about when you're talking about the Marlen
8  property.
9      A.  The whole entire property or just this
10  piece?
11      Q.  Yeah.  I understand it's -- but go ahead.
12      A.  The picture doesn't have all the property.
13      Q.  Okay.  Well, show us the boundary lines,
14  as you understand it, on this map.
15      A.  Of this 90?
16      Q.  Yes.  The area that you're that -- that
17  Triangle Grain is maintaining.
18      A.  We'll just do this.
19      Q.  Okay.
20      A.  We'll start here.  It almost has it all.
21  I can't really see.
22      Q.  Yeah.  If you back up and get it at an
23  angle --
24      A.  Right here.

Page 51

1      Q.  Well, as I understand, this is Joe's
2  property, right?
3      A.  Yes, it is.  I'm trying to figure out the
4  line.
5      Q.  Got it.
6      A.  Here we go like this, and it goes all the
7  way up here like this, here.  Now, I'm not exactly
8  sure in this timber who owns what, but I'll just for
9  sake of -- the agricultural field I farmed is right
10  here.
11      Q.  Okay.  Is that clear there?  You can
12  see -- this is all pretty well clear?
13      A.  Yes.  That's a field.
14      Q.  That's a field, a pasture?
15      A.  Correct.
16      Q.  All right.  When you say all about a third
17  drains to the east, will you show me where that tube
18  is?
19      A.  Oh, the tube?  Right here.
20      Q.  So this is -- this here, is this a levee?
21      A.  That is a levee.
22      Q.  Okay.  And a tube right there?
23          MR. BLEYER:  When you say "that,"
24  "there," you mean the -- so we know what you're

Page 52

1  marking.
2          MR. DEVORE:  Here we go.
3  BY MR. ST. ONGE
4      Q.  So you're going to put a dotted mark on
5  the levee?
6      A.  That's the levee.
7          MR. DEVORE:  Does it go all the --
8          THE DEPONENT:  Yeah.  The levee
9  continues on down.
10  BY MR. ST. ONGE
11      Q.  And then you transversed that with a mark
12  showing the tube?
13      A.  Right here.
14          MR. BLEYER:  Put a "T" by that.
15  BY MR. ST. ONGE
16      Q.  And two-thirds of the drainage goes
17  through that; is that right?
18      A.  That is correct.
19      Q.  Okay.  And then where does the rest drain?
20      A.  The rest would come over here off this
21  picture into a ditch.  Over here it's a levee
22  district.
23      Q.  And off of that pasture, there's no other
24  drainage area?

Page 53

1      A.  Here?
2      Q.  Yes.
3      A.  No.
4      Q.  Okay.
5      A.  I mean -- I mean, little ones here and
6  there, but the majority of all this drains -- this
7  is the Kaskaskia River.  This all drains --
8      Q.  Yeah.  That's marked.  Just for the
9  record, that's all marked, but . . .
10      A.  All the farm ground, in general, and them
11  river bottoms fall with the flow of the river.  So
12  the river is running south, and everything wants to
13  come south in the farm fields.
14          From this point right here to this tube
15  right here, which is --
16      Q.  And the point there is up at the --
17      A.  That would be the north, the extreme
18  northeast corner of the Marlen family farm.
19      Q.  Okay.
20      A.  There is approximately a foot and a half
21  of fall from here to here, which would be close to
22  half a mile.  So as you can imagine, this is all
23  really flat.  So, roughly --
24      Q.  And you're marking -- what are you marking

14  (Pages 50 to 53)

Doug Blankenship
August 31, 2023

Page 54

1 just for the record?  Is that --
2    A.  This is -- I'm going to say this is,
3 roughly, what drains back this direction.
4    Q.  Okay.
5    A.  The rest of this.
6    Q.  You've put three marks going to the right,
7 okay?  Just for the record here.
8    A.  Okay.  The rest of this area here wants to
9 flow this direction, all coming to this tube that
10 goes through the levee.
11    Q.  Okay.  So all this water that you've
12 marked as falling down this way, that goes onto --
13    A.  That goes through a tube.
14    Q.  The farm property?
15    A.  Right.  That goes through a tube that is
16 owned by the Vandalia Levee District, and it comes
17 right here.  And as soon as it exits the end of the
18 tube, there's an existing ditch that runs right down
19 along the west side of the levee.
20    Q.  Yes.  Can you put a "D" right next to
21 that?  Would you --
22    A.  [Deponent indicated.]
23    Q.  Okay.  So there's a ditch that runs
24 north-south then?

Page 55

1    A.  Yes.
2    Q.  And that connects eventually then to the
3 Kaskaskia River?
4    A.  Yes.  I believe that would be on Joe's
5 property, right approximately right here.
6    Q.  Okay.  And that ditch -- how is that ditch
7 created?  Did you create that ditch?
8    A.  No.  That ditch was there for -- years
9 ago.  I would assume that -- what I've been told by
10 the Vandalia Levee District is that ditches along
11 there -- any ditches along the levees was made to
12 enhance drainage when they built the levee system.
13    Q.  And where do you understand Joe Lucas's
14 property to be?  You can draw a circle where you
15 believe his property to be.
16    A.  [Deponent indicated.]
17    Q.  Put an "L" in the middle of that, would
18 you?
19    A.  [Deponent indicated.]
20    Q.  Okay.
21       (Exhibit 6 was marked for identification.)
22 BY MR. ST. ONGE
23    Q.  Let me show you another one that we've
24 marked as Exhibit 6.  This is a Google aerial map.

Page 56

1 It's a blowup of that portion of that field that
2 you've --
3    A.  Correct.
4    Q.  That you maintained; is that right?
5    A.  Yes.
6    Q.  And can you show us the boundary line, as
7 you understand it, between the property line
8 that -- between what Marlen owns and what Joe Lucas
9 owns?
10       MR. HASENSTAB:  I hate to interrupt,
11 but just for clarification, can we show where north
12 is on this?
13       MR. DEVORE:  I did on that mine, too,
14 if that's what you're asking.
15       MR. HASENSTAB:  I apologize for
16 interrupting.  My confusion.
17       Go ahead.  I'm sorry.
18       THE DEPONENT:  As I understand the
19 boundary line, not being a surveyor, I'm assuming
20 it's by going off of this property line by crossing
21 the east side of the levee.  It runs through here
22 approximately like this.
23 BY MR. ST. ONGE
24    Q.  And above that is the Marlen property, and

Page 57

1 below that is the Lucas property?
2    A.  Correct.
3    Q.  Okay.  And why don't you just put an "L"
4 up on the -- the below.
5    A.  [Deponent indicated.]
6    Q.  And you've not seen a survey, correct --
7    A.  No.
8    Q.  -- to show what the actual line is?
9    A.  No.
10    Q.  But it's roughly -- that line that you've
11 drawn is roughly where?
12    A.  Roughly.
13    Q.  Where the trees begin; is that right?
14    A.  Right, correct.
15    Q.  Okay.  You can set those aside for now.
16       Now, at some point in the --
17       MR. BLEYER:  May we sit down?
18       MR. ST. ONGE:  It's up to you.
19 BY MR. ST. ONGE
20    Q.  At some point in the spring or the summer
21 of 2021, I understand from your interrogatory
22 answers in this case that Rex Moreland, a
23 Blankenship employee, entered the Lucas property to
24 do some drainage work?

15  (Pages 54 to 57)

Doug Blankenship
August 31, 2023

Page 58

1    **A.  A Blankenship and Triangle Grain employee.**
2    Q.  Okay.  So he's an employee of both
3    companies?
4    **A.  Mm-hmm, yes.**
5    Q.  And he's the only one that entered and did
6    some property drainage -- or did some drainage work
7    at this time; is that right?
8    **A.  Rex was working on this stretch of this**
9    **ditch down through Marlen.**
10   Q.  Okay.
11   **A.  Randy --**
12   Q.  Why don't you make a mark on there and
13   show me what you're talking about.
14   **A.  [Deponent indicated.]**
15   Q.  Anytime you make a reference on the map,
16   it's not going to come through.
17   **A.  Roughly starting here, going down to**
18   **there.**
19   Q.  So Rex was doing work on that ditch on
20   that map that you've marked?
21   **A.  Correct.**
22   Q.  And was Rex being paid by Blankenship for
23   this work that he did?
24   **A.  I believe at that point in time he was**

Page 59

1    **being paid by Triangle.**
2    Q.  Okay.  And did you have a -- did you have
3    some -- that would be -- all be in some payroll
4    records, right?
5    **A.  Potentially.**
6    Q.  He received checks from Blankenship
7    Construction and also from Triangle Grain?
8    **A.  Yes, either a paycheck, or sometimes we**
9    **did cash.**
10   Q.  Okay.  And what would decide whether you
11   did a paycheck or cash?
12   **A.  Well, whatever he wanted that week.**
13   Q.  Yeah, okay.
14        MR. BIERMAN:  I tell you what.  Let's
15   take a quick break.  Can we?
16        MR. BLEYER:  Before we go off the
17   record, can you have him-- is it all right if he
18   writes "Rex" on that line where he said that Rex was
19   doing the work?
20        MR. ST. ONGE:  Go ahead.
21        MR. BLEYER:  Sorry.
22        MR. DEVORE:  Can you point out is
23   that the levee, or is that the actual ditch?
24        THE DEPONENT:  The levee you

Page 60

1    see -- the levee is right here.  You can see that
2    lighter green streak right here?
3    BY MR. ST. ONGE
4    Q.  So why don't you just write a line next to
5    that and put --
6    **A.  I'll dash it.**
7    Q.  Okay.  On Exhibit 6, you're putting a dash
8    on the levee?
9    **A.  [Deponent indicated.]**
10        MR. BLEYER:  Are you taking a break?
11        MR. ST. ONGE:  Yeah, just a minute.
12        (A short break was taken.)
13   BY MR. ST. ONGE
14   Q.  Back on the record.
15        So we were talking about before the break
16   about Rex Moreland -- I'll let you finish up on your
17   phone.
18   **A.  Oh, go ahead.**
19   Q.  And we were talking before the break about
20   Rex Moreland.
21   **A.  Yes.**
22   Q.  And you said he went on to the property in
23   the summer of 2021 is what you said in your
24   interrogatory answer, and you confirmed it today.

Page 61

1    My question is:  Who was it that was
2    paying Rex for the work that he did on the south
3    side of Marlen's property -- on Lucas's property in
4    the summer of 2021?
5    **A.  I can't recall exactly who paid him that**
6    **week.**
7    Q.  Would there have been a record?  Either of
8    these companies would have a record of payment?
9    **A.  Yes.**
10   Q.  Okay.  And you said sometimes he was paid
11   in cash, and sometimes he was paid through the
12   company through a check?
13   **A.  Right.**
14   Q.  When you pay him by cash, do you withhold
15   taxes?
16   **A.  No.  It's usually under -- we keep**
17   **underneath like a hundred bucks.  You know, if he**
18   **needs a hundred dollars here or there, you know, for**
19   **a day's worth of work, something like that, that's**
20   **what we do.**
21   Q.  So you just paid him a hundred dollars to
22   do a day's worth of work?
23   **A.  I mean, depending on how many hours he**
24   **worked, yes.  It could be a hundred, two hundred.**

16  (Pages 58 to 61)

Doug Blankenship
August 31, 2023

Page 62

1    Q.  And he's the one dictating whether he gets
2    paid in cash or whether he gets paid formally?
3        **A.  Yes, whenever he needed some cash for**
4    **whatever personal needs he needed.**
5        Q.  And he couldn't just get that through a
6    check?
7        **A.  I assume he could.**
8        Q.  And anytime he asked to be paid with cash,
9    you guys would oblige him and pay him with cash?
10       **A.  If we could -- if we had it, you know, if**
11   **I had it in my pocket.**
12       Q.  And when you pay him with cash, you're not
13   making a record of what his taxes are; is that
14   correct?
15       **A.  No.**
16       Q.  Sorry.  You're saying "no," but am I being
17   correct?
18       **A.  Yes.**
19       Q.  So if you paid him in cash, you wouldn't
20   have a record of whether that was paid through
21   Triangle Grain or if that was paid through
22   Blankenship; is that correct?
23       **A.  That's correct, right, and that was done**
24   **rarely, very rarely, on occasion.**

Page 63

1    Q.  Was that done here?
2        **A.  I couldn't tell you.  I don't remember.**
3        Q.  But you would have records --
4        **A.  If he was paid through Blankenship**
5    **Construction on that certain date on that job, which**
6    **I don't know if we can pin it down to the exact day,**
7    **then there would be record.**
8        Q.  Okay.  And if he was -- alternatively, if
9    he was paid through Triangle Grain -- I'm sorry.  I
10   don't know if you said "Blankenship."
11       If he was paid by either one of those
12   companies for that work, you'd have a record of it?
13       **A.  Yes.**
14       Q.  And sitting here today, you don't know
15   which company was paying?
16       **A.  I can't remember, no.  I'm assuming that**
17   **he was probably paid by a check through Blankenship**
18   **Construction on this.  I'm assuming that.**
19       Q.  And why do you say that?
20       **A.  Because we was doing several other**
21   **projects around at that time to where we wasn't**
22   **going to mix up that arrangement, so to speak,**
23   **because I believe at that time, we may have been**
24   **doing a few odds and ends for other people in that**

Page 64

1    area.
2        Q.  Okay.  As far as you know, looking at the
3    south side of the property next to the Lucas
4    work -- next to the Lucas property -- Rex Moreland
5    was the only one doing work in that area?
6        **A.  Yes.**
7        Q.  You weren't there when he was doing that
8    work?
9        **A.  No, no.**
10       Q.  Do you know if Rex ever spoke with Nate
11   Marlen about that work that he was doing?
12       **A.  I do not know that.**
13       Q.  Would that be odd to you if Rex and Nate
14   were talking, or would that seem --
15       **A.  Well, I mean, it's -- I mean, Nate -- and**
16   **they interacted whenever Nate was around.  You know,**
17   **he wasn't there -- rarely during his project.  I**
18   **instructed Rex on what to do.**
19       Q.  Okay.  Let's talk about that.
20       Did you walk the property with Rex and
21   say, "This is what we need to have done?"  Or did
22   you just tell him this is what --
23       **A.  I just told him.**
24       Q.  You weren't on the property with him?

Page 65

1        **A.  Not at that time, no.**
2        Q.  Okay.  And what did you tell him needed to
3    be done?
4        **A.  I told him to go to the south end of that**
5    **ditch that he was cleaning out, and there was a**
6    **concrete structure there in the ditch.  I said to go**
7    **ahead and remove that.**
8        Q.  And you just told him that?  You didn't
9    show him a map; you didn't point it out to him?
10       **A.  No, I did not.**
11       Q.  You just said, "Walk to the bottom of
12   that, and you'll see a concrete structure"?
13       **A.  As you're working down the ditch cleaning**
14   **this ditch on Nate Marlen, when you get down there,**
15   **you will see an old concrete structure in the ditch**
16   **line.**
17       Q.  How do know there was a concrete structure
18   in there?
19       **A.  Because I've discussed this with Nate, and**
20   **you could see it on the maps, and I had seen it**
21   **prior to that whenever I went and had looked at the**
22   **property.**
23       Q.  Okay.  So let's talk about that.  When did
24   you go down and look at the property?

17 (Pages 62 to 65)

Doug Blankenship
August 31, 2023

Page 66

1      A.  I don't know the exact date.  It was prior
2  to the work in '21.
3      Q.  If you go to Exhibit Number 4 --
4          MR. HASENSTAB:  Which one is that at?
5          MR. ST. ONGE:  The interrogatories.
6          MR. HASENSTAB:  Okay.
7  BY MR. ST. ONGE
8      Q.  Yeah, if you flip to the first page.
9          So you're identified here in the answer to
10  the question that asks for the people, the employees
11  or agents of Blankenship who entered the Lucas
12  property, and your answer says that you met with
13  Plaintiff on or about February 2022 to discuss
14  removal of the concrete structure and entered into
15  an agreement to perform certain services on behalf
16  of Plaintiff.
17          Do you see that, that you wrote that
18  there?
19      A.  Yes.
20      Q.  Okay.  And you're not listed?
21      A.  Wait a minute.  Let's just -- to verify.
22      Q.  Yeah.
23      A.  That wasn't to meet with him to remove the
24  structure.  The structure might have been removed at

Page 67

1  that time.
2      Q.  Okay.
3      A.  This was a meeting to --
4      Q.  I understand that.
5      A.  Okay.
6      Q.  But you said that you had been on the
7  property another time?
8      A.  Yeah.
9      Q.  Okay, but that's not listed in your answer
10  here?
11      A.  Well, I mean, I looked at the property
12  prior to doing any work.
13          MR. DEVORE:  Can we clarify
14  "property," please, whether it's Lucas or Marlen?
15  BY MR. ST. ONGE
16      Q.  Where the concrete structure --
17      A.  I assumed that concrete structure was on
18  Marlen property because, at that time, there was no
19  survey.
20      Q.  Okay.  Did you ask Nate Marlen:  "Hey, is
21  that concrete structure" --
22      A.  No, I did not.  We -- me and Nate and his
23  father, Jim, had a meeting in the office.
24      Q.  When was this?

Page 68

1      A.  It was prior to the work.
2      Q.  Okay.  How far before?  This work happened
3  in the summer of 2021.  When was the meeting?
4      A.  Spring maybe --
5      Q.  Okay.
6      A.  -- okay?
7          So as a group that we collectively decided
8  that -- on this drainage work, I asked Jim and Nate
9  about the structure that was down there.
10          I said, "Hey, this thing, I've seen it.
11  It's blocking."
12      Q.  That's what I want to know.  When did you
13  see it for the first time?
14      A.  I would assume in the spring of '21.
15      Q.  So you're walking on the property?
16      A.  Yeah, I've seen it.  I've seen it.
17      Q.  Tell me about that.  Beforehand you saw
18  it.  Like, you walked down there; you saw it.  Were
19  you walking all around that property at that point?
20      A.  Not all around that property at that
21  point.  I was looking at it because I was always
22  looking at Google Maps, and I can identify where.
23          MR. BIERMAN:  Just to be clear, when
24  you say "property," say "Lucas property."

Page 69

1          MR. ST. ONGE:  Thank you.  So good
2  point.
3  BY MR. ST. ONGE
4      Q.  So we're talking about the Lucas property,
5  and you're walking around the Lucas property?
6      A.  No, I was not walking on the Lucas
7  property.
8      Q.  Okay.
9      A.  I was on Jim Marlen's property, the Marlen
10  family farm, looking at the structure in the ditch.
11      Q.  So if you pull up that map that you've
12  got -- Exhibit 6 -- where are you standing where you
13  can see that structure?
14      A.  Approximately right here.
15      Q.  Put a mark there.
16      A.  [Deponent indicated.]
17      Q.  Okay.  And you can see the structure?
18      A.  Yes.
19      Q.  That's -- you didn't go further south than
20  that?
21      A.  Me personally, no.
22      Q.  Right.  You couldn't actually go down
23  there, touch the concrete structure?
24      A.  No.

18  (Pages 66 to 69)

Doug Blankenship
August 31, 2023

Page 70

```
 1        Q.  Look in the ditch, nothing?
 2        A.  You could see it.  You could visually see
 3   it from standing right here in the ditch.
 4        Q.  Okay.  So you were not standing in the
 5   ditch next to the concrete structure at any point?
 6        A.  No.
 7        Q.  Even at any point?
 8        A.  No.
 9        Q.  Okay.
10        A.  I was not down in the ditch physically
11   looking at it and touching it, no.
12        Q.  Okay.
13        A.  I was standing up in the field looking at
14   it from the field.
15        Q.  How far away would you say that is?  A
16   hundred feet?
17        A.  Yeah.  I mean, a hundred, 200 feet.  It
18   was very visible in the ditch.
19        Q.  This is the springtime?
20        A.  I believe so.
21        Q.  I mean, is there any vegetation that's
22   there at that point?  I mean, is it -- the leaves
23   are off the trees still, or are they still on the
24   trees?
```

Page 71

```
 1        A.  They was -- they was maybe just starting
 2   to come onto the trees.
 3        Q.  And tell me about the conversation that
 4   you had with Nate and his father.
 5        A.  So collectively whenever we decided to
 6   enter into an agreement to do the drainage work
 7   for -- in lieu of some reduced rent on the cash rent
 8   of the ground, I said this concrete structure is
 9   down here in this ditch that's holding back water,
10   and, actually, it was holding it back enough that
11   the water was actually draining around it and was
12   cutting -- trying to cut another ditch because it
13   was so dilapidated, it had the ditch blocked off,
14   and it was backing up silt and water.
15            Jim at that point said, "Yeah, I put that
16   in years ago thinking we was going to try and flood
17   it for duck hunting."  And he said, "It didn't
18   really work out."  He said, "Go ahead and take it
19   out."
20        Q.  Jim Marlen told you that he put that
21   concrete structure in there?
22        A.  Yes.
23        Q.  Did he tell you when he did that?
24        A.  It was years and years ago.  I'm not sure
```

Page 72

```
 1   of the date.
 2        Q.  Did you know if he ever owned that
 3   property where he put that concrete structure?
 4        A.  I have no recollection whether he owned it
 5   or he didn't.
 6        Q.  Did he tell you what it was?  I mean, just
 7   a piece of concrete, or was it something that was --
 8        A.  It was, like, tubes going through a
 9   concrete and armored-up tubes to try, and, you know,
10   protect it with a sluice gate that would be able to
11   drop the sluice gate to hold back water to flood
12   this area for ducks.
13        Q.  To flood which area?  The north area?
14        A.  The north area.
15        Q.  So you could block off the ditch in order
16   to create flood north of that?
17        A.  Yes.
18        Q.  Okay.  And he told you that was there, and
19   what did he tell you about it?
20        A.  He told me that he had put it in there
21   years ago, and it was -- they never did use it, and
22   now it's been years.  It's dilapidated.  It fell in,
23   and it was blocking water.
24            He said, "I put it in."  He said, "Get it
```

Page 73

```
 1   out of there if you want to get it out of there."
 2            Well, I suggested we get it out of there.
 3   You know, that's our problem right here.  That's our
 4   problem child.
 5        Q.  And who told you this?  Nate?
 6        A.  No, Jim.
 7        Q.  Jim Marlen.
 8        A.  Jim Marlen said he put it in there.
 9            And I said, "Well, I would suggest you
10   pull it out of there."
11            And he said, "Pull it out of there if you
12   want to pull it out of there."  So I pulled it out
13   of there.
14        Q.  Well, who made the suggestion to pull it
15   out?  Jim?
16        A.  I made the suggestion to pull it out.
17        Q.  And he told you what in response?
18        A.  He told me that he put it in there years
19   ago.
20            He said, "If you want to pull it out, pull
21   it out."
22            I said, "Well, that's our problem.  We've
23   got to pull it out."
24        Q.  Okay.  Was Nate in the room at this point?
```

19  (Pages 70 to 73)

Doug Blankenship
August 31, 2023

Page 74

1      A.  Nate was in the room at that point, and he
2  never said anything.
3      Q.  Okay.  How long was that meeting?
4      A.  An hour.
5      Q.  Was anybody else there apart from the
6  three of you?
7      A.  Just the three of us.
8      Q.  And what happened next then?
9      A.  We agreed on what we was going to do next
10  on the farm, and they left.
11      Q.  And with respect to the area on the Lucas
12  property, was the removing the concrete structure
13  the only thing that you discussed at that meeting
14  with the two Marlens?
15      A.  I can't recall what all we discussed.  I
16  mean, we may have discussed the other drainage work
17  that was going on, on the other side of the levee,
18  yeah.
19      Q.  Did you discuss increasing the size of the
20  ditch on the Lucas property?
21      A.  No, we did not discuss it.  We did not
22  know that that was the Lucas property where the
23  concrete structure was at.
24      Q.  You never asked him who owns the property

Page 75

1  south --
2      A.  No, no.
3      Q.  I'm sorry.  Let me finish my question.
4      A.  Okay.
5      Q.  You never asked Nate or Joe -- I'm
6  sorry -- Nate or Jim Marlen who owns the property
7  south of the farmland?
8      A.  I was told previously that it was Joe
9  Lucas's property.
10      Q.  Who told you that?
11      A.  Nate.
12      Q.  Okay.
13      A.  And Jim.
14      Q.  Okay.  And at that same meeting?
15      A.  No.  This would have been prior to that.
16      Q.  Okay.  And so you were told that the land
17  south of the Marlen property was the Lucas property?
18      A.  Yes.
19      Q.  That would include the area where the
20  concrete structure was?
21      A.  That would include, yes, now
22  knowing -- looking back, that would include where
23  the concrete structure was, but at that time there
24  was no survey markers.  We didn't know, and Jim said

Page 76

1  he put the structure in years ago.
2      Q.  And when Jim told you that it was owned,
3  did he -- when Jim told you that Lucas owned that
4  property south, did he tell you where the boundary
5  line was?
6      A.  No.
7      Q.  He just said what?
8      A.  He said that he put that structure in
9  years ago.
10          And he said, "If you want to get it out of
11  there, get it out of there."
12          I said, "Well, that's our problem.  I
13  highly suggest we pull it out of there."
14      Q.  Right, and I understand you're talking
15  about that.
16          My question is about where the Lucas
17  property line began, and you didn't have a
18  discussion with Jim or Nate about that?
19      A.  No.  No, we did not.
20      Q.  Nobody said like, "Hey, those woods there
21  are Lucas's"?
22          I mean, when you say they told you that
23  the land of the south was Joe's, what -- I mean, did
24  you ask them:  "Well, where is the line?"

Page 77

1      A.  No, I did not.
2      Q.  Did you know where the line was?
3      A.  No.  There was no marks, no surveys, no
4  nothing.  I just assumed that when Jim said that he
5  put that structure in years ago in the ditch, that
6  that must have been either on the line or on Jim.
7      Q.  Okay.  And so you said, "We've got to pull
8  that structure out"?  That was what you recommended?
9      A.  That is what I recommended.
10      Q.  When you discussed that boundary line, did
11  you know that Jim or Nate did not know where the
12  boundary line was?
13      A.  We didn't discuss the boundary line.
14      Q.  Did you do any independent work to figure
15  out where that boundary line was?
16      A.  No.
17      Q.  You knew you were close to Joe Lucas's
18  property line?
19      A.  I assumed that it was on the line.  I
20  didn't know how Jim would have put it on the line or
21  where it was at.  That didn't -- that was done years
22  ago.
23      Q.  You didn't bother to look into that?
24      A.  No.

20  (Pages 74 to 77)

Doug Blankenship
August 31, 2023

Page 78

1    Q.   At the time of this meeting, do you know
2  that Jim or Nate did not know where the boundary
3  line is between the Marlen property and the Lucas
4  property?
5    A.  Do they know now?
6    Q.   No, at the time of the meeting.  Did you
7  know that they --
8    A.  I did not know if they knew where the line
9  was.  No, I don't know.
10   Q.   And, again, you didn't look for -- you
11 didn't ask them for a survey or nothing?
12   A.  I did not ask them for a survey.  That's
13 typically not what we do.
14     I mean, you know, whenever we're working
15 on somebody's property, you know, we try and watch
16 what we're doing as far as the neighboring property,
17 but in this situation where it was right down at the
18 bottom of Jim's property, and it was right there
19 where Jim said he put that structure in years ago,
20 we just -- I just figured that was on Jim, or it was
21 on the line or whatever.
22   Q.   You just took Jim and Nate's word for it?
23   A.  I took their word for it that they put
24 that structure in years ago.  They never told me

Page 79

1  where the line was at.
2    Q.   But you knew you were close?
3    A.  I figured we was close, yes.
4    Q.   And in your discussions -- so after that
5  meeting, you went back and talked to Rex?
6    A.  Correct.
7    Q.   What did you instruct Rex to do?
8    A.  I instructed Rex to go down there as he
9  worked his way towards this structure.
10     I said, "When you get to that structure,"
11 I said, "Go ahead and get that pulled out of there."
12 I said, "If you've got to clear it" -- there was
13 some trees growing around it a little bit on the
14 back side.  It had silted in on the back side of it.
15     Like I said before, the water was wanting
16 to jump out around the structure and go down onto
17 Joe kind of willy-nilly.  There wasn't -- from this
18 point on, there was a little bit of a ditch kind of
19 established.  When I say "a little bit," it was
20 silted in, but once it gets so far in there, then it
21 just pretty much kind of spreads out.
22   Q.  Okay.  So --
23   A.  There's really not a, per se, ditch until
24 you get down to the -- if you look on a clear map.

Page 80

1  If you get down to the river --
2    Q.   So my question -- I think you're getting
3  far afield.
4      My question is:  What did you tell Rex?
5    A.  I told Rex to go ahead and pull that
6  structure out, and then go ahead -- if there's some
7  brush around it, whatever you've got to do to get to
8  that structure, go ahead and take out a few trees,
9  keep it at a minimum as possible.
10     And I said, "Clean it up, pull it out of
11 there and take care of it and open up anything on
12 the back side so it looks like we've got a little
13 bit of drainage going through there."
14   Q.   And when you say "open up a little bit on
15 the back side," what do you mean by that?
16     MR. BIERMAN:  That's not what he
17 said.  You just restated his testimony.  Ask him the
18 question.
19     MR. ST. ONGE:  Can you --
20     MR. BIERMAN:  Have her read it back.
21     THE REPORTER:  The answer?
22     MR. ST. ONGE:  Yes.
23     THE REPORTER:  Okay.
24     "I told Rex to go ahead and pull that

Page 81

1  structure out, and then go ahead -- if there's some
2  brush around it, whatever you've got to do to get to
3  that structure, go ahead and take out a few trees,
4  keep it at a minimum as possible.
5      And I said, 'Clean it up, pull it out
6  of there and take care of it and open up anything on
7  the back side so it looks like we've got a little
8  bit of drainage going through there.'"
9  BY MR. ST. ONGE:
10   Q.   You said open up on the back side?
11   A.  Right.
12   Q.   On the south side of that concrete
13 structure?
14   A.  Immediately adjacent to it because the
15 silt is collecting around the back side of it.
16   Q.   You told him just to take out anything
17 that was back there?
18   A.  "Take out the concrete structure, anything
19 in the existing ditch behind the structure as far as
20 silt or trees that may have been growing in there.
21 Just pull that out of that ditch, get it out of the
22 way.  If you have to take out a few trees to get to
23 it because you've got a big machine, then we may
24 have to take out a few trees to get to it."

21  (Pages 78 to 81)

Doug Blankenship
August 31, 2023

Page 82

1    I said, "Do as minimal as possible. Get
2    it out, get it cleaned up. Call it a day."
3        Q. And did he -- while he was working on
4    this, did he ever call you and ask you for guidance?
5        A. No. Rex is a veteran hand. I didn't have
6    to worry about him. He knew. I didn't have to
7    babysit him.
8        Q. And, again, you never walked the property
9    with him to discuss any of this?
10       A. No.
11       Q. Correct?
12       A. Correct.
13       Q. Do you know if anybody else ever walked it
14   with Rex before he started to work?
15       A. No.
16       Q. And after he did -- did he report back
17   what he did?
18       A. Yeah. I mean, every day we talked, and
19   I'd say, "Hey, did you get that structure out?"
20           And he said, "Yeah, got it out. Got it
21   taken care of."
22       Q. Did you ask to take any pictures?
23       A. No.
24       Q. Do you know if he did take any pictures?

Page 83

1        A. No.
2        Q. Did you know what equipment he brought
3    with him for that work?
4        A. That would have been a Caterpillar 323
5    excavator.
6        Q. Is that Blankenship Construction
7    equipment?
8        A. Yes, it was.
9        Q. Do you know how long he was on Lucas's
10   property?
11       A. No, I don't.
12       Q. Do you know how long it took him to remove
13   that concrete structure?
14       A. I'm going to guess. I'm going to say
15   maybe four hours.
16       Q. And how do you know that?
17       A. Just by my recollection of seeing the
18   structure, and I kind of know what it takes to do
19   things as far as machine time, and I'm just kind of
20   guesstimating that's what he had in it. Probably
21   around four hours.
22       Q. But he didn't report back to you after
23   that?
24       A. No. I mean, other than, yes, I would say

Page 84

1    he reported back and said, "Hey" -- you know, we
2    discussed every day what happens, and he tells me
3    that he got it taken care of and end of story.
4        Q. Is that as far south as he went in doing
5    that ditch was that concrete structure?
6        A. To the concrete structure and just a
7    little past probably, I'm going to say, maybe
8    50 feet.
9        Q. 50 -- he did what in those 50 feet?
10       A. Removed any silt, anything that was
11   collected on the back side of the structure.
12       Q. Inside the ditch?
13       A. Inside the ditch.
14       Q. He was removing debris or material from
15   the back side of that structure in the ditch?
16       A. Correct.
17       Q. And what did he do with all that, the
18   debris?
19       A. He pulled it up on the west side of the
20   ditch in the area that he had to get into, and he
21   kind of graded it out.
22       Q. Do you know how he got into the property,
23   from which direction?
24       A. Yeah. He got -- come in from the north on

Page 85

1    the west side of the ditch. It would have been
2    right down through here like this.
3        Q. Okay. Were you on the Marlen property at
4    all that day when he was doing that work?
5        A. No.
6        Q. Do you guys keep records of how much time
7    is spent on the hour meters on the equipment for a
8    particular job?
9        A. Not off the hour meter.
10           Whenever we go in and we start out the
11   day, they usually get started at 7:00 o'clock. They
12   will work until 3:30.
13           And then we -- I'll ask them -- I'll say,
14   "Okay. What portion was you on?"
15           And he'll say or whomever it may be will
16   say, "Well, I worked on X, Y, Z ditch."
17           And then the next day if they move
18   somewhere else, I'll say, "Well, how much time did
19   you have on that ditch?"
20           So what would have happened here, he would
21   have been on this stretch down through Marlen for
22   probably a couple, three days, getting this cleaned
23   out from that tube going down through there, the
24   existing ditch, and whenever he got down to here, he

22  (Pages 82 to 85)

Doug Blankenship
August 31, 2023

Page 86

1    took care of the structure.  That would have been
2    about the last day that he worked on that side of
3    the farm, I'm assuming, on that -- on that stretch
4    of ditch, because we worked our way through this
5    direction from the north going to the south.
6        Q.  Are there records kept of what people did
7    each day?
8        A.  No, not on these private projects.
9        Q.  It's just a report to you, a verbal
10   report?
11       A.  Yeah, yeah.  So we make sure that whenever
12   we go to -- in other instances when we invoice, that
13   we can capture the time of the work done.
14       Q.  But you didn't make an invoice here?
15       A.  No.
16       Q.  So you don't have any records of actual
17   work that Rex did on that side of the property --
18       A.  No.
19       Q.  -- that day?
20       A.  No.
21       Q.  You don't even know which day it was?
22       A.  No.
23       Q.  Okay.  So you said that he -- do you know
24   whether he took out some trees while he was on the

Page 87

1    way down there on the Lucas property next to that
2    concrete structure?
3        A.  Yes.
4        Q.  How many did he take out?  Do you know?
5        A.  I don't know.  I'm going to say, I'm going to say probably
6    recollection wise, when -- I'm going to say probably
7    anywhere from 6 to 12 trees.
8        Q.  You said "recollection wise."  Did you
9    ever see?
10       A.  For me looking at that structure that day
11   and knowing that that machine is going to have to
12   get into there to get this taken care of, there may
13   have been 6 to 12 trees in there that need to be
14   taken out.
15       Q.  And you counted those?
16       A.  I didn't count them.  I'm just assuming.
17       Q.  So you don't actually know how many trees?
18       A.  There was probably multiple, little trees
19   that was the size of your thumb to your wrist that
20   was behind the structure that we're talking that had
21   grown there that was clogging up the back side of
22   the structure.
23       Q.  So when you say it was six to ten trees,
24   those are mature trees?

Page 88

1        A.  Anywhere from, like, 10- to 12-inch to
2    maybe 16-inch trees, diameter.
3        Q.  Right.
4        Do you know what he did with those trees?
5        A.  Put them in a pile right there.
6        Q.  Why don't you make a little mark on that
7    Exhibit 6.
8        A.  And I believe he piled them on Joe at that
9    time, because we did end up removing that pile and
10   cleaning that area up a little bit better.  So I
11   know the pile was on Joe.
12       Q.  It was on Joe's property that we're
13   seeing?
14       A.  Yes.  After the fact knowing where the
15   property line was and in discussions when we went
16   back to clean it up and make sure everything was
17   taken care of, we did remove that pile, and I
18   believe we brought it up onto Nate.
19       Q.  Now, in your answer in this case, you've
20   said that they were all softwood trees or otherwise
21   valueless hardwoods; is that right?
22       A.  Yes.
23       Q.  What kind of hardwoods were these?
24       A.  I believe there wasn't any hardwoods in

Page 89

1    there.
2        Q.  You said they were valueless hardwoods.
3        A.  Well, the only hardwoods that would be
4    down there is predominantly black oak.  That's a
5    hardwood, but black oak is not used for veneer.
6    It's more or less used for blocking material.
7        Q.  How do you know which trees were taken
8    down?  Is that based only on you standing on
9    Marlen's property and looking at the structure?
10       A.  Yes.
11       Q.  And how do you know that these hardwoods
12   were valueless?
13       A.  Just from past experience being in that
14   area and talking to loggers, and, you know, knowing
15   the variety of trees.  And I'm not a logger,
16   so . . .
17       Q.  Did you see the pile of trees?
18       A.  After I met -- yes.  The day I met with
19   Joe down there to look at this, I did see the pile
20   of trees.
21       Q.  That was a year later?
22       A.  Yeah.
23       Q.  Now, did Blankenship Construction ever ask
24   Joe Lucas if its folks could enter onto his

23  (Pages 86 to 89)

Doug Blankenship
August 31, 2023

Page 90

1  property?
2  **A.  I never asked Joe Lucas that, no.**
3  Q.  And why not?
4  **A.  I did not know where the property line was**
5  **at that time.  I didn't realize that we was on Joe.**
6  Q.  Now, Nate Marlen has said in this case in
7  his interrogatories, similar to the ones that you
8  answered -- he said that before the work started,
9  you asked specifically who owned the property to the
10  south, and he said it was Joe Lucas.
11  **A.  Okay.**
12  Q.  And to give -- and he gave you his phone
13  number; is that true?
14  **A.  I believe so, yes.**
15  Q.  So you specifically asked; he said it was
16  Joe Lucas and said, "Here's his phone number"?
17  **A.  Right.**
18  Q.  Did you call Joe Lucas?
19  **A.  No.**
20  Q.  Why not?
21  **A.  I didn't know that I had a reason to at**
22  **that time.  I didn't know I was on his property.**
23  Q.  Then why did you ask who owns the property
24  to the south?

Page 91

1  **A.  I believe we had discussions on other**
2  **topics of where Joe owned.  You know, I think he**
3  **owned this piece because we was doing other little,**
4  **minor work around the field.  And he said Joe**
5  **owns -- I believe up here in this corner.  So I**
6  **mean, I kind of wanted to know from the aspect of**
7  **where I'm at, who's where, what.  That's basically**
8  **it.**
9  Q.  Because you wanted to make sure that you
10  stayed off of somebody else's property, right?
11  **A.  Yes.**
12  Q.  And so you asked him; he gave you the
13  name, but you didn't actually call Joe to ask him?
14  MR. DEVORE:  Objection.  You've asked
15  this question, like, ten different ways, counsel.
16  But go ahead.
17  THE DEPONENT:  No, I don't believe
18  that I actually called Joe to verify where the line
19  was at.
20  BY MR. ST. ONGE
21  Q.  In your conversations with Nate, did you
22  tell him that you may have legal authority to clear
23  the ditch on his property without his permission?
24  **A.  Not prior to the work, no.**

Page 92

1  Q.  You didn't tell him that before the work
2  started?
3  **A.  No.**
4  Q.  You never told him that?
5  **A.  No.**
6  MR. BLEYER:  Wait.  Never told him
7  that before or never told him that at all?
8  THE DEPONENT:  I told him that after
9  the fact whenever all this -- this came about.
10  I said, "Well, you know, I believe I
11  do have legal authority to clean and maintain
12  drainage."
13  To my knowledge.  I'm not a lawyer.
14  I just heard that in the past.
15  BY MR. ST. ONGE
16  Q.  And that happened after this issue came
17  up?
18  **A.  Yes.**
19  Q.  After Joe complained about --
20  **A.  Yes, yes.**
21  Q.  Did you ever determine whether or not you
22  did have legal authority?
23  **A.  No.**
24  MR. DEVORE:  Objection.  Calls for a

Page 93

1  legal conclusion.
2  Go ahead.
3  BY MR. ST. ONGE
4  Q.  Go ahead.
5  **A.  No.  I've never, never asked anybody about**
6  **it, particularly other than discussing it with my**
7  **attorney.**
8  MR. DEVORE:  Don't talk about that.
9  BY MR. ST. ONGE
10  Q.  Okay.  Was Blankenship Construction ever
11  instructed by anybody to go onto Lucas's property?
12  **A.  No.**
13  **(Exhibit 7 was marked for identification.)**
14  BY MR. ST. ONGE
15  Q.  I'm handing you what we marked as
16  Exhibit 7.
17  Do you recognize this document?  It's
18  titled, "Blankenship Construction and Doug
19  Blankenship's Answer to Plaintiff's Complaint."
20  **A.  Yes.**
21  Q.  You've seen this before?
22  **A.  Yes.**
23  Q.  If you go to paragraph 20, on Page 4.
24  **A.  Okay.**

24  (Pages 90 to 93)

Doug Blankenship
August 31, 2023

Page 94

1    Q.  Paragraph 20 reads:  "Defendants admit
2  they removed the old structure, which was impeding
3  the flow of water from the Marlen property, and
4  admit that it was done at the direction of Marlen."
5       Is that true?
6    A.  That was -- that was not at the sole
7  direction of Marlen.  That was agreed upon between
8  all three of us that it needed to come out.
9    Q.  Okay.  So he did not direct you is what
10 you're saying now, that he did not direct you to
11 take that out?
12   A.  It was basically:  "If it needs to come
13 out, we can take it out.  I put it in years ago."
14   Q.  So this is incorrect then, number 20?
15   A.  As it's stated here, yes.  I mean, it
16 wasn't a direction from Jim or Nate.  It was an
17 agreed upon task.
18   Q.  It was an agreed upon task, but it came at
19 your suggestion, correct?
20   A.  Yes.
21   Q.  And it was agreed by Nate and Joe -- Nate
22 and Jim that it should come out?
23       MR. HASENSTAB:  Misstates his prior
24 testimony.

Page 95

1  BY MR. ST. ONGE
2    Q.  Go ahead.
3    A.  It was agreed upon that if it is blocking
4  water, and it is causing impedement (phonetic) of
5  water not doing its natural flow down the ditch,
6  they said, "If you think it needs to come out, take
7  it out."
8    Q.  So they approved of your recommendation to
9  take it out if it was impeding water?
10   A.  They approved, yes, but it was not a
11 directive.
12   Q.  But you said it was an agreement?
13   A.  It was an agreement.
14   Q.  Now, afterwards, did the drainage on
15 Marlen's property improve?
16   A.  To an extent, yes.
17   Q.  Still a problem, though?
18   A.  There's still a problem.
19   Q.  Okay.  And did Marlen remark that it had
20 improved, but there was still a problem?
21   A.  No.
22   Q.  That was just something you observed?
23   A.  Yes.
24   Q.  And did you have any discussions with Nate

Page 96

1  Marlen that:  "Look.  The drainage is better, but we
2  still need to do some more work"?
3    A.  Yes.  It's kind of like I said before.
4  It's constant maintenance.  I mean, you're going to
5  always need to do work.
6    Q.  Did you do anything else on that area of
7  Marlen property or on Lucas property to increase the
8  drainage after that time in the summer of 2021?
9    A.  Did -- repeat that.
10   Q.  Did you do anything -- after removing the
11 structure, did you do anything else on Lucas's
12 property --
13   A.  No.
14   Q.  -- to help remove the drainage?
15   A.  No.
16   Q.  Okay.  If you go to Page 7 of Exhibit 7,
17 paragraph 1, the second sentence says "the ditch."
18 Do you see where I am?  "The ditch on the Lucas
19 property"?  It starts on the third line.
20   A.  Oh, right here.  Okay.
21   Q.  Yeah.
22   A.  Yeah.
23   Q.  It says, "The ditch on the Lucas property
24 where the old structure was located is within the

Page 97

1  Vandalia Levee District and under their
2  jurisdiction."
3       So it's your belief the ditch is actually
4  within the Vandalia Levee District's jurisdiction?
5    A.  I was -- I was told afterwards that that
6  may be the case.
7    Q.  Who told you that?  If it was lawyers,
8  just don't answer, but . . .
9    A.  No.  I believe that that was in
10 conversation with one of the levee district members.
11   Q.  Who was that?
12   A.  Randy Braun, I believe.
13   Q.  This is after the fact you were told this?
14   A.  Yeah.  And I'm not sure about that, if
15 that -- if that -- I think it was Randy, yes.
16   Q.  Okay.  And what caused that conversation
17 to come up?  Did you call Randy?
18   A.  Well, after -- after we cleaned his ditch
19 and everything, I was like, okay, well, I contacted
20 Randy because we was discussing other things when we
21 was working on their projects and told them what we
22 was kind of doing because they was -- we're all
23 farmers down there.  Randy Braun is a farmer, too,
24 and we're all concerned about the drainage.

25  (Pages 94 to 97)

Doug Blankenship
August 31, 2023

Page 98

1    And I said, "Yeah," I said, "we're
2    cleaning them trees -- or cleaning the ditch out on
3    Nate on that back side of that levee where that
4    single tube goes through there."
5        And he said, "Oh, you're in that ditch?"
6    I said, "Yeah."
7        He said, "Well, that's probably
8    technically ours."  He said, "I don't know if I'm a
9    hundred percent sure, but" he said, "that may be our
10   ditch."
11       And I said, "Well, I cleaned her out for
12   you."  He said, "Good deal."
13   Q.  Did you tell him what you did?  Did you
14   tell him that you removed the structure?
15   A.  Not necessarily, no.  I just said that we
16   cleaned that ditch down through there, the existing
17   ditch.
18       And I'm thinking discussing that, it was
19   because of all the acreage that flows through that
20   ditch and how we was having trouble getting the
21   water to leave the west -- east side of the levee.
22   Q.  And you said you cleaned that ditch down
23   through there?
24   A.  Mm-hmm.

Page 99

1    Q.  Is that "yes"?
2    A.  Yes.
3    Q.  Is that the 50 or so feet that you
4    referenced earlier past the concrete structure that
5    you removed?
6    A.  The whole ditch starting from the tube all
7    the way down to where we ended.
8    Q.  Okay.  So the ditch -- okay.
9        All right.  You're talking about the ditch
10   north of Lucas's property?
11   A.  Yes.  At that time, yes.
12   Q.  And he said that may be actually the
13   district's ditch?
14   A.  Correct.
15   Q.  Did you mention to him how far south you
16   had cleaned it?
17   A.  No, huh-uh.
18   Q.  So when he told you that that may be the
19   Vandalia Levee District's ditch, that was -- he
20   didn't really have any reference of which portion
21   that you had actually --
22   A.  No.
23   Q.  -- cleaned?  Is that right?
24   A.  No, no.  Well, other than starting at the

Page 100

1    tube and where we ended, and I didn't exactly tell
2    him where we ended.
3    Q.  Let's go to your interrogatories,
4    Number 4.
5        MR. DEVORE:  A different exhibit.
6    Number 4.  There we go.
7    BY MR. ST. ONGE
8    Q.  Page 2, question 2.
9        MR. BLEYER:  Which answer?  I thought
10   you said 4.
11       MR. DEVORE:  Exhibit 4.
12       MR. BLEYER:  Oh.  Exhibit 4.  I am
13   sorry.  I thought you said question 4.
14   BY MR. ST. ONGE
15   Q.  Number 2, at the very end, you say, "The
16   concrete structure was later determined to be
17   located within the drainage easement of the local
18   drainage district boundaries on the Lucas property."
19       When did you determine that this was
20   located within the drainage easement?
21   A.  That was an assumption that it was the
22   levee district's ditch after talking to Randy that
23   it was -- that may or may not be the levee
24   district's.

Page 101

1    Q.  Well, it says here it was later determined
2    to be located.
3    A.  That -- that was just my wording.  I don't
4    know.  I may have incorrectly stated that.  We don't
5    know at this point if it is or it isn't.  Nobody
6    said, "Yes, it is."
7    Q.  Well, in your answer, you said it was
8    located within the levee district, and here you're
9    saying it's on a drainage easement.
10   A.  It is within the levee district.  The
11   whole entire bottom is in the levee district.
12   Q.  Well, you're saying here that it was on an
13   easement.
14   A.  Not an easement.  I don't know any kind of
15   an easement.  I wouldn't be privy to that.
16   Q.  Well, that's your answer.
17   A.  I understand that, but that's
18   probably -- I didn't know what I was saying at that
19   point in time.
20   Q.  Okay.  And you signed these under oath,
21   right?
22   A.  Sure, yes.
23   Q.  You're saying it still hasn't been --
24   A.  I'm just trying to answer these the best I

26 (Pages 98 to 101)

Doug Blankenship
August 31, 2023

Page 102

1    can, you know, off of a piece of paper.
2        Q.   Well, I understand, but you reviewed it,
3    right?
4        A.   Right.
5        Q.   These are your words?
6        A.   Right.  So I don't know if
7    there's -- still at this point if there's an
8    actual -- if that is a levee district's easement or
9    a levee district's property or under their
10   jurisdiction.
11       Q.   Or completely outside of their
12   jurisdiction?
13       A.   I don't know at this point.
14       Q.   You don't know one way or the other?
15       A.   Right, because in conversation with the
16   levee district, they say it may or may not be.
17       Q.   And you don't have any survey to support
18   any of this, right?
19       A.   No surveys.
20       Q.   All right.  So your understanding that
21   this may be on the levee district's easement or
22   within the district comes from your conversation
23   with Randy Braun?
24       A.   Right.  I was assuming that because it

Page 103

1    was -- you know, runs down along the levee that is a
2    levee district's property.  Well, that would be the
3    easement would be the levee.
4        Q.   And you didn't discuss with Randy or
5    anybody else in the district before this concrete
6    structure was removed?
7        A.   No.
8        Q.   When Randy told you that this was actually
9    the -- this area here that you cleared, that this
10   ditch may have been within their jurisdiction, did
11   you ask them, like:  "Well, could you pay me for it
12   then?"
13       A.   No, because I only performed the work not
14   knowing that it may or may not be.  I was actually
15   performing that work underneath the guise of trying
16   to help the drainage on the Marlen farm.
17       Q.   Let's go back to your answer, which is
18   Exhibit 7, Page 7.
19            Okay.  And the paragraph 1 after the
20   sentence that we read together before, it says, "The
21   10 to 12 trees removed by Defendants were also
22   contained within the levee district's ditch."
23            Is that based on your conversation with
24   Randy Braun as well?

Page 104

1        A.   No.  I just assumed that.
2        Q.   Okay.  And the next says, "Defendants had
3    legal authority to take such acts under Section 211
4    of the drainage code and or the common law as
5    recognized in such cases as . . ."
6            Do you have any -- what's your basis for
7    saying that?
8        A.   I don't know that I -- that would have
9    been something the attorney would have put in there.
10   I don't -- I'm not -- I don't know those numbers,
11   no.  I don't even know that case law.  I wouldn't
12   have looked that up.
13       Q.   Okay.  That's fine.
14            Do you know if the ditch on the portion of
15   Lucas's property, was that built by the agreement of
16   the adjoining landowners at some point?
17       A.   I have no idea.  That's been there for
18   ages.
19       Q.   Okay.  And you don't know who built it?
20       A.   No.
21            (Exhibit 8 was marked for identification.)
22   BY MR. ST. ONGE:
23       Q.   Number 8 is a letter from Silver Lake
24   Group to Jon Bierman from Erik Hyam.  Have you seen

Page 105

1    this before?
2        A.   I don't believe so.
3        Q.   Silver Lake Group, that's your lawyers?
4        A.   Yes.
5        Q.   Okay.
6        A.   I may have, but it's been a while.  I
7    can't recall.
8        Q.   And I want to bring your attention
9    to -- this was sent, I mean, while they were
10   representing you, right?
11       A.   Okay.
12       Q.   November 23rd of 2022?
13       A.   Yes.
14       Q.   They were representing you at that point?
15       A.   Yes.
16       Q.   The second paragraph, fifth line down, it
17   says, "The ditch repaired was constructed decades
18   ago by the Vandalia Levee District."
19            You don't know whether that's true or not;
20   is that right?
21       A.   No, I don't know if that's true or not.
22   I'm assuming that was -- I don't even know when
23   the Vandalia Levee District was formed.  This may
24   have been prior to that.  It may have been a

27  (Pages 102 to 105)

Doug Blankenship
August 31, 2023

Page 106

1    federal.
2         Q.  You're just guessing?
3         A.  I'm just -- yeah, because the whole thing
4    is in a levee district.
5         Q.  Okay.  Go back to your answer, number 1.
6         It says, "The concrete structure was in
7    such a state of disrepair that it was impeding the
8    natural flow of water on the Marlen property and the
9    other property which may have been upstream."
10        And then the very end, you say that it was
11   done for the sole purpose of returning and
12   preserving the natural flow of water drainage.
13        Is that still your contention?
14        A.  Yes.
15        Q.  Okay.  And the basis for saying that
16   the -- did you see the natural flow beforehand?
17        A.  Yes.
18        Q.  Okay.  And was there water on the south
19   side of the property -- of the Marlen property, pool
20   of water?
21        A.  There's a pool of water there now.
22        Q.  Do you know if that is because of rainfall
23   or if that's because of the intentional manmade
24   flooding; what?

Page 107

1         A.  The ditch that runs down through there
2    that we cleaned out runs onto Joe.  The part that we
3    did not go any further, where we quit from thereon,
4    there is a pool of water in the timber that the
5    ditch flows into.
6         Q.  So you don't know what caused that water
7    to pool?
8         A.  Blockage.
9         Q.  Okay.  But from rainwater?
10        A.  River water, rainwater.
11        Q.  Natural-occurring water?
12        A.  Yeah.
13        Q.  Okay.  So that work was done in the spring
14   or summer of 2021.  Did Joe Lucas then call you and
15   complain about what you had done on his property?
16        A.  Actually, the way it happened was
17   Nate -- I believe Nate and Joe had a conversation,
18   and Nate said that Joe was upset.
19        And I said, "Well, I'll give him a call or
20   give me his phone number."
21        And I called Joe at that point in time to
22   set up a meeting to discuss it.
23        Q.  And what did you say with him on the
24   phone?  What did you guys talk about on the phone?

Page 108

1         A.  I believe we said -- I said, "Hey.  I
2    apologize if we got on you.  I didn't know it."  I
3    said, "I'd like to meet with you to discuss to see
4    how we can make things better," trying to, you know,
5    ruffle -- or trying to smooth some feathers that had
6    been ruffled.
7         Q.  Did he tell you that -- you know, that you
8    had widened and deepened his ditch?
9         A.  I can't remember at that time.
10        Q.  You don't know whether he said that or
11   not?
12        A.  He just said, "I believe you entered on my
13   property.  You didn't have permission."
14        And I'm like, "Yes, I understand that.
15   I've done that now, and, you know, sorry about it.
16   Let's try and get together and discuss it."
17        Q.  Did you ask him if the banks of the ditch
18   had gotten too high as a result of what you did on
19   the property?
20        A.  No.  I didn't -- I didn't know anything.
21   I didn't know how it looked until I met with him
22   that day.
23        Q.  So all he told you on the phone that time
24   was that you entered on his property, and you said,

Page 109

1    "Okay.  Let's get together"?
2         A.  Pretty much.
3         Q.  He didn't make any specific statements to
4    you about widening the ditch, making it deeper?
5         A.  I don't believe.  I don't know.  I can't
6    remember.
7         Q.  Okay.  So did you get -- did you promise
8    on the phone that you would fix what you did?
9         A.  I said, "Let's have a meeting.  Let's go
10   look at it, and we'll discuss it there."
11        Q.  Okay.  And then did you meet with him
12   later?
13        A.  Yes.
14        Q.  And who was -- did you meet with him on
15   his property?
16        A.  Correct.
17        Q.  Who else was at that get-together?
18        A.  John Cripe.
19        MR. BLEYER:  John who?  I'm sorry.
20        THE DEPONENT:  Cripe.
21        MR. BIERMAN:  C-R-I-P-E.
22        MR. BLEYER:  Thank you.
23        THE DEPONENT:  I can't remember the
24   other gentleman's name, but they call him "Jimmer."

28  (Pages 106 to 109)

Doug Blankenship
August 31, 2023

Page 110

1  I'm sorry.  I can't remember his name.
2  BY MR. ST. ONGE
3      Q.  Was Don Gardner there?
4      **A.  Yes.**
5      Q.  So it was you; it was Joe Lucas; John
6  Cripe; and Don Gardner?
7      **A.  Correct.**
8      Q.  Did you meet -- where did you get together
9  to meet to go to the property?
10     **A.  We actually drove onto the levee on the**
11 **south side adjacent to Joe's property, walked up the**
12 **levee, jumped down across the levee onto Joe's**
13 **property and went -- come in to look at the ditch**
14 **from the south side; the river side, I'll call it.**
15     Q.  Tell me what you discussed during that
16 time that you were together on the Lucas property.
17     **A.  Well, Joe was upset that we entered on his**
18 **property.**
19     **And he said -- basically he said, "You**
20 **know, you guys kind of left a mess there," and this,**
21 **that, and the other.**
22     Q.  Well, "this, that, and the other," is that
23 what he said, or is that what you're summarizing
24 what he said?

Page 111

1      **A.  He said, "You left the trees all -- the**
2  **dirt that was pulled out, you know, from cleaning**
3  **the ditch out was not smoothed down."**
4      **And, you know, he was just upset that we**
5  **entered on his property and did this work without**
6  **his permission.**
7      Q.  Okay.
8      **A.  I said, "How do we get this taken care**
9  **of?"**
10     Q.  Did he tell you that you had widened and
11 expanded his ditch?
12     **A.  No, not to that point, I don't believe.**
13     Q.  Did he ever tell you that during that
14 meeting?
15     **A.  I don't think so.  I don't recall it.**
16     Q.  But he told you that he was upset that you
17 had taken dirt from the ditch and piled it up and
18 not leveled it?
19     **A.  Yes.  The mess from removing the silt and**
20 **stuff from the ditch was up here, and I'll admit it**
21 **was not leveled off and presentable, nice.**
22     Q.  Did you apologize to him and tell him that
23 you were just following what Nate told you to do?
24     **A.  I apologized to him for entering on the**

Page 112

1  property.  I said, you know -- no, I did not tell
2  **him that was a directive from Nate.**
3      Q.  You didn't say, "I'm just doing what Nate
4  told me to do"?
5      **A.  I said -- no.**
6      **I said, "You know, we removed this**
7  **structure.  Jim said that it was put in there years**
8  **ago.  He said that if you think it needs to be**
9  **pulled out, pull it out."**
10     **And I said, "Well, I'm going to pull it**
11 **out because it's blocking drainage."**
12     Q.  Did he tell you at any point that you had
13 expanded the ditch so much that he couldn't get his
14 four-wheeler across to enter his property?
15     **A.  Yes.  He said that he's having trouble**
16 **getting across the ditch.**
17     **And I said, "Well, let's go look at it."**
18     **We looked at it.  Where I stopped cleaning**
19 **the ditch out, there was tracks in the ditch where I**
20 **had not been by a side-by-side that went across**
21 **there.  Beyond south of that was a whole bunch of**
22 **corn stalks and trash and debris that was piled up**
23 **in front of this pooled-up area.**
24     Q.  Did you ever --

Page 113

1      **A.  And he mentioned that the corn stalks, the**
2  **trash is all piled up.**
3      **He said, "Look at that."  I said, "Well,**
4  **there's not much I can do about that.  That's going**
5  **to happen."**
6      **I said, "What do we got to do to take care**
7  **of this?"  I said -- he said, "Well, I'd like to**
8  **have a crossing in there."**
9      **I said, "Well, you know, I can take care**
10 **of that.  I've got pipes in the yard and stuff like**
11 **that."**
12     **I said, "What we'll do is we'll bring some**
13 **pipes down, put them in the ditch, and we'll clean**
14 **the area up and -- presentable."**
15     Q.  Did you ever specifically deny that you
16 had expanded and widened his ditch?
17     **A.  I don't think.  I don't know.  I don't**
18 **know if I did or not.  I just cleaned out the**
19 **existing ditch.**
20     Q.  Did you promise to build him three
21 crossings on his property across the ditch so he
22 could get to his property?
23     **A.  One.**
24     Q.  You offered to build him one crossing?

29  (Pages 110 to 113)

Doug Blankenship
August 31, 2023

Page 114

1    A.  Yes.
2    Q.  Where?
3    A.  Pretty much right where we was looking
4  where the four-wheeler had went through or just at
5  the end of where we cleaned the ditch, somewhere in
6  that neighborhood.
7    Q.  And you never offered to build him a
8  crossing over by the pond south -- the south side of
9  the ditch?
10   A.  No.  You can't even get in there.  It's
11  fully wooded.
12   Q.  Did you ever offer to do anything else to
13  fix the property?
14   A.  Other than put this -- the crossing in,
15  was to clean up the area where we had been, level it
16  off, and then remove the brush pile, I believe, and
17  we drug the brush pile up to the Marlen farm.
18   Q.  "Brush pile," meaning the trees that Rex
19  had taken out?
20   A.  Yes.
21   Q.  You saw those trees stacked up on the
22  property when you visited it?
23   A.  Mm-hmm.
24   Q.  Did you bother to count how many were

Page 115

1  there?
2    A.  No.
3    Q.  I'm going to ask you to go to your
4  interrogatory answer, which is Exhibit 4.
5         MR. DEVORE:  When we get to a good
6  breaking point, I've got to use the restroom.
7         MR. ST. ONGE:  That's fine.
8         MR. DEVORE:  Thank you very much,
9  sir.  I appreciate that.
10        (A short break was taken.)
11  BY MR. ST. ONGE:
12   Q.  So we were talking about you agreed to
13  build him a crossing on his property to allow him to
14  cross the ditch and get to the rest of the land; is
15  that right?
16   A.  Right, yes.
17   Q.  And you did this because you wanted to be
18  neighborly, right?
19   A.  Try to right any wrongs that was done on
20  Joe's property, yes.
21   Q.  You wanted to be neighborly?
22   A.  Yes.
23   Q.  Now, it wasn't because you were trying to
24  settle some debt with Joe, right?

Page 116

1    A.  No.
2    Q.  Okay.  And you never told Joe that you're
3  going to do this:  "Okay.  If all is forgiven, and
4  you don't, you know, come after me for legal work,
5  for legal action"?
6    A.  No, we never even discussed that.
7    Q.  Did you tell Joe that you needed to talk
8  with Nate Marlen before you did any of this work?
9    A.  No.
10   Q.  Did you tell him that Nate Marlen was
11  going to be paying for this so you needed to run the
12  bills past him and run the estimate past him first?
13   A.  Nate Marlen didn't pay for that.  I did
14  that on my own.
15   Q.  But did you tell Joe that Nate was going
16  to be paying for it?
17   A.  No.  I was going to do that on my own.
18   Q.  Did you discuss any of the proposal for
19  making the crossing and taking out the debris?  Did
20  you discuss any of that with Nate?
21   A.  No.
22   Q.  Okay.  So you said that you saw the
23  concrete structure from standing on the Marlen
24  property looking over at the structure about

Page 117

1  200 feet away.  That's the only time you saw
2  that -- that structure -- right?
3    A.  In person, yes.
4    Q.  Okay.  And so you're standing there.  This
5  is in the spring?
6    A.  Yes.
7    Q.  Okay.  And so you're saying you can see
8  the structure from where you're standing, and can
9  you also see the ditch?
10   A.  Yeah.  There was a little bit of a clear
11  ditch north of the structure.
12   Q.  How about south of the structure?
13   A.  I couldn't really see south of the
14  structure.
15   Q.  And as far as the work that Rex did, you
16  didn't supervise him --
17   A.  No.
18   Q.  -- at the time, right?
19   A.  No.
20   Q.  You took his word for it that he did the
21  right thing?
22   A.  Right.
23   Q.  You didn't go inspect his work afterwards?
24   A.  The only time is when I met with Joe.

30  (Pages 114 to 117)

Doug Blankenship
August 31, 2023

Page 118

1    Q.  And did you -- how much time did you spend
2  south of where that structure was in the ditch?
3        MR. BLEYER:  After meeting with Joe
4  or what?
5        MR. ST. ONGE:  Yes, at the time he
6  was meeting with Joe.
7        THE DEPONENT:  Okay.  We was there,
8  I'm going to assume, maybe 30, 45 minutes talking it
9  over.
10 BY MR. ST. ONGE
11    Q.  Over the whole course of the time?  You
12 were there on the property 30 to 45 minutes?
13    A.  With Joe.
14    Q.  Okay, but you weren't just at that
15 concrete -- where that concrete structure was?  You
16 were walking all along the property, right?
17    A.  Just along the ditch.
18    Q.  Okay.  And including down by the pond?
19    A.  We came in past the pond to get to the
20 ditch area.
21    Q.  Okay.  And so you can't tell exactly what
22 it is that Rex did based upon being there, right?
23    A.  Yeah, I looked.  I looked at the ditch
24 work he did do, and I could tell what he did.

Page 119

1    Q.  You said that you just saw some debris all
2  over the place, that he had -- did not do a very
3  good job of leveling it, right?
4    A.  There was a brush pile and some unlevel
5  ground on the adjacent side, west side of the ditch
6  where he had been to clean out the ditch.
7    Q.  How far from where that structure was?
8    A.  75, 80 feet, just guessing.
9    Q.  So did you perform the repair work, the
10 crossing and the debris removal, afterwards for Joe?
11    A.  Rex -- I informed Rex to do that, along
12 with Barry Matthews, who helped Rex install the tube
13 in the ditch, and then Rex used the machine to cover
14 the tube up and clean up.  As we worked our way back
15 towards Marlen side, we cleaned everything up and
16 pulled the pile out.  I wasn't physically there
17 overseeing it.
18    Q.  The pile of trees?
19    A.  Yeah.
20    Q.  Okay.  So did you tell Rex and Barry
21 exactly what to do?
22    A.  Yes.
23    Q.  And what was it that you told them exactly
24 what to do?

Page 120

1    A.  Take these tubes down there, put them in
2  the ditch, establish them a nice crossing, put some
3  dirt over it, clean that area up, take care of it.
4    Q.  Okay.  And what machines did you
5  use -- did they use for that?
6    A.  An excavator.
7    Q.  Do you know where that crossing was
8  erected?
9    A.  I'm assuming it was per Joe and I's
10 discussion.  I'm assuming.  Now, I did not go back
11 and look at it, the crossing.  I've not seen it
12 since.
13    Q.  Well, you've never seen it?
14    A.  I've never seen it, not the one that we
15 put in for Joe, okay?  I've never seen it.  I'm
16 assuming that it was south of the old original
17 concrete structure.
18    Q.  Do you know how far south?
19    A.  I'm just -- at this point, I'm assuming.
20    Q.  And how did Rex and Barry know where to
21 build that?
22    A.  Well, I said -- well, I said, "Don't go
23 any further south in which we -- when we cleaned out
24 the ditch."  I said, "Put it north of that

Page 121

1  someplace."
2        So in other words, where we ended --
3    Q.  When you were -- you had cleaned out the
4  ditch, and you said go up 80 feet?
5    A.  Upstream north and put the crossing in
6  there, and that's where Joe and I discussed was, you
7  know, when we first walked up there, there was
8  tracks across the ditch with the side-by-side where
9  we hadn't even been.
10    Q.  There were tracks across the ditch.  You
11 don't know where that was in relation to where the
12 concrete structure was?
13    A.  It was south.
14    Q.  How far south?
15    A.  Probably 100, 150 feet.
16    Q.  Okay.
17    A.  So someone had been down through there
18 where we had not cleaned out the ditch and crossed
19 the ditch with a side-by-side.
20        When he said, "I can't cross there," I'm
21 sitting there looking at tracks.
22    Q.  Did you say, "Hey, well, you said you
23 can't cross.  Whose are these?"
24    A.  I wasn't going to be arguing at that

31  (Pages 118 to 121)

Doug Blankenship
August 31, 2023

1  point.  My goal right then and there was to make him
2  happy so that everything would just be okay.
3          I said, "Well" -- and then he said and
4  made mention of the corn stalks had piled up even
5  further south than that.  And I said, "Well, there's
6  not much I can do about that."
7      Q.  So it was 150 feet south down the ditch
8  from the concrete structure where you saw those
9  tracks?
10     A.  Approximately.
11     Q.  Do you know where that crossing was put
12  up, like, in relation to the concrete structure?
13     A.  No, I don't know.  I don't know an exact
14  measurement.
15     Q.  You said you got two tubes.  What are we
16  talking?  How big a diameter are these tubes?
17     A.  I want to say they're probably a 24-inch,
18  maybe a 30-inch.
19     Q.  What are they made out of?
20     A.  Plastic.
21     Q.  What do you typically use these for?
22     A.  Drainage.
23     Q.  Okay.
24     A.  Culverts for drainage.

1      Q.  And you've got two of them that you just
2  had -- where did you get them?
3      A.  They was on -- we had gotten them off the
4  job site somewhere, that they had extras that we
5  brought back to the yard.
6      Q.  Were these new or used?
7      A.  They would have probably been new, but
8  they may have been cut off or who knows.  Just extra
9  pieces.
10     Q.  And did you direct Rex exactly what to do
11  with these tubes?
12     A.  Rex and Barry, yes.
13     Q.  Okay.  And what did you tell them to do?
14     A.  To put them in the ditch.
15     Q.  Connect them?
16     A.  Join them up, and I believe they even
17  bolted them together, if I'm not mistaken, is what
18  Barry told me, and then put the dirt back over the
19  top of the tube to make the crossing.
20     Q.  This is what you instructed them to do?
21     A.  Yes.
22     Q.  And you never went back out to see if it
23  had been done?
24     A.  No.  They said they got it done.  I took

1  their word for it and -- done.
2      Q.  Do you know whether that crossing has
3  maintained its place over there?
4      A.  No.  No, I do not know.
5      Q.  You don't know if it's collapsed or
6  anything?
7      A.  No, no.
8      Q.  Because you haven't been out to check it?
9      A.  No.  I figured if I -- if there was
10  something wrong with it, I would have -- Joe would
11  have called me and said, "Hey, this thing is no
12  longer usable."
13     Q.  Did you tell Joe in advance of when you'd
14  be coming out there?
15     A.  I told him that we would try and get it
16  when we get back in the field because it was muddy
17  at that time.  It was late February, I believe.
18         I said, "When we -- we'll get it in before
19  we -- as we're going out with the crops, planting
20  crops.  We'll get it in before we do that, which
21  would be somewhere April-ish."
22     Q.  So in a couple of months?
23     A.  Yes.
24     Q.  And what did he say?

1      A.  He said, "That would be fine."
2      Q.  Before your guys went out there to make
3  the actual -- the crossing, did you give him -- Joe
4  any advance notice that they'd be out there?
5      A.  I don't believe, no.
6      Q.  Did you ask Rex:  "Hey, just give Joe a
7  heads-up when you come out there"?
8      A.  No.  Rex wouldn't have had any way of
9  getting ahold of Joe.
10     Q.  Did you say, "Hey, let me know, and I'll
11  contact Joe"?
12         MR. DEVORE:  Asked and answered,
13  like, four times.
14         Go ahead.
15         THE DEPONENT:  So, no.  I mean, I
16  just told Rex and guided Rex and Barry on what to do
17  and sent them out there before we got into the field
18  with crops because I wanted to get that done before
19  we had crops in the field.
20  BY MR. ST. ONGE
21     Q.  After it was done, did you call Joe and
22  say, "Hey, we made it.  Let's -- come out and take a
23  look and see what you think"?
24     A.  I don't believe so, no.

Doug Blankenship
August 31, 2023

Page 126

1    Q.  Read your answer, if you've got it open
2  there.
3         If you go to Page 7 -- sorry -- Page 8,
4  you say that "Defendants performed each and every
5  request of Plaintiff to his satisfaction, all at
6  substantial cost to the Defendants and none to
7  Plaintiffs."
8         How do you know that Joe was satisfied
9  with the crossing that you built him?
10    A.  I don't know that he was actually
11  satisfied, no.  I did what we -- I assumed we did
12  what we discussed.
13    Q.  But you had no discussions with Rex or
14  Barry and never went to go look at it yourself?
15    A.  No, I did not.
16    Q.  What was the cost to Blankenship
17  Construction of preparing this crossing?
18    A.  An estimate?
19    Q.  Well, you say it was a substantial cost.
20  I want to know what you mean by "substantial" in
21  your answer.
22    A.  I mean, by the time we ended up getting
23  the tubes and deliveries and the hoe and everything
24  else, I mean, you may be looking at $3,500, $5,000.

Page 127

1    Q.  The tubes were free, right?
2         MR. DEVORE:  Objection.
3  BY MR. ST. ONGE
4    Q.  Yes?  The tubes were free?
5         MR. DEVORE:  Lack of foundation.
6         THE DEPONENT:  They wasn't free, no.
7  We paid for them at some point in time on a job
8  site.  So I mean, they was still -- had been
9  purchased by Blankenship Construction.
10  BY MR. ST. ONGE
11    Q.  Did you pass that cost on to the customer
12  that you bought it for?
13    A.  To -- depending on the job, that would
14  have been in the bid.
15    Q.  Okay.
16    A.  So if they was used on the job site or
17  not, then they would have come back to the yard.
18    Q.  Can you tell me how much they cost?
19    A.  I don't even know what the size of it was
20  we put in the ditch.  So I'm just going to rough
21  guess a 30-inch and 12 dual-wall plastic culvert per
22  foot is probably going to be somewhere in the
23  neighborhood of $40, $45 a foot.
24    Q.  Do you know how long they were?

Page 128

1    A.  No, I do not.
2    Q.  And going back to your answer, you said
3  that it was done at no benefit to you; is that
4  right?  That crossing didn't create any benefit for
5  you, for Blankenship Construction?
6    A.  As in the sense of I was hoping that it
7  was going to benefit in making sure everybody's
8  feelings was okay, and we appeased everybody.
9    Q.  But I mean, the tube allows water to
10  continue to flow through there, right?
11    A.  Right, no.  It was -- at that point, it's
12  really not a benefit to Blankenship Construction,
13  not to Blankenship Construction at all.  To Triangle
14  Grain, it is probably not a benefit whatsoever
15  because that's eventually going to probably block up
16  traction and cause drainage problems, but I did it
17  anyway to make Joe happy.
18    Q.  Because you wanted to be neighborly?
19    A.  I wanted to be neighborly.
20    Q.  So at the time that Blankenship
21  Construction built that crossing, did it do anything
22  else on Lucas's land?
23    A.  Other than cleaning up where we had been
24  previously?

Page 129

1    Q.  Right.
2    A.  That's it.
3    Q.  Okay.  Did you plant seed?
4    A.  I can't remember if they throwed some
5  grass seed down or not.
6    Q.  And those trees that had been taken down
7  from when Rex took out the concrete structure and
8  cleaned out that ditch, what had happened to those
9  trees when Rex and Barry came back?
10    A.  I believe we had them pull those trees out
11  and move them up to the Marlen farm and get
12  them -- the mess off of Joe.
13    Q.  And you don't know where they are today?
14    A.  They're probably -- they're stacked up
15  next to the existing ditch or may have been burnt.
16  I'm not sure what's happened to them.  I don't
17  remember.
18    Q.  Did you ask Joe when he wanted -- whether
19  he wanted them?
20    A.  No.
21         In the discussion, I said, "We'll get
22  these pile of trees cleaned up.  We'll pull it up
23  there.  We'll pull it up on Nate's farm.  Get it out
24  of here and clean things up and make it look nice."

33 (Pages 126 to 129)

Doug Blankenship
August 31, 2023

Page 130

1    Q.  You didn't ask him:  "Do you want these
2  trees?"
3    **A.  I didn't ask him, no.**
4      **I said, "Will that make you happy?"**
5    Q.  Did you plant any trees on the area
6  that --
7    **A.  No.**
8    Q.  -- you had cleared earlier?
9    **A.  No.**
10   Q.  Did Blankenship Construction dig a new
11  ditch at that point when it was creating the
12  crossing?
13   **A.  No.  I don't believe so, no.**
14   Q.  Did you talk with Rex about that?
15   **A.  No.**
16   Q.  So you don't know whether he did or not?
17   **A.  No.**
18   Q.  Are you aware of a ditch that connects the
19  Marlen's property to the ditch that's on his
20  property where the crossing was built, separate
21  ditch?
22   **A.  No.  Rephrase that.**
23     MR. DEVORE:  I lost that.
24     MR. BIERMAN:  Say "Lucas property."

Page 131

1  BY MR. ST. ONGE
2    Q.  Okay.  On the Lucas property, there's a
3  ditch, and you built a crossing over that ditch,
4  correct?
5    **A.  The main ditch?**
6    Q.  Yes.
7    **A.  Yes.**
8    Q.  Is there a new ditch that was created on
9  Lucas's property that connects the Marlen property
10  to the Lucas property going between them?
11   **A.  Other than the main ditch?**
12   Q.  Correct.
13   **A.  I don't know.  I don't think so.  I don't**
14  **know.  I haven't been back there.**
15   Q.  You haven't been back since Rex and Barry
16  built that crossing?
17   **A.  Yes.  I have not been back there.**
18   Q.  Who is James Berner?  It was identified in
19  your interrogatory.  Do you know who that is?
20   **A.  James?**
21   Q.  Yeah.
22   **A.  Berner?**
23   Q.  Yeah.
24     (Exhibit 9 was marked for identification.)

Page 132

1  BY MR. ST. ONGE
2    Q.  If you look, do you recognize this
3  document, Blankenship Construction's disclosures?
4    **A.  Yes.**
5    Q.  Okay.  If you go to Page 2, under that
6  bold heading, it says, "The name, and, if known, the
7  address and telephone number of each individual
8  likely to have discoverable information -- Defendant
9  may use to support his claim to defenses."
10     You list Joe Lucas, John Cripe, Doug
11  Blankenship, Marlen, James Berner.
12   **A.  That may have been Jimmer -- Don.  We may**
13  **have got that name wrong.**
14     MR. DEVORE:  What's his real name?
15  Jimmer?
16     THE DEPONENT:  That's his nickname.
17  BY MR. ST. ONGE
18   Q.  Is it Don Gardner?
19   **A.  Yes.**
20     MR. DEVORE:  Okay.  Don Gardner.
21     MR. BIERMAN:  For the record, let's
22  be clear.  They are two different people.
23     MR. DEVORE:  Yes.
24  ///

Page 133

1  BY MR. ST. ONGE
2    Q.  You don't know who James Berner is?
3    **A.  No.**
4    Q.  You don't know whether he goes by
5  "Jimmer"?
6    **A.  Yeah.**
7    Q.  Don Gardner goes by "Jimmer"?
8    **A.  Yes.  I later found that out.  That was**
9  **the first time I met that gentleman.**
10   Q.  You said that you have text messages with
11  Nate Marlen.  Do you have those on your phone?  Can
12  you pull those up just to see if you have them?
13   **A.  [Deponent indicated.]**
14   Q.  I don't need them now.  I'm just going to
15  ask you to preserve those, and we'll ask you to get
16  those to us later.
17   **A.  Okay.  That --**
18     MR. DEVORE:  Make sure they're still
19  there, though, Doug, before you --
20     THE DEPONENT:  That's a good-looking
21  car right there.
22     MR. ST. ONGE:  So we've got text
23  messages there.
24     MR. DEVORE:  It looks like there's

34  (Pages 130 to 133)

Doug Blankenship
August 31, 2023

Page 134

1  something from Mr. Marlen.  I don't know how far
2  back it goes.
3  BY MR. ST. ONGE
4      Q.  And you communicated with Nate Marlen
5  regarding the property that's north of Joe Lucas's,
6  correct?
7      **A.  The property?**
8      Q.  You communicated with him for work stuff,
9  right?
10     **A.  When we're either planting -- farming on**
11 **his farm or we're doing work on his farm, yes, I**
12 **communicate.**
13     Q.  Okay.  And how far back are those
14 messages?  How far back do they go?
15         MR. DEVORE:  Is that it?
16         THE DEPONENT:  Yes, that's the last
17 one.
18         MR. DEVORE:  What year is that in?
19         THE DEPONENT:  2023.
20         MR. DEVORE:  February 28th.
21 BY MR. ST. ONGE
22     Q.  What's the date?  How far back does it go?
23     **A.  February 28th of 2023.**
24         MR. ST. ONGE:  Okay.  Well, I'll ask

Page 135

1  to get those, and we'll ask you to produce the lease
2  that you have with Nate Marlen for that property.
3         THE DEPONENT:  Yes.
4         MR. BLEYER:  The lease with Marlen
5  Farms or --
6         MR. DEVORE:  The trust with Triangle
7  Grain.
8         MR. BIERMAN:  Let's take a break.
9         MR. DEVORE:  Break?
10        MR. BIERMAN:  Yeah.  We're almost
11 done.
12     (A short break was taken.)
13        MR. ST. ONGE:  All right, sir.  Let's
14 go back on the record.
15 I have no further questions at this
16 time for you.
17        MR. BLEYER:  That was anticlimactic.
18        MR. ST. ONGE:  Does anybody else have
19 questions?
20        MR. BLEYER:  I've got some, yes.
21        EXAMINATION
22 BY MR. BLEYER
23     Q.  Doug -- may I call you "Doug"?
24     **A.  Yes.**

Page 136

1      Q.  I'm Joe Bleyer, and we represent -- Dan
2  and I represent Nate Marlen in this litigation.
3         When I refer to the Marlen property, it's
4  the farm north of the Lucas property.  Do you
5  understand that?
6      **A.  Yes.**
7      Q.  Okay.  That Nate -- that Marlen property,
8  you have a farming contract with it, with that
9  property?
10     **A.  Yes.**
11     Q.  And who is the contract with?
12     **A.  It's with -- between Triangle Grain**
13 **Incorporated and the Marlen Family Trust.**
14     Q.  Okay.  And when I assume you first started
15 working or farming this property, it was with the
16 Marlen Family Trust?  Is that your first contract?
17     **A.  I believe.  I don't know, because at that**
18 **time, I believe Jim was still alive.  So I don't**
19 **know if it was with Jim.  I can't remember if it was**
20 **Jim or the family trust.  I don't know at this**
21 **point.**
22     Q.  Do you know if the property was in a
23 family trust while Jim was living?
24     **A.  I do not know that.**

Page 137

1      Q.  Do you know -- I guess I should ask Nate.
2         MR. BLEYER:  But when did Jim pass
3  away?
4         MR. MARLEN:  April 2, 2022.
5  BY MR. BLEYER
6      Q.  Jim passed away in April of 2022.  The
7  first contract for this property was the farming
8  season for 2021?
9      **A.  Yes.**
10     Q.  Okay.  And you reached an agreement with
11 Jim to talk about farming that property in 2021?
12     **A.  I believe so, yes, yep.**
13     Q.  And you have a written contract?
14     **A.  I believe.  That year, I believe it was a**
15 **one- or two-year contract.  It may have been 2020**
16 **when we started.  I can't remember at this point --**
17     Q.  Okay.
18     **A.  -- that we started farming it, but, yeah,**
19 **I believe there was a two-year contract, and then we**
20 **went to a five-.**
21     Q.  And did you say last year was the first
22 year of this five-year contract?
23     **A.  I believe so.**
24     Q.  So this planting season when you harvest

35 (Pages 134 to 137)

Doug Blankenship
August 31, 2023

Page 138

1  next month or whenever will be the second year of
2  the contract, or is this --
3      A.  I believe so, yes.  I'm a little fuzzy on
4  that.  A lot of things run together.
5      Q.  That would back up to about when Jim
6  passed away.
7          So when you had signed that new five-year
8  contract with the Marlen Family Trust, was it with
9  the trust?
10     A.  Yes.
11     Q.  Okay.  And the document you have for
12 farming that, the lessor is the Marlen Family Trust?
13     A.  Yes.
14     Q.  Do you know who signed it as the trustee
15 of this five-year contract?
16     A.  I did not look at that.  I don't know.
17 I'm not sure if it was a brother.  I couldn't tell
18 you.
19     Q.  As far as the Marlen property that you
20 farmed and are under contract to farm now, has Nate
21 Marlen individually signed any documents to allow
22 you to farm on that property?
23     A.  Not to my knowledge.
24     Q.  Okay.  It's your understanding that your

Page 139

1  agreement to do any work on the Marlen property
2  is -- on behalf of the lessor would be the Marlen
3  Family Trust?
4      A.  Rephrase that again.
5      Q.  The work you do on the Marlen property --
6      A.  Concerning excavation?
7      Q.  Concerning any of it.
8      A.  Any of it?  Okay.
9      Q.  Any operations you do on this Marlen
10 property that we referred to -- the Marlen
11 property -- it's always been at the request of the
12 Marlen Family Trust?
13     A.  Yes.
14     Q.  Okay.  Do you pay your cash rent before
15 planting or after planting?
16     A.  We pay half and half, half at the
17 beginning of the year and the other half in the
18 fall.
19     Q.  Okay.  And it's strictly a cash operation,
20 cash rent?
21     A.  Yes.
22     Q.  And when you -- you said you've known Nate
23 Marlen.  I think you said you've known who he was
24 for, like, 15 years?

Page 140

1      A.  Yeah, mm-hmm, yes.
2      Q.  That's good.
3          And then, what, in the last five years or
4  so, you became acquainted with him differently or
5  better or however you want to put it?
6      A.  Better, better.
7      Q.  Okay.  And do you farm any property for
8  Nate individually?  Does he own any property
9  individually?
10     A.  No.
11     Q.  This Marlen property that's north of Joe
12 Lucas, is that the only Marlen property that you
13 farm, or are there others?
14     A.  Yes.
15     Q.  And I think you said it was 580?
16     A.  530.
17     Q.  530 acres.
18         And even though it's not a square, it's
19 contiguous?
20     A.  Yes, yeah.  I mean, a portion.  There is a
21 levee separating some fields, but, yeah, it would be
22 contiguous.
23     Q.  Okay.  So the first year you farmed it,
24 who contacted you to farm it?

Page 141

1      A.  The first year we farmed it?
2          Nate brought up -- in conversation with
3  Nate, he brought it up that the farm up north needs
4  a lot of work.
5          "Would you be interested going up and
6  trying to give us an idea what we can do?  Maybe
7  talk about -- you know, you might want to be
8  the -- you might want to rent it."
9          So that's where that got started.
10     Q.  And was Jim involved in that conversation,
11 too?
12     A.  After he's -- Nate referred back to Jim
13 saying, "It's all Dad's decisions.  You need to get
14 ahold of Dad, but, you know, let's set that -- let's
15 set that up before we talk to Dad."
16     Q.  Okay.
17     A.  Jim.
18     Q.  So in other words, Nate suggested to you
19 first that you might want to farm this Marlen
20 property?
21     A.  First was the drainage issues, and then we
22 might want to because they was having trouble at the
23 time with the tenant that they currently had, and
24 then, you know, said if we can work out a deal,

36 (Pages 138 to 141)

Doug Blankenship
August 31, 2023

Page 142

1  maybe we can get some drainage done and maybe farm
2  the ground.
3         And I said, "It sounds great."  And he
4  said, "Well, I've got to run this past Jim," his
5  dad, and "We'll set up a meeting and talk," which we
6  did.
7     Q.  Okay.  So I was confused.  Maybe just
8  clear my confusion.
9         You did this drainage work before you
10 started farming?
11    A.  The same year that we started farming, we
12 started the drainage work, yes.
13    Q.  Okay.
14    A.  That spring.
15    Q.  Okay.  And I think you said that meeting,
16 you were there with Jim and Nate and you.  That was
17 in the spring of '21, February of '21, I think it
18 was?
19    A.  Meaning where?
20    Q.  When you had this meeting about the
21 drainage.
22    A.  Yeah.  I believe so, yeah.
23    Q.  Okay.
24    A.  Yeah.

Page 143

1     Q.  So initially Nate says, "Hey, we have some
2  drainage problems.  Maybe we can work something out,
3  and you can farm it."
4         And then Nate referred you to his father
5  who had to make all the decisions?
6     A.  At that point in time, yes.
7     Q.  Okay.  And then eventually you contacted,
8  I guess, and had a meeting with Jim Marlen, Nate
9  Marlen, and yourself?
10    A.  That's correct.
11    Q.  And that was at your place or
12 their -- Jim's place or --
13    A.  Typically it was all at my office.
14    Q.  Okay.
15    A.  And then Jim and I also discussed things
16 about the farm over the phone.
17    Q.  Okay.  Earlier you talked about -- today
18 about that meeting about the drainage work you were
19 going to do and about the structure.  As I
20 understand it, that meeting was at Blankenship
21 Construction's office?
22    A.  At my office, correct.
23    Q.  You were present?
24    A.  Yes.

Page 144

1     Q.  Jim Marlen was present?
2     A.  Yes.
3     Q.  And Nate Marlen was present?
4     A.  Yes.
5     Q.  And as I understand it, the discussion as
6  to what would be done on the Marlen property, the
7  discussion was between you and Jim Marlen?
8     A.  For the most part, yes.
9     Q.  Okay.
10    A.  Yeah.
11    Q.  At one point you said Nate just sat there
12 and didn't say anything?
13    A.  I mean, at that time Jim was alive.  He
14 was making all those decisions on the farm.
15    Q.  We're talking about this meeting in
16 February when you were talking about cleaning the
17 ditch?
18    A.  Right.
19    Q.  And at that meeting about this ditch work
20 and drainage work on the Marlen property, the
21 discussion was between you and Jim Marlen, correct?
22    A.  Pretty much, yes.
23    Q.  What would -- pretty much that's a lawyer
24 question, okay?  That always pops another question.

Page 145

1     A.  It was.  It was between Jim and I.
2     Q.  Okay.  So when you and Jim had the
3  discussion about the drainage issues on the Marlen
4  Family Trust at Blankenship Construction's office,
5  you and Jim discussed what work needed to be
6  performed on the Marlen Family Trust property?
7     A.  Yes.
8     Q.  Okay.  And you had walked it before that,
9  I assume?  That's when you saw this concrete
10 structure?
11        MR. ST. ONGE:  Objection.  That
12 misstates the prior testimony.  He said he had never
13 walked it.  He said he looked at it from the Marlen
14 property.
15        MR. BLEYER:  I'll rephrase the
16 question.
17        THE DEPONENT:  Yeah.
18 BY MR. BLEYER:
19    Q.  We're talking farm lingo.
20    A.  Yes.
21    Q.  So you've been on the property, correct?
22    A.  I've been on the property.
23        MR. ST. ONGE:  What property are we
24 talking about?

37 (Pages 142 to 145)

Doug Blankenship
August 31, 2023

Page 146

1        MR. BLEYER:  The Marlen property.
2        THE DEPONENT:  Yes.
3   BY MR. BLEYER
4        Q.  That was before this meeting?
5        A.  Yes.
6        Q.  And while you were on the Marlen property,
7   you observed this concrete structure?
8        A.  I observed it at some point in time.  I
9   don't know if it was prior to that meeting or not,
10   but, yes, I had observed it.  Yes, it was prior to
11   that meeting.
12        That's why the discussion was
13   over -- because we had several meetings on the farm.
14   As we would start one section and get it done, then
15   we'd move on to the next and the next.
16        And we could always kind of reconvene and
17   say, "Here's what needs to be done here, you know."
18        And when we got to that ditch that we was
19   cleaning out on the Marlens, I believe we come down,
20   and I said, "Hey, we need to get together.  There's
21   a concrete structure down there."
22        So they came out.  We sat in the office,
23   and we discussed it.
24        And I said, "It needs to come out.  I

Page 147

1   mean, it's causing an issue."
2        Q.  So let's talk about the meetings or
3   discussions you had, and I want to refer
4   to -- limit it to the ditch, which I understand is
5   on the west side of this levee that's got the tube
6   through it?
7        A.  Yes.
8        Q.  Okay.  And that's the ditch -- ditch in
9   question that we've all been talking about here
10   today?
11        A.  Yes.
12        Q.  Okay.  Somewhere in that ditch, you
13   observed prior to this meeting a concrete structure?
14        A.  Yes.
15        Q.  Okay.  And at that time, did you know
16   whose property that concrete structure was on?
17        A.  No.
18        Q.  Okay.  And then after observing that ditch
19   and the concrete structure sometime after that, you
20   and Jim had a discussion at your office, and Nate
21   was there, too, but you and Jim had a discussion as
22   to what work that needed to be done on the ditch on
23   the west side of this levee that has the tube
24   through it?

Page 148

1        A.  Yes.
2        Q.  Okay.  And what did you suggest to be done
3   to that ditch on the west side of the levee with the
4   tube through it?
5        A.  That we clean the ditch out.  My
6   suggestion was that we clean the ditch out from the
7   tube that goes through the levee all the way down to
8   where it goes south off to the -- off of their
9   property down to Lucas.
10        And I said, "There's a concrete structure
11   there, Jim.  It's old, dilapidated.  It's blocking
12   up water."  I said, "I suggest we pull it out."
13        He said -- and then he told me the story
14   about he'd put it in years ago and didn't work, and
15   said, "Yeah, go ahead and take it out.  If you think
16   it needs to come out, take it out."  So I did.
17        Q.  So let's talk from the tube to the
18   concrete structure.
19        A.  Okay.
20        Q.  What were you going to do, and what
21   did -- what were you going to do for that part of
22   the ditch on the west side of the levee with the
23   tube through it?
24        A.  We went in and basically left the bigger

Page 149

1   trees that's down along that ditch and took out the
2   smaller stuff so we could reach in and clean that
3   ditch out all the way down through there.
4        Q.  Now, let's talk about this concrete
5   structure.  You said it was dilapidated?
6        A.  Yes.
7        Q.  You and I probably know what that means,
8   but what do you consider --
9        A.  In disrepair, junk.
10        Q.  Okay.  Was it operating as any type of a
11   water retention structure in the condition you saw?
12        A.  No.  It was retained water, yes, but it
13   wasn't supposed to be doing it in that fashion.
14        Q.  Okay.  And was it just like a concrete
15   berm with pipes through it that has the ability to
16   put some gates over the front of the pipes?
17        A.  Yes.
18        Q.  Okay.  And I think you described
19   earlier -- and I've seen this happen before -- when
20   the concrete structure is impeding water, water will
21   start to go around the structures?
22        A.  Yes.
23        Q.  And I assume, then, that the middle of the
24   structure was the same level as the end of the

38  (Pages 146 to 149)

Doug Blankenship
August 31, 2023

Page 150

1  structures, and that's -- in other words, so it
2  wouldn't go through the middle?
3      **A.  Yes.**
4      Q.  Do you know what I'm talking about, how
5  you --
6      **A.  Mm-hmm, yes.**
7      Q.  If you put a pipe in a ditch, you've got
8  to make sure that the end of the riprap or the
9  barrier is higher than the ditch, or you'll have
10  erosion around the concrete or rock?
11      **A.  Correct.**
12      Q.  Okay.  So did you suggest to Jim Marlen
13  that this structure should be removed?
14      **A.  Yes.**
15      Q.  Okay.  And he told you whatever -- do
16  whatever you feel that's necessary to -- is that
17  correct?
18      **A.  Yes.**
19      Q.  Do you do this type of work?  I mean, does
20  Blankenship Construction -- is that your --
21      **A.  Yes.**
22      Q.  You do excavating, you make drainage
23  ditches, you clear drainage ditches; is that
24  correct?

Page 151

1      **A.  That's correct.**
2      Q.  And how long have you been doing that as a
3  company?
4      **A.  Since 1968.**
5      Q.  If I had a farm, you're the guy to call
6  and say, "Hey, this farm is not draining"?  You're
7  the expert and come tell me what I need to do?
8      **A.  I will -- I will say we'll come down and
9  take a look at it.  We'll discuss it.  I'll give you
10  my best estimate, what I think needs to happen.**
11          **Then at that point, if you agree, then we
12  discuss estimated costs, and from there we'd proceed
13  forward and either:  "That's too much," or "That
14  sounds great.  Come and do it."**
15      Q.  And that's basically what you did with Jim
16  Marlen?
17          You came down, looked at it, assessed it,
18  and said, "This structure needs to be removed.
19  That's my suggestion," and that's what took place?
20      **A.  Right.**
21          MR. ST. ONGE:  Objection.
22  Mischaracterizes the testimony of the witness.
23          THE DEPONENT:  Correct.
24  ///

Page 152

1  BY MR. BLEYER
2      Q.  Okay.  And then as I understand it, Rex is
3  the one that did the work?
4      **A.  Correct.**
5      Q.  Okay.  Did you later learn -- or how did
6  you learn that -- strike that.
7          Did you later learn this concrete
8  structure that you removed was not on the Marlen
9  Family Trust property?
10      **A.  Did I learn that?**
11      Q.  Yes.
12      **A.  Yes, I learned that.**
13      Q.  From whom?
14      **A.  From Nate.**
15      Q.  And did he tell you how he knew that?
16      **A.  That Joe had called him upset that we'd be
17  on his property.**
18      Q.  And when you had that meeting with Jim
19  Marlen, no one -- there was no discussion of where
20  the property line was?
21      **A.  No.**
22      Q.  That's a bad question.
23          When you had this meeting with Jim, was
24  there a discussion where the property line was?

Page 153

1      **A.  No.**
2      Q.  Okay.
3      **A.  Not that I can remember, no.**
4      Q.  Okay.  Did the Marlen Family Trust ever
5  direct you to go onto the Lucas property?
6      **A.  No.**
7          MR. ST. ONGE:  Objection.  The trust?
8  Can you identify a person?
9          MR. BLEYER:  I'll get to that.
10  BY MR. BLEYER
11      Q.  The trust, or the trustee, the trustee of
12  the trust did they ever direct you to go onto the
13  Lucas property of the Marlen Family Trust?
14          MR. ST. ONGE:  Objection.  The
15  question is vague.  It assumes evidence.  Who is the
16  trustee we're talking about?
17  BY MR. BLEYER
18      Q.  Do you understand the question?
19      **A.  Yeah, yeah.**
20      Q.  Okay.
21      **A.  No.  No one from the trust, trustee
22  directed me to go onto Joe Lucas's property.**
23      Q.  Did Jim Marlen direct you to go on the
24  Lucas property?

39  (Pages 150 to 153)

Doug Blankenship
August 31, 2023

---

Page 154

1  A. No.
2  Q. Did Nate Marlen ever direct you to go on
3  the Lucas property?
4  A. No.
5  Q. Did Jim Marlen direct you to remove his
6  concrete structure?
7  A. Jim Marlen said that "If you think that it
8  needs to come out, take it out."
9  Q. And then after he told you that, it was
10  your decision to take it out?
11  A. Correct.
12  Q. Okay. Did Nate Marlen ever give you any
13  direction about this concrete structure?
14  A. No.
15  Q. Did the trustee or whoever it was of the
16  Marlen Family Trust ever direct you to excavate a
17  ditch on the Lucas property by making it wider,
18  longer, and deeper?
19  A. No.
20  Q. Did Jim Marlen ever direct you to go onto
21  the Lucas property and excavate the original ditch
22  to make it longer, wider, and deeper?
23  A. No.
24  Q. Did Nate Marlen ever direct you to go on

---

Page 155

1  the Lucas property to excavate it to make it -- the
2  original ditch to make it wider, longer, or deeper?
3  A. No.
4  Q. There was some question earlier about a
5  new ditch. Are you -- are you aware of a new ditch
6  that --
7  A. I'm not aware of a new ditch. Like I
8  said, I've not been back to see it after I directed
9  Rex and Barry to put the crossing in. So I
10  apologize. I've not seen it.
11  Q. Okay. Are you aware that -- has anybody
12  advised you that the work that your company did
13  caused a new ditch to be -- to originate on the
14  Lucas property and take water somewhere else?
15  A. No.
16  Q. Does that question make sense?
17  A. Yes. In other words, work performed that
18  we did may have caused erosion or a new ditch to
19  start some other direction. No one's never
20  mentioned anything about that.
21  Q. Okay. Are you aware whether or not
22  Blankenship Construction on the Lucas property
23  intentionally excavated a new ditch?
24  A. No.

---

Page 156

1  Q. Did Blankenship Construction intentionally
2  excavate and create a new ditch on the Lucas
3  property?
4  A. Not to my knowledge.
5  Q. Okay. Are you aware of any work that
6  Lucas -- or any work that Blankenship did on the
7  Lucas property blocked access to the Lucas property?
8  A. Other than the original ditch-cleaning
9  where Joe said that we can't get across there -- or
10  "I can't get across there." No, other than that.
11  Q. And does the Lucas property run all the
12  way to the south to the river?
13  A. I believe so, yes.
14  Q. And were you -- I assume you were on the
15  Lucas property where the excavation stopped?
16  A. Yes.
17  Q. Okay. Your being from that area and being
18  around there, how far are you from the Kaskaskia
19  River when that drainage -- where you've stopped
20  working on the drainage ditch?
21  A. 300 feet.
22  Q. Okay.
23  A. 400 feet.
24  Q. And you talked about him pointing to some

---

Page 157

1  corn stalks?
2  A. Yes.
3  Q. I assume that is field rubble or field
4  trash that comes down with the water?
5  A. Yes.
6  Q. Like you see in every river bottoms where
7  the water hits towards the river, all the corn
8  stalks and everything piles up, doesn't it?
9  A. Yes.
10  Q. Okay. And everything else that floats
11  down with the water when it comes through this?
12  A. Yes.
13  Q. This Marlen property, is it flood prone?
14  A. Yes.
15  Q. I assume it's in the flood plain since
16  it's on the west side of the levee?
17  A. Yes.
18  Q. Is there another levee between that levee
19  and the Kaskaskia River to the west?
20  A. There is an old, old levee that's got
21  breaks in it. Now, I've not walked every square
22  inch of it, but, yes.
23  Q. Is that old levee basically nearly
24  adjacent to the river?

---

40  (Pages 154 to 157)

Doug Blankenship
August 31, 2023

Page 158

1      A.  I really can't answer that.  I
2   didn't -- I've just only seen one portion of it.
3      Q.  Okay.  So the Marlen property and the
4   Lucas property on the west side of this levee has
5   water -- river water on it -- I wouldn't say yearly.
6   I assume there's some years it probably doesn't, but
7   is that a common occurrence that the river comes up
8   in the spring and puts water all over of the Lucas
9   property and the Marlen property?
10     A.  Yes.
11     Q.  And then you said it all drains south?
12     A.  Yes.
13     Q.  Okay.  And so if these fields are covered
14   with flood water or raising river water after the
15   harvest when it's receding to the south, that's what
16   brings all the stubble off the Marlen property onto
17   the Lucas property and on into the Kaskaskia River?
18     A.  Yes.
19     Q.  And is that what you're referring to when
20   you told Joe Lucas that there's nothing you can do
21   about the corn stubble that's stacked up or
22   accumulated down by this pond?
23     A.  Yes.
24     Q.  Okay.  And I assume after you became aware

Page 159

1   of the problems on the Lucas property, your
2   company -- you met with Joe, and then you went in
3   there and made a crossing across the portion of the
4   ditch that you excavated so that the Lucas property
5   could be accessed from the levee across the ditch to
6   the property?
7      A.  Yes.
8      Q.  Okay.  Did you use -- you described the
9   pipe.  I assume -- and that's a bad thing to do.  Is
10  it just the black, corrugated, rubber, plastic pipe
11  you're using?
12     A.  It's referred to as N-12.  It is a black
13  plastic -- it's a smooth interior with a corrugated
14  exterior.
15     Q.  Okay.  And it snaps together?
16     A.  Yeah, except I think on that section, we
17  had a damage.  We cut the damage off, and we ended
18  up putting it together and bolting it, and I think
19  they threw some concrete around it is what Barry
20  told me, and Rex.
21     Q.  And they're a pain in the ass to snap them
22  together unless you have an excavator on it?
23     A.  The big ones are, yes.
24     Q.  Now, you were on the Lucas property the

Page 160

1   day that you met there with Joe; is that correct?
2      A.  Yes.
3      Q.  Is that the only time that you were aware
4   that you were on the Lucas property?
5      A.  Yes, that I knew I was on the Lucas
6   property.
7      Q.  That's what I mean.  Right.
8         Not knowing when you were out there
9   sometimes where the line was, but when you met with
10  Joe, that's the first time that you actually had
11  knowledge that you were on Lucas's property?
12     A.  Rephrase that again.
13     Q.  That was a bad question.  Thank you.
14        Lucas's property butts the Marlen property
15  on the south -- Marlen south, correct?
16     A.  Yes.
17     Q.  Okay.  And you farm up towards the south
18  end of Marlen property up to the Lucas property,
19  correct?
20     A.  Yes.
21     Q.  Okay.  And when you were out there meeting
22  with Joe, did he show you where the line was?
23     A.  No.
24     Q.  Have you ever seen any survey, any

Page 161

1   markings of any lines?
2      A.  No.
3      Q.  Okay.  And as far as this concrete
4   structure being on the Lucas property, you
5   had -- you believe it was today as a result of Nate
6   telling you that Joe said it was?
7      A.  Yes.
8      Q.  Okay.  Now, let's talk when you were out
9   there with Joe.
10        You saw some trees?
11     A.  Yes.
12     Q.  Trees that were excavated by your company
13  out of the ditch?
14     A.  Yes.
15     Q.  And they were piled up?
16     A.  Yes.
17     Q.  Okay.  So do you know how soon after the
18  work was performed on the ditch that you were on the
19  property?
20     A.  Let's see.  I was on the property.
21     Q.  With Joe, I mean.
22     A.  Yeah.  Not quite a year maybe.
23     Q.  Okay.  Had there been a flood season or a
24  spring season?

41  (Pages 158 to 161)

Doug Blankenship
August 31, 2023

Page 162

1   A. Well, should have been, yes.
2   Q. Okay. Not being familiar with that part
3   of the Kaskaskia, do you have trouble with fall
4   flooding very often, or is it just spring flooding?
5   A. No. They can be fall also.
6   Q. Okay.
7   A. Winter, fall, yeah.
8   Q. Where I'm going with that question is: Do
9   you know from the time you did -- your company did
10  the work until you met with Joe Lucas on the
11  property, had the river carried any of the trees
12  away?
13  A. I wouldn't know that. I don't know.
14  Q. When you saw this pile of trees when you
15  were out there with Joe Lucas, can you describe that
16  for us, please, what you observed?
17  A. That it was a pile of trees that we
18  removed from the ditch that was stacked up against
19  on his property kind of over next to some other
20  standing timber, and it was laid in a kind of
21  north-south fashion.
22  Q. Kind of like windrowed up against --
23  A. Not necessarily windrowed, but piled. It
24  was just -- they're kind of all stacked together

Page 163

1   side by side.
2   Q. Okay. And do you have any idea how many
3   trees there were?
4   A. Like I said, 6 to dozen, 20. I'm not
5   sure. I couldn't tell you. They're hard to count
6   when they're in a pile.
7   Q. That's true.
8   Were they stumps in all or just --
9   A. Yes.
10  Q. Okay. So when you clean out these
11  ditches, you use a ditching bucket of some sort on
12  your excavator and take them -- root, rod, and all?
13  A. Yes.
14  Q. And then part of the agreement with Joe
15  was to -- you were going to use an excavator or
16  track -- the bulldozer and something and move those
17  trees back onto the Marlen property?
18  A. Yes.
19  Q. And did you, in fact, direct Rex to do
20  that?
21  A. Yes.
22  Q. Did he tell you he did that?
23  A. They said it was done.
24  Q. Okay. And are you involved in the farming

Page 164

1   of the Marlen property?
2   A. Yes.
3   Q. And you actually do -- you personally do
4   any of the farming?
5   A. Fall. I do the fall harvest. I do not do
6   the spring planting.
7   Q. So you do the combining?
8   A. Yeah.
9   Q. And make sure the money gets in, right?
10  Do you ever get mad at the planter, the
11  guy that did the planting, when you run the combine?
12  A. Yeah.
13  Q. Did you harvest the Marlen property last
14  fall?
15  A. Yes.
16  Q. Were the trees still there on the south
17  end of the Marlen property?
18  A. To be quite honest, I couldn't tell you.
19  I didn't look over there. I was concentrating right
20  here in front of me.
21  Q. Okay. Would there be a place on the
22  Marlen property that the trees could be brought back
23  on the Marlen property without impeding on the crop
24  field?

Page 165

1   A. Yes.
2   Q. Okay.
3   A. There was an area where we -- when we come
4   down and cleaned the ditch that was on the Marlen
5   farm. We'd stack what brush we took out of the
6   Marlen farm along there. So we probably just added
7   that to that. So I wouldn't be able to tell you one
8   from the other.
9   Q. So what you just described, this ditch
10  along the west side of this levee would go farther
11  south than the farm field?
12  A. Yes.
13  Q. Okay. And so the little chute, so to
14  speak -- do you know what I'm talking about? I
15  guess there's a chute past the farm field that you
16  cleaned out on the ditch, right?
17  A. Yeah.
18  Q. Do understand what I'm saying?
19  I mean, kind of the farm field, and then
20  you clean the ditch further south?
21  A. Yes.
22  Q. Okay.
23  A. Yes.
24  Q. And I assume the levee is on one side as

42 (Pages 162 to 165)

Doug Blankenship
August 31, 2023

Page 166

1  opposed to trees are on the other?
2        MR. ST. ONGE:  Let him answer.
3        THE DEPONENT:  Yes.
4  BY MR. BLEYER
5     Q.  So any trees you took out of the ditch on
6  the Marlen property as opposed to trees you brought
7  back from the Lucas property would have been in that
8  area south of where you farmed?
9     A.  Yes.
10    Q.  Okay.  Adjacent to the drainage ditch?
11    A.  Yes.
12    Q.  Okay.  Stacking them on the side of the
13 drainage ditch does not impede the drainage process,
14 does it?
15    A.  No.
16    Q.  Working in and around Fayette County area,
17 I assume you do a lot of work in the bottoms?
18    A.  Yeah, yes.
19    Q.  You're familiar with types of trees?  What
20 trees are valuable, what trees are not valuable?
21    A.  Somewhat, yes.
22    Q.  Okay.  Did you see any valuable trees in
23 that area when you were on the Lucas's property with
24 Joe?

Page 167

1     A.  I did not.  I wasn't specifically looking
2  for valuable trees, so I can't say that I noticed
3  any valuable trees or I didn't.
4     Q.  Valuable trees.
5        What else besides oak is good that grows
6  in the --
7     A.  In the river bottoms would be walnut
8  potentially.  Typically your hardwoods in your river
9  bottoms are the red oaks, white oaks.  The ones more
10 valuable are not in your river bottoms.  Your black
11 oaks, bur oaks, stuff like that, they tend to like
12 that weather -- damper, hydric soil better.  Other
13 than that, it's sycamore, cottonwoods, willows.
14    Q.  Have you ever seen a sycamore or willow
15 growing in the high ground, dry ground?
16    A.  No.
17    Q.  They like the river bottoms, though, don't
18 they?
19    A.  They like water.
20    Q.  Okay.  Did Jim Marlen direct you to cut or
21 remove any trees from the Lucas property?
22    A.  No.
23    Q.  Did the Marlen Family Trust direct you to
24 remove any trees from the Lucas property?

Page 168

1        MR. ST. ONGE:  Objection to the form
2  of the question.  It's vague.
3        THE DEPONENT:  No.
4  BY MR. BLEYER
5     Q.  When I say "Marlen Family Trust," I'm
6  referring to the trustee.  Did the trustee ever tell
7  you to remove any trees from the Lucas property?
8        MR. ST. ONGE:  Objection to the form
9  of the question.  It's also vague.  If you can
10 identify a person, it would be helpful.
11       THE DEPONENT:  No.
12 BY MR. BLEYER
13    Q.  At the time of the incident, Jim Marlen
14 was trustee.  Did Jim Marlen, trustee of the Marlen
15 Family Trust, ever direct you to remove any trees
16 from the Lucas property?
17    A.  No.
18    Q.  Did Nate Marlen ever direct you to remove
19 any trees from the Lucas property?
20    A.  No.
21    Q.  Okay.  As I understand it, while Jim
22 Marlen was living, all the direction as to the work
23 you, Blankenship, were trying to farm would be at
24 the direction of Jim Marlen?

Page 169

1     A.  Agreed upon between Jim Marlen and myself,
2  yes.
3     Q.  Okay.  Even if Nate would have made a
4  suggestion, you still had to reach the agreement
5  with his dad while he was living?
6     A.  Yes.
7        MR. BLEYER:  I need to talk to my
8  co-counsel for a second.
9        MR. ST. ONGE:  Okay.
10       (A short break was taken.)
11 BY MR. BLEYER
12    Q.  Doug, when you had the meeting with Joe
13 Lucas on his property, was Nate Marlen present?
14    A.  No.
15    Q.  Was Jim Marlen present?
16    A.  No.
17    Q.  And these gentlemen that worked for
18 you -- Rex, and who was the other guy?
19    A.  Barry Matthews.
20    Q.  Barry.
21       I assume you were the one that would have
22 directed them what to do?
23    A.  Yes.
24    Q.  Let me ask the question.

43  (Pages 166 to 169)

Doug Blankenship
August 31, 2023

Page 170

1      You were the one that directed them to
2  perform the work they performed?
3      **A.  Yes.**
4      Q.  You wouldn't expect them -- or strike
5  that.
6          Did Nate Marlen give them any direction on
7  what to do on the Marlen Family Trust --
8      **A.  No.**
9      Q.  -- the property?
10     Did Jim Marlen direct your employees to do
11  any work on the --
12     **A.  No.**
13         MR. ST. ONGE:  Let him finish the
14  question.
15         On what property?
16         MR. BLEYER:  I was getting ready
17  to --
18         THE DEPONENT:  Oh, sorry.
19  BY MR. BLEYER
20     Q.  Did Nate Marlen direct any of your
21  employees to do any work on the Marlen Family Trust
22  property?
23     **A.  No.**
24     Q.  Did Nate Marlen direct any of your

Page 171

1  employees of work to do on the Lucas property?
2      **A.  No.**
3      Q.  Did Jim Marlen direct your employees how
4  to do any work on the Marlen property?
5      **A.  No.**
6      Q.  Did Jim Marlen direct any of your
7  employees how to do work on the Lucas property?
8      **A.  No.**
9          MR. BLEYER:  That's all the questions
10  I had.
11         MR. DEVORE:  Just a couple.
12             EXAMINATION
13  BY MR. DEVORE
14     Q.  Mr. Blankenship, you've had a lot of
15  questions about the removal of this concrete
16  structure and the conversations you had with Jim
17  Marlen.
18         You testified that over your decades of
19  doing these types of projects, you would give a
20  recommendation to a landowner, and the landowner
21  would accept all or part of your recommendation, and
22  then if you come to an agreement on price, you would
23  do the work?
24     **A.  Yes.**

Page 172

1      Q.  Have you ever had one of your
2  recommendations by a landowner rejected and saying,
3  "We're not interested in that"?
4      **A.  Yes.**
5      Q.  And if they reject your recommendation, do
6  you still do the work?
7      **A.  No.**
8      Q.  At the time you had this meeting with Jim
9  Marlen, it was your understanding, based upon
10  comments from Jim, that he had put this structure
11  in, correct?
12     **A.  Yes.**
13     Q.  And did you conclude at that time,
14  rightfully or wrongly, that that meant that Jim
15  may have owned where that property was at?
16     **A.  Yeah.**
17     Q.  If Jim would have said to you:  "I don't
18  want to remove that," would you have still removed
19  it?
20     **A.  No.**
21         MR. ST. ONGE:  Objection.  Calls for
22  speculation.
23  BY MR. DEVORE
24     Q.  In your experience, if a landowner tells

Page 173

1  you:  "I don't want that done," can you -- do you
2  still remove it?
3      **A.  No.**
4      Q.  So your recommendation, under this fact,
5  was accepted by Jim, correct?
6      **A.  Yes.**
7          MR. BLEYER:  Just show my objection.
8  It's called "mere speculation."
9          MR. DEVORE:  What's speculation,
10  counsel?  What's speculation?
11         MR. BLEYER:  As to what the question
12  was.  Unless you want to go talk to Jim.
13         MR. DEVORE:  You made a
14  recommendation to Jim -- well, we've been listening
15  to Jim's conversations all day.
16  BY MR. DEVORE
17     Q.  You made a recommendation when Jim and
18  Nate were present to remove this structure, correct?
19     **A.  Yes.**
20     Q.  And Jim said to you:  "If that's your
21  recommendation, go ahead and remove it," correct?
22     **A.  Yes.**
23     Q.  Okay.  And because of that acceptance of
24  your recommendation, only then is that why you

44  (Pages 170 to 173)

Doug Blankenship
August 31, 2023

Page 174

1  removed it?
2      **A.  Yes.**
3      Q.  Now, you were there with Mr. Lucas, and
4  you walked from the south from the Kaskaskia up to
5  where this old structure used to be, correct?
6      **A.  Yes.**
7      Q.  Okay.  And so you were able to visually
8  see at that point in time what appeared to be the
9  work that Rex had done --
10     **A.  Yes.**
11     Q.  -- correct?
12        You saw the area where this old structure
13  was at?
14     **A.  Yes.**
15     Q.  Okay.  You saw the area north of where the
16  old structure was at where he would have come from
17  the drainage ditch to the north working his way
18  south, correct?
19     **A.  Yes.**
20     Q.  Okay.  You saw somewhere in this general
21  area a pile of trees?
22     **A.  Yes.**
23     Q.  Okay.  Now, how many piles of trees in
24  your decades of experience have you stacked in your

Page 175

1  time?
2      **A.  Several, lots.**
3      Q.  Is there a significant difference between
4  a pile of 20 trees and a pile of 150 trees?
5      **A.  There is no piles of 150 trees.  It would**
6  **be too big of a pile.  Yes, there's a significant**
7  **difference.**
8      Q.  I was getting to that.  You knew I've been
9  doing this awhile, too, right?
10        Can you even stack 150 trees in one stack?
11     **A.  They would have to be very small trees to**
12  **do it.**
13     Q.  How about trees that are 56 inches in
14  diameter?
15     **A.  No way, no.**
16     Q.  Did you see more than one stack of trees
17  that day?
18     **A.  No.**
19     Q.  In that stack of trees, is there any way
20  possible there was 150 trees in that stack?
21     **A.  No.**
22     Q.  Now, you were there cleaning out this
23  drainage ditch with a ditching bucket?  It would
24  have been a ditching bucket on your machine?

Page 176

1      **A.  There would have been -- at first,**
2  **clearing the brush would have been a "digging"**
3  **bucket.**
4      Q.  Okay.
5      **A.  And then they would have dropped it off**
6  **and went to the smooth-mouth, ditching bucket.**
7        MR. ST. ONGE:  I'm sorry.  I didn't
8  understand that.  You said he was out there digging?
9        MR. DEVORE:  No, I didn't say that,
10  did I?  I apologize.  No.
11  BY MR. DEVORE
12     Q.  Whoever would have been there doing this
13  work -- Rex -- would he have only used the ditching
14  bucket for this work, or would he have had another
15  bucket?
16        MR. ST. ONGE:  Sorry.  What work are
17  we talking about?  The repair work or the original
18  work?
19        MR. DEVORE:  The original work.  Fair
20  enough.
21  BY MR. DEVORE
22     Q.  When he cleaned this ditch, would he have
23  cleaned it all with one bucket, or would he have had
24  two buckets on the excavator?

Page 177

1      **A.  Typically we would have two buckets, yes.**
2      Q.  But you wouldn't have known because you
3  weren't there?
4      **A.  I wouldn't have known it because I wasn't**
5  **there.**
6      Q.  Now, this -- we've talked a lot about this
7  ditch that runs along the west side of the levee,
8  and we're talking about where it comes through the
9  Marlen property from the east to the west through
10  the levee, correct?
11     **A.  Correct.**
12     Q.  And the water comes through that ditch or
13  through that pipe and then heads south, correct?
14     **A.  Correct.**
15     Q.  Okay.  And it heads south through -- can
16  we call it a drainage ditch?  Is it a ditch?
17     **A.  Yes.**
18     Q.  Okay.  And you testified that those
19  ditches will over time get silt in them from the
20  farm practices?
21     **A.  Farming practices, just lack of**
22  **maintenance, yes.**
23     Q.  Corn stalk debris?
24     **A.  Yes.**

45 (Pages 174 to 177)

Doug Blankenship
August 31, 2023

Page 178

1      Q. So cleaning that ditch out is a common
2  practice for drainage maintenance?
3      **A. Yes.**
4      Q. Now, this drainage ditch that we're
5  talking about, it has to end someplace, correct?
6      **A. Yes.**
7      Q. Where does it end here?
8      **A. Kaskaskia River.**
9      Q. And you testified 300 or 400 feet, you
10  believe, from the old concrete structure to the
11  river?
12      **A. 300 or 400 feet from our -- where Rex last**
13  **did a scoop out of the ditch to the river.**
14      Q. Okay. You said he went -- it was your
15  testimony that he went a little bit further south
16  than where the old structure to the best of your
17  recollection?
18      **A. Right, to the best of my recollection.**
19      Q. Okay. So would it be fair to say that for
20  someone to say you've widened it, deepened it,
21  et cetera, would have to be based upon how this was
22  originally constructed whenever it was constructed?
23      **A. Yes.**
24      Q. So when you clean out a ditch, unless you

Page 179

1  have knowledge of how it existed before it started
2  silting in, you wouldn't be able to say whether it
3  was increased in size or depth, et cetera; is that
4  fair?
5      **A. That's fair, yes.**
6      Q. As you sit here today, do you have any
7  facts available to yourself that would lead you to
8  believe that this ditch may not be in the levee
9  district?
10      **A. No.**
11      Q. Strike that.
12          This whole area that we're talking about,
13  to the best of your recollection, is in the levee
14  district, correct?
15      **A. Yes.**
16      Q. Okay. Would it be fair to say it's a
17  separate question of whether or not this ditch
18  itself is actually part of the levee district's
19  drainage apparatus, one they maintain? Is that a
20  separate question of whether the property is in the
21  drainage district or not?
22      **A. Yes.**
23      Q. And as you sit here today, your knowledge
24  is from some -- a board member of the levee district

Page 180

1  saying, "We believe that's our ditch"; is that fair?
2      **A. Yes.**
3      Q. Okay.
4      **A. I mean, the tube, the levee that's there**
5  **now that the water runs through is the levee**
6  **district's, so . . .**
7      Q. That's a good point. I want to mention
8  that.
9          To your knowledge -- and, again, we only
10  want your knowledge -- the levee -- how tall is that
11  levee?
12      **A. That levee is 15 or so feet tall probably.**
13      Q. Okay. And as you sit here today, that
14  levee -- everything you know to be true is actually
15  the levee district's?
16      **A. Yes.**
17      Q. Okay. And the drainage ditch that's to
18  the west of it that we've been talking about running
19  south of the pike all the way to the Kaskaskia, as
20  you sit here today, rightfully or wrongfully, you
21  believe it's part of the levee district's drainage
22  apparatus?
23      **A. Yes.**
24      Q. Now, you -- strike that.

Page 181

1          You said that when you were there
2  with -- in 2022 with Mr. Lucas, that you were able
3  to visually see where Rex had stopped cleaning the
4  ditch?
5      **A. Yes.**
6      Q. Can you say, to the best of your
7  recollection, where he stopped, how deep was the
8  ditches compared to where it was still silted in as
9  it headed south, if you recall?
10      **A. Immediately adjacent to where Rex stopped,**
11  **there was still some depth in the ditch. You had to**
12  **go another 100, 120 feet, and then all of a sudden,**
13  **it just kind of filled up, and everything just kind**
14  **of dispersed. There's a pond there it kind of runs**
15  **into and just brush everywhere. It's just clogged**
16  **up.**
17      Q. So based upon your decades of experience,
18  would you have been led to believe at some point in
19  time in the past from the point that Rex stopped all
20  the way to the Kaskaskia was, in fact, cleared out
21  to where the water could freely flow?
22      **A. Yes.**
23      Q. But you didn't go that far, correct?
24      **A. No.**

46 (Pages 178 to 181)

Doug Blankenship
August 31, 2023

Page 182

1      Q.  Okay.  As you sit here today, do you
2  believe that work needs to be done in order to get
3  the drainage on all of this property around this
4  area to be able to flow correctly?
5      **A.  Yes.**
6      Q.  Okay.  So you said from where Rex had
7  stopped, that even if you continued to go a little
8  farther, there was still some semblance of a ditch?
9  Just the elevation was a little higher?
10     **A.  Possibly, a little.**
11     Q.  All right.  And you saw some place in this
12 area where someone had been driving through with
13 some kind of side-by-sides or ATVs?
14     **A.  Yes.**
15     Q.  Okay.  Now, would it be fair to say that
16 if the ditch -- where your staff had cleaned out the
17 ditch, but then where they'd stopped and we had this
18 other area, was it possible to cross where Rex had
19 done the cleaning out still?
20     **A.  No.**
21     Q.  Okay.  So Mr. Lucas bringing up to you
22 that he couldn't -- he was having problems now
23 crossing --
24     **A.  Yes.**

Page 183

1      Q.  -- how -- why did you believe that he
2  couldn't cross?  I'm just curious.  I'm trying to
3  visualize.  He couldn't cross that area if you
4  hadn't excavated it out.  Do you think he could
5  still cross there?
6          MR. ST. ONGE:  Objection.  Asked and
7  answered.
8          MR. DEVORE:  I don't think I've asked
9  that question.
10         MR. ST. ONGE:  He just said he
11 couldn't cross.
12 BY MR. DEVORE
13     Q.  Go ahead.
14     **A.  Rephrase the question one more time.**
15     Q.  Okay.  His -- your statement was that
16 Mr. Lucas said, "Because of the work that you have
17 done, I can't cross."
18     **A.  Correct.**
19     Q.  Okay.  But you still saw an area somewhere
20 south of where Rex had stopped that he was crossing?
21     **A.  Someone had, yeah.**
22     Q.  Someone had?
23         MR. ST. ONGE:  Objection.  Calls for
24 speculation.  Thank you.

Page 184

1  BY MR. DEVORE
2      Q.  Somebody crossed?
3      **A.  Somebody crossed.**
4      Q.  I think your testimony was you didn't
5  quibble about that because you just wanted to solve
6  what Mr. Lucas was calling an issue?
7      **A.  Yes.**
8      Q.  So the putting the pipe in, this area,
9  somewhere in that area -- I mean, to the best of
10 your recollection, that pipe is somewhere from where
11 Rex stopped between there and the Kaskaskia River?
12     **A.  No.  It's to be from where Rex stopped,**
13 **get back north to where the structure was.**
14     Q.  Oh, that was your understanding at least?
15     **A.  Yes.**
16     Q.  It wasn't -- they weren't going to put it
17 south of where Rex stopped?  They were going to come
18 back north someplace?
19     **A.  Yes.**
20     Q.  And prior to Rex doing this work, could
21 you tell about how much silt had been pulled out
22 where Rex had done the work to where he hadn't?  How
23 far down, give or take?  Could you even tell?
24     **A.  I mean, certain areas require more digging**

Page 185

1  **because the way they get blocked up, but I mean, I**
2  **want to say probably 18 inches of material out of**
3  **the bottom, something to that . . .**
4      Q.  And you've cleaned out drainage district
5  ditches before, correct?
6      **A.  Yes.**
7      Q.  Okay.  You've done that?
8      **A.  Yes.**
9      Q.  Okay.  Have you ever cleared out a
10 drainage district ditch for them and then put a pipe
11 and a culvert in it so the people that owned the
12 property, subject to the drainage easement, could
13 get across the drainage levee's ditch?  Have you
14 ever done that before?
15     **A.  No.**
16     Q.  To your knowledge and experience, is that
17 something that the levee district would even want?
18     **A.  No.**
19         MR. ST. ONGE:  Objection.  Calls for
20 speculation.
21         MR. DEVORE:  I don't know if he's
22 speculating.  He's a 30-year expert.
23 BY MR. DEVORE
24     Q.  Let me ask you this.

47  (Pages 182 to 185)

Doug Blankenship
August 31, 2023

Page 186

1          Putting that in the way that it was put
2    in, could the levee district take the position that
3    that pipe and work, in and of itself, is impeding
4    their drainage district? Could they take that
5    position?
6        A.  Yes.
7            MR. DEVORE:  No further questions.
8            FURTHER EXAMINATION
9    BY MR. ST. ONGE
10       Q.  I've got a few follow-ups for you.
11           You said just a minute ago that -- when
12   you were asked if you knew how much silt had been
13   taken out, you said you didn't know, but you thought
14   it might be, what, 18 inches?
15       A.  Could possibly be.
16       Q.  And you didn't measure that at all?
17       A.  No.
18       Q.  And you didn't have -- you had never seen
19   that ditch before except for 250 feet north?
20       A.  Correct.
21       Q.  Standing on the Marlen property?
22       A.  Yes.
23       Q.  You said part of the levee district's
24   drainage apparatus goes all the way to the river,

Page 187

1    right? What is that based upon?
2        A.  Ask me that again, please.
3        Q.  Part of the levee district's drainage
4    apparatus your counsel asked you about, you said
5    that that goes all the way down to the Kaskaskia
6    River?
7            MR. DEVORE:  Misstates prior
8    testimony. He said he believed it would likely go
9    that far.
10           MR. ST. ONGE:  Okay. Well, he said
11   he did. That's my question.
12   BY MR. ST. ONGE
13       Q.  You don't actually know if it goes all
14   that far?
15       A.  I don't actually -- well, no, I don't,
16   but, I mean, it should because the ditch just cannot
17   stop.
18       Q.  Okay, but what's that based upon? What is
19   it -- I mean, what is your basis for your belief
20   that the ditch -- that the district --
21       A.  My knowledge is that whenever you drain
22   water down a ditch, you just can't stop it with a
23   block wall. It's got to drain out to someplace, and
24   nature is the Kaskaskia River.

Page 188

1        Q.  So the levee district owns that entire
2    ditch? Is that your testimony?
3        A.  It's in the levee district.
4        Q.  So it owns that ditch?
5            MR. DEVORE:  You're misstating his
6    testimony. He said if, in fact, the levee district
7    does own --
8            MR. ST. ONGE:  Let him testify.
9            MR. DEVORE:  Well, you're trying to
10   put words in his mouth, counsel. That's not what he
11   testified to.
12           MR. BLEYER:  Calm down. She's got to
13   take everything down. It's easier for one person to
14   talk at a time.
15           MR. DEVORE:  I agree.
16           My client is borderline getting
17   badgered here at this point.
18           Go ahead, Doug.
19           THE DEPONENT:  I would assume beings
20   it's in a levee district, and it runs a long, deep
21   levee, that would be property -- or under the
22   jurisdiction of the levee district.
23   BY MR. ST. ONGE
24       Q.  Does the public have free rein to clean

Page 189

1    out any of the levee district's ditches wherever
2    they may happen to fall?
3        A.  No.
4            Well, let me back up. If it's a
5    professional crew, I'm quite sure the levee district
6    wouldn't oppose it if they want to do it for no fee.
7        Q.  So they just can go out there anytime they
8    want and just clear ditches for the levee district?
9        A.  What my knowledge is that if there is some
10   property owners that have excavators
11   themselves -- farmers -- and there is a levee
12   district ditch that is stopped up and flowing, a
13   levee district will from time to time let them clean
14   that ditch out.
15       Q.  What is that based upon?
16           MR. DEVORE:  My client is not a
17   lawyer. He's trying to restate the drainage act,
18   counsel.
19           THE DEPONENT:  I'm just saying that's
20   just common practice throughout the bottom,
21   everybody that owns the bottom ground.
22   BY MR. ST. ONGE
23       Q.  And if those ditches happen to fall on
24   private property, it's okay for anybody that wants

48  (Pages 186 to 189)

Doug Blankenship
August 31, 2023

Page 190

1   to go onto that private property and clear out the
2   ditch? Is that your testimony?
3       **A. If it's -- I can't say that if it's not**
4   **their private property, no.**
5       Q. If it's on other private property, the
6   public can just go on there to clear --
7           MR. DEVORE: My client is not a
8   lawyer, counsel. You're trying to ask him to state
9   the law. Ask him a question of fact, please.
10  BY MR. ST. ONGE
11      Q. Go ahead.
12      **A. Ask the --**
13      Q. To your understanding, the public can just
14  go onto a ditch that is maintained by a levee
15  district, even though it happens to be on other
16  private property, and clean out that ditch without
17  getting permission?
18          MR. DEVORE: Before you answer that,
19  Doug, I'm going to say that our affirmative defense
20  clearly states out what he believes to be a legal
21  justification for him having and going and done that
22  if, in fact, it is in the levee district.
23          MR. BIERMAN: Exactly, which is why
24  this is a perfectly reasonable line of inquiry

Page 191

1   because he has taken this position, this legal
2   position.
3           MR. DEVORE: Okay.
4           MR. BIERMAN: So let's hear about it.
5           MR. DEVORE: If he understands that
6   that's what the law says, that's all he can say. He
7   can't articulate to you some prose like he's an
8   attorney.
9           MR. ST. ONGE: That's good advice for
10  your witness, but I'd like to hear his answer.
11          THE DEPONENT: John Q. Public, if
12  they have no expertise, no machines, can't
13  technically go on somebody else's property.
14  BY MR. ST. ONGE
15      Q. Even if they have the experience, they
16  can't --
17      **A. Even if they have the experience -- in the**
18  **levee district situation, I can't answer to that.**
19      Q. Okay. And you said that the -- when your
20  lawyer was questioning you, you said that Rex had
21  cleared out a little bit beyond the structure. Now,
22  I'm trying to quantity. You said earlier that it
23  was about 50 feet worth.
24      **A. I'm guesstimating. So I took an app -- or**

Page 192

1   **not app, but a computer program. I measured it from**
2   **the supposed line on the program down to the bottom**
3   **of where Rex quit was 85 feet. So somewhere in**
4   **between that property line and that 85 feet where**
5   **Rex quit, there was a structure in there.**
6       Q. That's 85 feet from what line to what
7   line? Sorry.
8       **A. From the property line on the app on the**
9   **computer, they've got a tool where you can measure.**
10      Q. Okay. So it's 55 feet from the
11  Marlen-Lucas border down to where he stopped?
12      **A. 85.**
13      Q. 85? Sorry. I need to get clarity on
14  that.
15      **A. 85 is what I measured off of the farm app.**
16      Q. And how did you know where he stopped?
17      **A. They've got lines drawn on there, 85 feet**
18  **from the border to where Rex stopped. The concrete**
19  **structure was somewhere in between that point and**
20  **the property line.**
21      Q. So he cleared 85 feet worth of ditch?
22      **A. Yes.**
23      Q. Did you -- do you have any documents to
24  show the measurement that you did?

Page 193

1       **A. It's on the computer.**
2       Q. Did you make a report of it, print it out?
3       **A. No.**
4       Q. Did you do it again?
5       **A. Yeah.**
6       Q. Okay. You said that there's no way there
7   was 150 trees on that property, but you didn't count
8   them, correct, the ones that were lined up?
9       **A. In the 150 trees in the pile?**
10      Q. Yes.
11      **A. No. There's no way there was 150 trees in**
12  **that pile.**
13      Q. Did you bother to try to count how many
14  trees were in that pile at any point?
15      **A. No, I did not.**
16      Q. The 85 feet, is that as the crow flies or
17  along the ditch?
18      **A. That was taking the mouse on the computer,**
19  **dotting the location on the property line and**
20  **bringing it straight south down the ditch to where**
21  **Rex had cleared.**
22      Q. Straight south or along the ditch? Same
23  thing?
24      **A. Yeah.**

49 (Pages 190 to 193)

Doug Blankenship
August 31, 2023

Page 194

1    Q.  Okay.
2    **A.  It's down -- down the work that he did.**
3    Q.  You traced along the ditch line?
4    **A.  Down the middle of the ditch.**
5    Q.  And that's an app from an aerial shot
6    above?
7    **A.  Right.  Now, whether those property lines**
8    **are accurate off of that app, I don't know.**
9    Q.  Well, there's tree covering, too, right?
10   **A.  Not in that, no.  Across there, that was**
11   **kind of an open area where trees had been cleared.**
12   **There's a new image after this work had been done.**
13   Q.  So there's no interference from the trees?
14   You can actually see the entire ditch on that app?
15   **A.  Pretty much, yes.**
16   Q.  What's the app called?
17   **A.  MyGIS.**
18   Q.  MyGIS?
19   **A.  MyGISOnline.  MyGISOnline, all together.**
20       MR. BLEYER:  Do you have to go to
21   Fayette County?
22       MR. DEVORE:  It's got all the
23   counties listed on MyGIS.
24       MR. BLEYER:  Then you go . . .

Page 195

1    BY MR. ST. ONGE
2    Q.  So when you met with Joe and Nate, they
3    told you that whatever you think you need to do in
4    order to clear that area --
5    **A.  Jim and Nate.**
6    Q.  Jim and Nate.  I apologize.
7       When you met with Jim and Nate, they said,
8    "Whatever you think you need to do to clear that
9    area, do it."
10      MR. HASENSTAB:  Objection.  Misstates
11   his testimony.  He didn't say they said it, that
12   they told him that.
13      MR. ST. ONGE:  Okay.
14      THE DEPONENT:  Right.
15      MR. HASENSTAB:  He said Jim said it.
16   BY MR. ST. ONGE
17   Q.  Jim told you whatever you need to do, you
18   can do it?
19   **A.  Upon my recommendation to Jim that that**
20   **structure needs to come out, Jim says, "If that's**
21   **what you think needs to happen, do it."**
22   Q.  And, again, Nate was right there with his
23   father at this point?
24   **A.  Yes, sir.**

Page 196

1    Q.  And he didn't make any objection to that
2    at all, did he?
3    **A.  No.**
4    Q.  When you were being questioned earlier,
5    you mentioned that the trees that were moved, you
6    said that they were in the ditch; is that right?
7    **A.  There was trees in the ditch, on the banks**
8    **of the ditch, and trees in the way -- to get the**
9    **machine to do the process, it had to come out.**
10   Q.  So they were not all in the ditch?  There
11   was some outside the ditch?
12   **A.  There was some outside the ditch.**
13   Q.  When Barry and Rex told you that they had
14   to bolt these tubes together and pour concrete on
15   it, does that sound like what you instructed them to
16   do?
17   **A.  Yeah.  I mean, they took pipes from my**
18   **yard, and they put them in there, and they said**
19   **there was some damage on one of them.**
20       **And Barry said, "I took it that we're**
21   **going to keep these together, so I bolted it**
22   **together with bolts."**
23       **And he said he even went to -- I believe**
24   **to Rural King, got a bag of Quikrete concrete, and**

Page 197

1    **poured over the top of it.**
2    Q.  So he got a single bag of Quikrete to pour
3    over --
4    **A.  To try to lock two pieces together.**
5    Q.  -- the seam?
6       And, again, there's no way to check -- for
7    you to check to see if that's correct?
8    **A.  Other than dig it up.**
9    Q.  Which you never did?
10   **A.  I never did.**
11   Q.  You said that the area from where Rex
12   stopped clearing out was about 300 to 400 feet from
13   the Kaskaskia?
14   **A.  To my knowledge, yes.**
15   Q.  Was that just eyeballing it?  You didn't
16   take a measuring tape?
17   **A.  I didn't take a measuring tape.**
18   Q.  You didn't walk it?
19   **A.  No.**
20   Q.  You said that no one has ever said that
21   Blankenship created a new ditch on the property?
22   You never heard that before?
23   **A.  No.**
24   Q.  Well, this lawsuit is the first time you

50  (Pages 194 to 197)

Doug Blankenship
August 31, 2023

Page 198

1  heard that?
2  **A.  Yes.**
3      Q.  And you said earlier that Blankenship did
4  not make a new ditch on the property?
5  **A.  Not to my knowledge.  They was not**
6  **instructed to do so.**
7      Q.  Right.  And you haven't been out there to
8  confirm whether that's the case?
9  **A.  No.**
10     MR. ST. ONGE:  That's all I have.
11         FURTHER EXAMINATION
12  BY MR. BLEYER
13     Q.  Just a couple of follow-up questions.
14     On the ditch on the Lucas property, is
15  there flat ground between the east ditch line and
16  the levee, or does the ditch just start at the
17  bottom of the levee?
18     **A.  No.  There's some -- there's some ground**
19  **between the edge of the ditch and the bottom of the**
20  **levee.**
21     Q.  Okay.  And then on the west side of this
22  ditch on the Lucas property, how wide did you have
23  to clean to get your excavator down the side of the
24  west side of the ditch?

Page 199

1     **A.  50, 60 feet.**
2     Q.  Okay.  And then do you know how wide that
3  flat land is between the east side of the ditch and
4  the levee?
5     **A.  No.  I don't know, no.**
6     Q.  Did you clean any of that off, or is it --
7     **A.  No.  We was only on the west side of the**
8  **ditch.**
9     Q.  This levee on the Lucas property there,
10  are there any trees or growth on the levee other
11  than grass?
12     **A.  No.**
13     Q.  Okay.
14     **A.  Just grass.**
15         MR. BLEYER:  Thank you.
16         MR. DEVORE:  Can I get a sticker,
17  please?  I'll make this record a little clearer.
18         (Exhibit 10 was marked for
19  identification.)
20         FURTHER EXAMINATION
21  BY MR. DEVORE
22     Q.  Doug, take a look at this briefly.  Let me
23  know when you're ready, sir.  Are you ready?
24     **A.  Yes.**

Page 200

1     Q.  And you talked to counsel about MyGIS and
2  a map that you had pulled up of this property; is
3  that fair?
4     **A.  Yes.**
5     Q.  Does this appear to be it?
6     **A.  Yes.**
7     Q.  Okay.  And getting your bearings on that,
8  that red line, I'm going to mark north being at the
9  top.
10     That red line that runs from the left to
11  the right, does that -- again, based upon at least
12  this mapping system -- appear to be the approximate
13  line where Mr. Marlen's property is to the north and
14  Mr. Lucas to the south?
15     **A.  Yes.**
16     Q.  Now, if we look at that line that's
17  diagonal -- if we look at the line that's diagonal
18  on the right-hand side, that runs southeast
19  diagonally.  Does that appear to maybe be the east
20  border of Mr. Lucas's property?
21     **A.  I would assume so.**
22     Q.  Okay.  So if we now -- in this picture,
23  two-thirds of the way from the left, there seems to
24  be a big, muddy area.  Do you see that?  Do you want

Page 201

1  to draw a line -- dash a line down through what
2  we're talking about here?
3     **A.  [Deponent indicated.]**
4     Q.  I mean, whatever that is.  We've marked it
5  here with a hyphenated line, right?
6         MR. ST. ONGE:  What are you saying
7  that is?
8         MR. DEVORE:  I'm getting ready to --
9         MR. ST. ONGE:  Okay.
10  BY MR. DEVORE
11     Q.  Does that appear to be you -- the dotted
12  line -- Mr. Blankenship, approximately the center of
13  this drainage ditch?
14     **A.  Yes.**
15     Q.  Okay.  Now, that drainage ditch runs to
16  the north up along the west side of the levee until
17  we get to the pipe that comes through the levee; is
18  that fair?
19     **A.  Yes.**
20     Q.  Okay.  Now, it appears where your dashed
21  line is, we go south -- we're headed south towards
22  Kaskaskia; is that correct?
23     **A.  Yes.**
24     Q.  And does it appear there that the ditch

51 (Pages 198 to 201)

Doug Blankenship
August 31, 2023

Page 202

```
 1   stops, and then we have trees, et cetera, going
 2   further south?  Is that a fair representation of
 3   what's going on there?
 4       A.  Yes.
 5       Q.  Is that area, to the best of your
 6   recollection, where the mud/water cleared area
 7   stops, is that where Rex quit digging?
 8       A.  Yes.
 9           MR. ST. ONGE:  Can you mark that?
10           MR. DEVORE:  Yeah.
11   BY MR. DEVORE
12       Q.  Can you draw a line across where your --
13       A.  [Deponent indicated.]
14       Q.  And your testimony is, is that then the
15   crossing is somewhere to the north of that line you
16   just drew representing where Rex quit digging to the
17   best of your recollection?
18       A.  To the best of my recollection.
19       Q.  But you haven't been there?
20       A.  I have not been there.
21       Q.  So what happens to the water as it comes
22   south through this ditch, and it hits where Rex
23   stopped digging?
24       A.  Where Rex stops digging?
```

Page 203

```
 1       Q.  Yeah.  What happens to it then?
 2       A.  It actually swells up out of what -- well,
 3   it just sprawls out all over the woodlands.
 4       Q.  Okay.
 5       A.  And runs off into a pond.
 6       Q.  So it's hitting however -- however -- and,
 7   again, this is what they're going to say.  You've
 8   never seen it happen.  I'm not asking you what
 9   you've seen here.  I'm asking you, based on three
10   decades of cleaning drainage ditches, what you see
11   in this picture, okay?
12       A.  Right.
13       Q.  So the water, as it comes down this
14   drainage ditch, it hits where it's no longer been
15   cleaned out, correct?
16       A.  Correct.
17       Q.  And when water hits there, will it --
18       A.  Slows down.
19       Q.  -- just slowly fill up and until it hits
20   the top?
21       A.  Yes.
22       Q.  And then it will just disperse across the
23   property?
24       A.  Yes.
```

Page 204

```
 1       Q.  Based on your experience, is that what
 2   you'd expect to happen here?
 3       A.  Yes.
 4       Q.  Now, if that ditch was cleaned out from
 5   there all the way to Kaskaskia, the water would just
 6   travel freely to the Kaskaskia River?
 7       A.  Yes.
 8       Q.  In your professional opinion, is that what
 9   needs to happen here?
10       A.  Yes.
11       Q.  And as you sit here today, this area that
12   we're calling the center of the drainage ditch, do
13   you believe, as you sit here today, that that is
14   something under the control of the levee district?
15   I'm not saying you know.  Do you believe it is?
16       A.  I would believe.
17           MR. ST. ONGE:  Objection.  Calls for
18   speculation.
19           MR. DEVORE:  I've asked it that way.
20   Okay.
21   BY MR. DEVORE
22       Q.  Now, if we look at this picture, there are
23   a couple of things I want to point out.
24           Do you see -- as we've called the end of
```

Page 205

```
 1   the digging out of Rex, do you see that?
 2       A.  Yes.
 3       Q.  Go north just a little bit, and it looks
 4   like off to the west, there's a little jog out of
 5   the muddy/sloughy area.  Do you see that?
 6       A.  Yes.
 7       Q.  Do you believe that's approximately where
 8   the concrete structure was at?  Do you know?
 9       A.  It could be, yes.
10       Q.  Well, can you -- based on, again,
11   experience only, have any appreciation of why there
12   might be that little area there that's --
13           MR. ST. ONGE:  Objection.  That calls
14   for speculation.
15           MR. DEVORE:  Again, counsel, I know
16   he's speculating.  That's why I'm asking him clearly
17   not to state a fact here.
18   BY MR. DEVORE
19       Q.  Do you -- any appreciation based on your
20   experience what it might be?  If you don't, that's
21   okay.
22       A.  It could be the fact that could be where
23   the structure was at.  I'm assuming that my guys
24   would have took the structure out and made the ditch
```

52 (Pages 202 to 205)

Doug Blankenship
August 31, 2023

| Page 206 |
|---|

1   nice and uniform.  What that could be is that could
2   be water coming down here and coming around through
3   here and then possibly finding a way into that new
4   ditch, and that could be an erosion.
5       Q.  Okay.  Now, if we go up a little further
6   to the west, does that appear to be a brush pile to
7   you?
8       A.  Yes.
9       Q.  Okay.  Do you believe that was the brush
10  pile that eventually got drug over to Marlen to the
11  best of your understanding?
12      A.  Yes, yes.
13      Q.  So from your understanding, where would
14  Rex have come into this property as he worked that
15  drainage ditch from the culvert way to the north,
16  south?  Where would the machine have physically been
17  working that property before it even gets to Lucas,
18  again, based on your experience of cleaning ditches?
19      A.  Just like that, right down along the west
20  edge of the ditch.
21      Q.  So if he's on the west edge of the ditch,
22  there would be -- how wide is a 323 Cat track
23  machine?
24      A.  About 11 1/2 foot wide.

| Page 207 |
|---|

1       Q.  So he would have needed a 12-foot wide
2   path along the west of the ditch to do his work?
3       A.  That's if he just drove straight.  To
4   operate and move and swing --
5       Q.  Yes.
6       A.  -- you've got to have at least double, if
7   not triple, that.
8       Q.  Okay.  Fair enough.
9           Did you ever walk that area when you were there
10  in 2022?
11      A.  When I was with Joe?
12      Q.  Yes.
13      A.  We walked up to this point.  I believe we
14  didn't cross the ditch.  We walked it to about where
15  Rex ended his excavation on the east side.
16      Q.  So you were on the east side where the
17  excavation ended.  You didn't go all the way up to
18  where the potential property line was at that day?
19      A.  No.
20      Q.  All right.  When you met with
21  Mr. Lucas -- I've got to ask you this question.  I'm
22  just curious.
23          Did -- anytime when he was raising his
24  concerns to you, did he ever say that you have in

| Page 208 |
|---|

1   this process removed trees worth hundreds of
2   thousands of dollars?  Did he ever say that to you?
3       A.  No.
4       Q.  Besides the concern about being able to
5   cross, did he raise any other concerns to you
6   beyond:  "You were on my property"?
7       A.  On the property, unable to cross, and this
8   was still roughed up where we had put the spoil
9   dirt, and I agreed that it was.
10      Q.  So you didn't smooth out the dirt?
11      A.  I didn't smooth out the dirt.
12      Q.  So you didn't smooth out the dirt well
13  enough for his satisfaction?
14      A.  Correct.
15      Q.  He couldn't cross the ditch?
16      A.  Correct.
17      Q.  And you just generally were on his
18  property without his permission?
19      A.  Yes.
20      Q.  Those were his concerns?
21      A.  Yes.
22      Q.  Nothing about trees?
23      A.  No.
24      Q.  After you -- you were -- you believed that

| Page 209 |
|---|

1   your staff had done what you and Mr. Lucas
2   discussed, right?
3       A.  Mm-hmm.
4       Q.  That would have been sometime early 2022?
5       A.  That would have been -- when the work was
6   performed?
7       Q.  Yes, to the best of your --
8       A.  That would have been in '21.
9       Q.  You met with him in the spring of '22 when
10  you did the remediation?
11      A.  Right.
12      Q.  Approximately when was that?
13      A.  Oh, the remediation?
14      Q.  Yes, sir.
15      A.  That would have been in '22.  That would
16  have been probably April area, May, April.
17      Q.  Okay.  And at some point in time, your
18  staff said, "We took care of it"?
19      A.  Yes.
20      Q.  After that time until the time you got
21  this lawsuit, did you ever hear one thing from
22  Mr. Lucas about anything?
23      A.  No.
24          MR. DEVORE:  No further questions.

53  (Pages 206 to 209)

Doug Blankenship
August 31, 2023

Page 210

1           FURTHER EXAMINATION
2   BY MR. ST. ONGE
3       Q.  Do you have any idea when this aerial
4   photograph in Exhibit 10 was taken?
5       **A.  I tried to look on the -- on the program,**
6   **and it didn't offer up a date.**
7       Q.  Okay.  So you don't know?
8       **A.  No.**
9       Q.  Okay.  And you said that based upon three
10  decades of cleaning ditches, you can tell how the
11  water is going to disperse on this property?
12      **A.  Yes.**
13      Q.  Okay.  But you've never actually seen how
14  the water is dispersed on this property, right?
15      **A.  No.  I've not actually sat there and**
16  **looked at it, no.**
17      Q.  Okay.  And do you know whether this ditch
18  ultimately runs into a pond that is on Joe Lucas's
19  property?
20      **A.  Yes.**
21      Q.  You said that at no point when you met
22  with Joe, did he mention anything about trees; is
23  that true?
24      **A.  Other than the fact that "You piled trees**

Page 211

1   **on me."**
2       Q.  Okay.  So he complained about the trees
3   being piled on his property?
4       **A.  Yes.**
5           MR. ST. ONGE:  All right.  That's all
6   I have.
7           MR. BLEYER:  I have nothing further.
8           Do you waive?
9           MR. DEVORE:  Yes.
10          (Lunch break.)
11          MR. BIERMAN:  So it's my
12  understanding that we have a deadline, which is
13  tomorrow, by which we have to take the parties'
14  depositions in this case.
15          Because of time constraints and
16  scheduling issues today, we have agreed between all
17  three parties present that we are going to extend
18  that deadline by agreement and that we should be
19  able to -- we will endeavor our best to complete
20  these depositions by the end of September?
21          MR. DEVORE:  I'm confident that
22  everybody will agree to that.
23          MR. BIERMAN:  Does everybody agree to
24  that?

Page 212

1           MR. DEVORE:  I'm comfortable with
2   whatever it takes.
3           MR. BLEYER:  You're going to be gone
4   tomorrow, right?
5           MR. HASENSTAB:  I'll be here.
6           MR. BLEYER:  Whenever I sent out that
7   AT&T number, would that be an easier way to get all
8   of us on the line to pick a new date?
9           MR. BIERMAN:  Of course.
10          But the fact is, we're agreeing that
11  we're going to endeavor to complete these
12  depositions by the end of September.
13          MR. BLEYER:  Yes.  I'm sorry.
14          MR. HASENSTAB:  We'll endeavor to do
15  it, yeah.
16          MR. DEVORE:  Mr. Blankenship and his
17  lawyer are not going to hold anybody to that date if
18  something happens, but we will try to get it done by
19  that time.
20          THE REPORTER:  Would you like a copy?
21          MR. BLEYER:  An E-tran only.  Dan
22  will order it.
23          MR. DEVORE:  E-tran with exhibits.
24          MR. ST. ONGE:  E-tran with exhibits

Page 213

1   for me.
2           MR. BLEYER:  Exhibits with
3   hyperlinks.
4
5           (Deposition ended 1:50 p.m.)
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

54  (Pages 210 to 213)

Doug Blankenship
August 31, 2023

Page 214

```
 1
 2              CERTIFICATE OF REPORTER
 3          I, Ann Marie Hollo, Certified
 4   Shorthand Reporter, Registered Diplomate Reporter,
 5   and Certified Realtime Reporter, within and for the
 6   State of Illinois, do hereby certify that the
 7   witness whose testimony appears in the foregoing
 8   deposition was duly sworn by me; the testimony of
 9   said witness was taken by me to the best of my
10   ability and thereafter reduced to typewriting under
11   my direction; that I am neither counsel for, related
12   to, nor employed by any of the parties to the action
13   in which this deposition was taken, and further that
14   I am not a relative or employee of any attorney or
15   counsel employed by the parties thereto, nor
16   financially or otherwise interested in the outcome
17   of the action.
18
19          Dated this 6th day of September,
20   2023.
21
22   _____
23   Certified Shorthand Reporter
     State of Illinois
24
```

Paszkiewicz Court Reporting
(618) 307-9320 / Toll-Free (855) 595-3577