Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

JOSEPH LUCAS,                    )
                                 )
        Plaintiff.               )
                                 )
v.                               ) No. 23-56-JPG
                                 )
BLANKENSHIP CONSTRUCTION         )
CO., DOUG BLANKENSHIP, AND       )
NATHAN MARLEN,                   )
                                 )
        Defendants.              )


DEPOSITION OF JOSEPH LUCAS

January 10, 2024


Reporter: Mark Arndt, CSR, CCR, RPR
CSR No. 084-004711
CCR No. 1398



EXHIBIT
C

_____
ARNDT REPORTING & LEGAL VIDEO
P.O. BOX 800
BELLEVILLE, IL  62222
(618) 277-7677

Page 3

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

JOSEPH LUCAS,                    )
                                 )
        Plaintiff,               )
                                 )
v.                               ) No. 23-56-JPG
                                 )
BLANKENSHIP CONSTRUCTION         )
CO., DOUG BLANKENSHIP, AND       )
NATHAN MARLEN,                   )
                                 )
        Defendants.              )

DEPOSITION OF JOSEPH LUCAS
January 10, 2024

Reporter: Mark Arndt, CSR, CCR, RPR
CSR No. 084-004711
CCR No. 1398

_____
ARNDT REPORTING & LEGAL VIDEO
P.O. BOX 800
BELLEVILLE, IL  62222
(618) 277-7677

                    INDEX OF INTERROGATION
Examination by Mr. Bleyer          Page 4
Examination by Mr. Cunningham      Page 105
Examination by Mr. Bleyer          Page 122
Examination by Mr. Cunningham      Page 124
Examination by Mr. St. Onge        Page 127
Examination by Mr. Cunningham      Page 136
Examination by Mr. St. Onge        Page 137
Examination by Mr. Cunningham      Page 137

                    INDEX OF EXHIBITS
Exhibit 18                         Page 32
Exhibit 19                         Page 36
Exhibit 20                         Page 40
Exhibit 21                         Page 56
Exhibit 22                         Page 58
Exhibit 23                         Page 62
Exhibit 24                         Page 67
Exhibit 25                         Page 68
Exhibit 26                         Page 69
Exhibit 27                         Page 79
Exhibit 28                         Page 83
Exhibit 29                         Page 84
Exhibit 30                         Page 85
Exhibit 31                         Page 86
Exhibit 32                         Page 86
Exhibit 33                         Page 87
Exhibit 34                         Page 87
Exhibit 35                         Page 87
Exhibit 36                         Page 88

        (All exhibits are attached.)

Page 2

Deposition of Joseph Lucas, taken pursuant to Notice of Taking Deposition, before Mark Arndt, a Certified Shorthand Reporter and Certified Court Reporter, at 525 West Main Street, Suite 200, Belleville, Illinois, on January 10, 2024.

APPEARANCES OF COUNSEL

On Behalf of Plaintiff:
    Polsinelli, P.C.
    100 South Fourth Street, Suite 1000
    St. Louis, Missouri 63102
    314-889-8000
    By:   Jon A. Bierman
          jbierman@polsinelli.com
          Britton St. Onge
          bstonge@polsinelli.com
On Behalf of Defendant:
    Bleyer & Bleyer
    601 West Jackson Street
    Marion, Illinois 62959
    618-997-1331
    By:   Joseph A. Bleyer
          jableyer@bleyerlaw.com
    Brown & James, P.C.
    525 West Main Street, Suite 200
    Belleville, Illinois 62220
    618-235-5590
    By:   John P. Cunningham
          jcunningham@bjpc.com

Page 4

        [11:22 a.m.]
        The witness, JOSEPH LUCAS, first having been duly sworn, testified as follows:
            EXAMINATION
BY MR. BLEYER:
        Q.   State your name, please.
        A.   Joseph Lucas.
        Q.   And your date of birth?
        A.   ██████.
        Q.   And where do you live?
        A.   2740 English Road, Pacific, Missouri, 63069.
        Q.   Your marital status?
        A.   Married.
        Q.   Your wife's name?
        A.   Tina.
        Q.   Have you ever lived in Illinois, or have you always been a Missouri resident?
        A.   Always Missouri.
        Q.   What do you do for a living?
        A.   Meat cutter.
        Q.   Do you have your own shop, or do you work for somebody?
        A.   I work for Straubs in St. Louis.

Page 5

1    Q.   Spell that.
2    A.   S-T-R-A-U-B-S.
3    Q.   Is that a meat packing place, or --
4    A.   No, it's a retail -- retail grocery
5    stores.
6    Q.   Okay.  I was going to say, is it a grocery
7    store or just a meat store?
8    A.   No, no.  Retail grocery store, upscale
9    grocery stores.  They have six stores, actually, so --
10   Q.   And you're a meat cutter in that store?
11   A.   I'm actually the director of meat and
12   seafood, but I'm a meat cutter by trade.
13   Q.   Okay.
14   Where did you learn that, just out of curiosity?
15   A.   As a kid, started growing up working in
16   the meat shop when I was 13 years old.
17   MR. ST. ONGE:  Comes in handy hunting, I
18   guess.
19   A.   Don't ever make a lot of money, but --
20   BY MR. BLEYER:
21   Q.   So how quick can you cut the back straps
22   out of a deer?
23   A.   Pretty quick.  Pretty quick.  We have a
24   lot of practice.  Not so much anymore.  Just for

Page 6

1    family.  That's pretty well it.
2    Q.   And how long have you been working for
3    Straubs?
4    A.   On and off since '04.
5    Q.   Have you ever had employment in southern
6    Illinois?
7    A.   No, sir.
8    Hang on one second.
9    Q.   Go ahead.
10   A.   Not southern Illinois.  I did work for
11   Kuna Food Service over there in Dupo, Illinois, for
12   about a year.  I ran their facility for them, their
13   meat cutting operation.
14   Q.   You still lived in Missouri at the time?
15   A.   Correct.
16   Q.   What time frame are we talking about?
17   A.   I left Straubs in '18, and went back, went
18   to work for Kuna, and then came back to Straubs in '19.
19   Q.   Could you spell Kuna for me?
20   A.   K-U-N-A.
21   Q.   Okay.
22   And you're a hunter; is that correct?
23   A.   Yes, sir.
24   Q.   Do you have a commercial hunting

Page 7

1    operation?
2    A.   No, sir.
3    Q.   Have you ever had a commercial hunting
4    operation?
5    A.   No, sir.
6    Q.   Do you personally own any property in
7    Illinois?
8    A.   Yes.
9    Q.   Do you own property -- are you a member of
10   any LLC or corporation that owns property -- property
11   you own personally?
12   A.   I'm sorry.  I didn't hear you.
13   Q.   Let me just start over.
14   Do you personally own property in Illinois?
15   A.   Yes.
16   Q.   Do you -- are you a member of an LLC or a
17   corporation that also owns property in addition to the
18   property you own personally?
19   A.   No.
20   Q.   Okay.
21   So only the property that you own in Illinois
22   would be property that is owned by Joe Lucas -- or
23   Joseph Lucas?
24   A.   Yes.

Page 8

1    Q.   And how much -- where is the property that
2    you own in southern Illinois located?
3    A.   Vandalia.
4    Q.   Okay.
5    We're talking about a 14-acre tract that's the
6    subject of this lawsuit.
7    Is that the only property that you own in
8    southern Illinois?
9    A.   No; I own a 27-acre tract north of that.
10   Q.   How far north?
11   A.   A quarter-mile on the other end of the
12   Butts's (ph) farm.
13   Q.   Okay.
14   So on the north and south end of the Butts?
15   A.   Uh-huh.
16   Q.   For lack of a better way to put it.
17   Right?
18   A.   Uh-huh.  Yes, sir.
19   Q.   Okay.
20   And I'm sorry that -- on the north end of the
21   Butts -- how many acres is that?
22   A.   It's 27.
23   Q.   And the area that's the subject of this
24   lawsuit is 14 acres.

Page 9

1    Correct?
2    A.   14.7.
3    Q.   Okay.
4    And when did you purchase the 14.7-acre tract?
5    A.   I was part of a LLC in -- I think I joined
6    in like 2006.  And 2016 is when I got out of the LLC
7    and just purchased that ground for deer hunting.
8    Q.   Okay.
9    And what was the name of the LLC?
10   A.   Owka Bottoms.
11   Q.   Spell that for me.
12   A.   O-W-K-A Bottoms.
13   Q.   And how much land did Owka Bottoms own?
14   A.   I'm going to say it was around 550,
15   somewhere in there.
16   Q.   Okay.
17   A.   I'm not exact.  I don't know exactly.
18   Q.   And was this 14.7-acre tract part of the
19   property that was owed by Owka Bottoms?
20   A.   Yes, sir.
21   Q.   Okay.
22   Did Owka Bottoms also own the 27-acre tract?
23   A.   Yes, sir.
24   Q.   Okay.

Page 10

1    In general to these two properties, where was
2    the other 500-and-some-odd acres of it?
3    A.   It was all right there.  We own the
4    Craycroft (ph) and the Lewis (ph), so it was all right
5    there pretty well together.  One farm being south of
6    the Butts's farm and the other farm being north of it.
7    Q.   Okay.
8    Was the Owka Bottoms property part of the old
9    Keck farm, or --
10   A.   Uh-huh.  Fred Keck.  Uh-huh.
11   MR. ST. ONGE:  Just wait.
12   BY MR. BLEYER:
13   Q.   And did Owka Bottoms purchase the property
14   from Keck when Keck was having problems and selling
15   stuff?
16   A.   No, actually, there's a few of the members
17   that I was in with that -- let's see.  There's a few
18   members --
19   Ask me the question one more time.  I'm sorry.
20   Q.   Yeah.
21   I mean, the Owka Bottoms, the 550 acres, was it
22   all part of the Keck property --
23   A.   Yes.
24   Q.   -- that you guys purchased when Keck was

Page 11

1    having his problems and --
2    A.   Well, actually, before that.  Even before
3    Fred was having problems.
4    Q.   Financial problems, I'm referring to.
5    A.   Correct.  Correct.
6    Q.   And he sold off.
7    A.   Yeah.
8    Q.   Who all was members of the LLC when you
9    were in the membership?
10   A.   Hubert Hindling.
11   Q.   Spell that last name.
12   A.   H-I-N-D-L-I-N-G.
13   Q.   Okay.
14   A.   Mark Orintor.
15   Q.   Spell that last name.
16   A.   Oh, boy.  I'm guessing here.
17   Q.   Okay.
18   A.   O-R-I-N-T-O-R.  Orintor.
19   Q.   And I always ask for the court reporter's
20   benefit, because I'm just going to read it from him and
21   he needs it.
22   MR. CUNNINGHAM:  Could you spell that one
23   again?  O-R-I-N --
24   A.   O-R-I-N-T-O-R.  I don't know how to spell

Page 12

1    Mark's name.
2    MR. CUNNINGHAM:  It ends with a --
3    MR. ST. ONGE:  Write it.
4    A.   (Marks on document.)  I'm not good at
5    spelling, fellas.  O-R-I-N-T-O-R.  Orintor.
6    BY MR. BLEYER:
7    Q.   Okay.
8    Well, that would be close enough.  Phonetically,
9    that's close enough for right now.
10   Anybody else?
11   A.   Bob Brinker.
12   Q.   Spell Bob's last name.
13   A.   B-R-I-N-K-E-R.
14   Q.   Oh, Brinker.
15   A.   Uh-huh.  And Tim Berry.
16   Q.   And you were the fifth member?
17   A.   I was.
18   Q.   Were you the operating member, or just a
19   member of the LLC?
20   A.   I'm just a member of the LLC.
21   Q.   Okay.
22   Is that LLC still --
23   A.   No.
24   Q.   -- in existence?

1           MR. ST. ONGE:  You've got to wait for him
2    to finish the question.
3           A.   Oh, I'm sorry.
4    BY MR. BLEYER:
5           **Q.   That's all right.**
6           A.   I don't know the answer to that.
7           **Q.   Okay.**
8           How was it -- what happened in 2016?  Did
9    everybody decide to disband the LLC?
10          A.   Actually, there's some guys that stayed
11   in.  Unfortunately for me, my grain wasn't paying for
12   my rent, and they said we'll go ahead and buy you out.
13   You're the only guy that likes to deer hunt.  Would you
14   be interested in this 42 acres for deer hunting?  And I
15   said, yeah, that would be fine.  We could work
16   something out with that.  The rest of them were all
17   duck hunters.  They did not deer hunt at all, so -- I
18   take that back.  Mark deer hunted every now and then.
19   Not very much.
20          **Q.   So you, being a deer hunter, just an**
21   **afterthought of the duck --**
22          A.   I'm just not mad at the ducks anymore.
23   I've shot too many of them.
24          **Q.   When you were a member of the LLC, you**

1    **realize that friends don't always stay friends when**
2    **they all get together and buy hunting property?**
3           A.   You know, actually, all of them guys still
4    own.  Some of them are old retired guys and got out,
5    but -- and then I think a couple of members left.  Tim
6    Berry, he actually bought the one farm, the Lewis farm,
7    and Bobby -- and gosh, I can't think of another guy.
8    They took on another guy right there when I got out.
9    They owned the Craycroft ground.
10          **Q.   Okay.**
11          A.   So just two guys that own that now, or
12   three guys, and I just owned the wooded ground.
13          **Q.   Okay.**
14          A.   But they all got along pretty good.
15          **Q.   Okay.**
16          The 42-acre or 41.7 or whatever it is, the two
17   tracts you got -- was there money exchanged, or did you
18   just get that -- they deed that property in exchange
19   for your getting out of membership?
20          A.   Oh, no, no.  I had to take a loan out to
21   pay for the rest of it.
22          **Q.   How much was the loan?**
23          A.   I don't remember it off the top of my
24   head.

1           **Q.   Just ballpark.**
2           A.   Maybe $20,000.
3           **Q.   Okay.**
4           So they gave you the -- was part of the
5    consideration for getting the property, the acres, you
6    giving up your interest in the LLC, plus 20 grand?
7           A.   Roughly.
8           **Q.   Okay.  Give or take 20 grand?**
9           A.   Right.
10          **Q.   But -- so part of the consideration was**
11   **you're relinquishing your membership in the LLC?**
12          A.   Yes, sir.
13          **Q.   Whatever value that was?**
14          A.   Uh-huh.
15          **Q.   Is that a yes?**
16          A.   Yes.
17          **Q.   And that was in 2016?**
18          A.   Yes.
19          **Q.   And when you deeded the property -- I**
20   **think I've got a copy of the deed -- it was deeded to**
21   **you individually?**
22          A.   Yes.
23          **Q.   Okay.**
24          And is it still deeded in your name

1    individually?
2           A.   Yes.
3           **Q.   Do you have any type of revocable trust or**
4    **family trust or anything of that nature?**
5           A.   Not that I'm aware of.  I'd have to ask my
6    wife on that.  She takes care of all of that.
7           **Q.   Okay.**
8           As far as you know, this property is owned
9    individually by you and not in any trust?
10          A.   Correct.
11          **Q.   Do you -- there's been a lot of**
12   **photographs taken, produced -- and you've produced some**
13   **photographs.**
14          Are you aware -- or first of all, any of the
15   photographs that you've produced from 2016 when you
16   first purchased the property?
17          A.   No.
18          **Q.   Are you aware of any photographs that**
19   **would depict the property as the way it existed when**
20   **you purchased it in 2016?**
21          A.   No.
22          **Q.   Okay.**
23          When is the -- or strike that.
24          This work that was done by Blankenship was in

Page 17

1   the -- 2021 -- correct -- or --
2       A.  May of '21.
3       Q.  Okay.
4       A.  May 29th.  I don't know if that's the work
5   that was done.  That's when I discovered it.  I have no
6   idea when they were in there.  I just want to be clear.
7       Q.  Thank you.
8       But the -- you became aware of the work that was
9   done that we talked about through all of these
10  depositions was in 2021?
11      A.  May of 2021.
12      Q.  Okay.
13      When was the last time you were on the property
14  prior to arriving in May of 2021 to discover the work
15  that had been done?
16      A.  I really don't know.  I'd probably say the
17  fall hunting season before that.
18      Q.  For deer?
19      A.  Yeah.  So I'd usually go in to spray my
20  food plots at the end of May.
21      Q.  Uh-huh.
22      A.  That's what I was doing there when I
23  discovered it.
24      Q.  Do you bow and shotgun?

Page 18

1       A.  Yes.
2       Q.  Do you lease any of that 42 acres for
3   hunting?
4       A.  No, sir.
5       Q.  Do it yourself?
6       A.  Just me and my kids.  That's it.  It's not
7   that big of a piece -- or pieces.
8       Q.  Okay.
9       Being two tracts, only 42 acres, can you get a
10  landowner's, or do you have to --
11      A.  Yeah, I think you have to have 40.  I get
12  landowner tags, yes.
13      Q.  Even though it's split?
14      A.  Yes.  Uh-huh.  Same county.
15      Q.  And kids that live with you, they get
16  landowner tags, too?
17      A.  Well, I have one in the military.  He gets
18  resident tags, and then both of the other kids live
19  with me.
20      Q.  Do they landowner tags or do they buy them
21  at Walmart?
22      A.  Yes.  No, no landowner tags.
23      I'll take that back.  The youngest one just
24  turned 18.  He just got a youth tag over the counter at

Page 19

1   Walmart.  He just now turned 18, so now he's on the
2   hook for --
3       Q.  But if he lives with you, he can still get
4   a landowner's?
5       A.  Well, he can get a landowner, but it's --
6   yeah, it's a nonresident hunting license.
7       Q.  Oh, you guys live in Missouri?
8       A.  Right.  Right.
9       Q.  Okay.  That's right.  Okay.  I thought --
10      A.  Yeah.
11      Q.  I never knew how that worked.
12      So if he lives in Missouri, even though the
13  property is in your name -- I know if they're under 18,
14  they can get a landowner's of off you, but once he
15  turns 18, he can't get the landowner's off of you
16  anymore since he lives in Missouri?
17      A.  I think as long as he's living under my
18  roof, he can.
19      Q.  Okay.
20      The 14-acre tract -- do you guys have permanent
21  deer stands, or do you use ground blinds, or what do
22  you do?
23      A.  I have permanent stands, ladder stands.
24      Q.  Okay.

Page 20

1       Do you have any of these -- seems like
2   everybody's getting now the boxes that --
3       A.  Oh, yeah.
4       Q.  Okay.
5       How many of those do you have?
6       A.  Just one in the right spot -- or used to
7   be the right spot.
8       Q.  Okay.  And that was on the 14 acres?
9       A.  Yes, sir.
10      Q.  Okay.
11      And do you have ladder stands on that other 14
12  acres?  The only stand you have on the 14 acres is this
13  one --
14      A.  I've got a tripod -- I've got a couple
15  tripods and some ladder stands there.
16      Q.  Okay.
17      How many stands are on the 14 acres?
18      A.  Five.
19      Q.  Okay.
20      How many have you got on the 27 acres?
21      A.  Three.
22      Q.  And the hunting season of fall of 2020 and
23  up until January of '21, did you have five stands on
24  the 14 acres?

Page 21

```
 1      A.  Yes.
 2      Q.  Okay.
 3      Is anybody else -- and I might have asked, but I
 4  just want to be specific.
 5      Since you owned the property in 2016 up until
 6  2021, did anybody else hunt on that property other than
 7  your family members?
 8      A.  Since '16?
 9      Q.  Yeah, since you bought it, or since it
10  came into your possession?
11      A.  Right.  Since I bought it, I did take a
12  couple of kids that's never killed a deer before youth
13  hunting out there, yes.
14      Q.  Did they kill any?
15      A.  One, uh-huh.
16      Q.  What are the names of your children that
17  would have hunted on the property -- deer hunted on the
18  property since you acquired it?
19      A.  Logan Lucas.
20      Q.  Logan --
21      A.  Uh-huh.
22      Q.  -- Lucas.
23      His date of birth?
24      A.  [REDACTED].
```

Page 22

```
 1      Hailey Lucas.
 2      Q.  H-A-I-L-E-Y?
 3      A.  H-A-L-E-Y.
 4      Q.  Is that your daughter?
 5      A.  Yes.
 6      Q.  And what's her date of birth?
 7      A.  [REDACTED].
 8      And Mason Lucas.  3-29-2005.
 9      Q.  And is Logan the one in the military?
10      A.  Yes.
11      Q.  What service is he in?
12      A.  Army.
13      Q.  How long has he been there?  When did he
14  go in?
15      A.  2000.
16      Q.  He was born in 2000.
17      A.  Oh, I'm sorry.  2020.  I'm sorry.
18      MR. BLEYER:  I was going to say.
19      MR. CUNNINGHAM:  Military baby.
20      MR. BLEYER:  Military baby.
21  BY MR. BLEYER:
22      Q.  Okay.
23      Is he stationed overseas or out here or --
24      A.  Fort Benning.
```

Page 23

```
 1      Q.  Is he going to be a paratrooper or?
 2      A.  He's actually in the Army, marksmanship
 3  unit.
 4      Q.  Okay.
 5      And they -- when they -- I guess for the
 6  landowner permits, they would have used the same
 7  address you used?
 8      A.  Yes.
 9      Q.  Your wife doesn't hunt?
10      A.  No.
11      Q.  Okay.
12      When you kill deer on this property, you and
13  your children, do you call it in?
14      A.  Yes.
15      Q.  Every one?
16      A.  Yes.
17      Q.  When you call them in, do you make a
18  distinction if it's the 27 acres or the 14 acres?
19      A.  I'm not asked that question.  It's if it's
20  harvest on private ground.  That's the question they
21  ask.
22      Q.  Okay.
23      And as far as you and your kids, if they've
24  killed any deer in Illinois since 2016, it would have
```

Page 24

```
 1  been on either the 27-acre or the 14-acre private land
 2  that you own?
 3      A.  Correct.
 4      Q.  Do you know if you or your any of your
 5  kids have reported deer in Illinois being harvested
 6  since 2016 on any property other than property you own?
 7      A.  No.
 8      Q.  Prior to 2016, did your kids -- or strike
 9  that.
10      Prior to 2016, when it was Owka Bottoms -- is it
11  Owka Bottoms?
12      A.  Owka.
13      Q.  Owka Bottoms.
14      When you hunted deer, was it always on those two
15  plots, was there other parts of Owka Bottoms that you
16  could deer hunt?
17      A.  Oh, there was other parts when we -- I was
18  part of the LLC that we did hunt.  Uh-huh.
19      Q.  Okay.
20      You said that you first noticed it when you went
21  to start working on your food plots in May of 2021?
22      A.  Yes.
23      Q.  Okay.
24      Do you recall if you would have been on that
```

Page 25

1  property at all from the last time you would -- do you
2  bow hunt?
3      A.  I do.
4      Q.  Do you muzzle load in January 2022?
5      A.  Ours -- I don't think we have a muzzle
6  loader in January.  Right.
7      Q.  That's right.
8      Do you have a pistol season in Fayette County
9  that you know of?
10      A.  No, not that I know of.  I've never done
11  it.
12      Q.  Okay.
13      So you've got the two shotguns, and then bow
14  season.
15      A.  Uh-huh.
16      Q.  That's the only one you're aware of in
17  Fayette County?
18      A.  Correct.
19      Q.  Of course, the youth hunt?
20      A.  Right.  Uh-huh.  Yeah.  That's that first
21  weekend in October.
22      Q.  All right.
23      So he wouldn't have -- bow season goes out
24  usually in Fayette County when?

Page 26

1      A.  I think it's January 15th.  I've only been
2  bow-hunting Illinois the last -- I don't know -- five
3  years, when they start letting you use crossbows.
4      Q.  Okay.  The lazy man's way.
5      A.  Well, when you got torn rotator cuffs and
6  you cut meat all your life, your shoulders aren't what
7  they used to be.
8      Q.  I agree.  I agree.
9      Five years, so it would have been 2018 or so?
10      A.  I'd say that's probably pretty close.
11  Yes.
12      Q.  Do your kids crossbow hunt, too, or are
13  they just shotgun hunt?
14      A.  They both crossbow hunt, the two younger
15  ones.  Uh-huh.
16      Q.  Did anybody bow hunt?  The regular
17  compound bows, anybody --
18      A.  The oldest boy, yes.
19      Q.  Okay.
20      So whatever season ended in January of 2021,
21  were you on the property from the last time you would
22  have been deer hunting until May of 2021 when you went
23  to check on the food plots?
24      A.  Repeat that.

Page 27

1      Q.  Deer season '20-'21 --
2      A.  The '21 deer season?
3      Q.  No.  Started in October of '20 --
4      A.  Okay.
5      Q.  -- for bow season.  Then shotgun season.
6  And then bow would go into January.
7      That season, the fall of 2020 through January of
8  '21, whatever they -- last time you were there,
9  whatever day you were hunting, were you ever on that
10  property from that day, whatever it was, until you got
11  there in May of 2021 to look at your food plots?  In
12  other words, the winter and spring after deer season
13  until you went to check on the food plots, were you
14  ever there?
15      A.  I'm going to say no.
16      Q.  Okay.
17      Any of the pictures that have been produced that
18  you are aware of that would have shown the property in
19  the deer season of 2020-21?
20      A.  No.
21      Q.  Okay.
22      Are you aware of any pictures of the property
23  that would have been taken in that season of -- that
24  fall of 2020 until January of 2021?

Page 28

1      A.  No.
2      Q.  What is the last time -- or have you seen
3  a picture -- strike that.  Bad question.
4      Are you aware of -- what's the date of -- you
5  aware of a picture of this property, the 14 acres,
6  prior to May of 2021?
7      A.  I don't know.
8      Q.  Have you produced any pictures of the
9  property prior to May of 2021?
10      A.  You talking about property or a picture of
11  a deer?
12      Q.  The 14 acres.  The 14 acres of the
13  property.
14      A.  Oh, no.  I mean, I don't take pictures of
15  that.  I mean, if they kids kill a deer or something
16  like that, I take a picture of the deer, but just not
17  at the property, no.
18      Q.  And you've taken a lot of pictures or
19  there's been produced pictures showing damage to this
20  14 acres after Blankenship did whatever he did;
21  correct?
22      A.  Yes.
23      Q.  I'm trying to determine whether or not you
24  have any pictures showing the property before --

Page 29

1    A.  No.
2    Q.  -- the Lucases --
3    A.  No.
4    Q.  -- came onto the property.
5    Are you aware of anybody that has any pictures
6  of the property before Lucas -- I'm saying before
7  Lucas --
8        MR. BLEYER:  Thank you.  You were going to
9  correct me.
10  BY MR. BLEYER:
11    Q.  Before Blankenship did whatever he did?
12    A.  No.
13    Q.  And if you would have taken a picture, it
14  would have been of the kids' deer or something?
15    A.  Correct.
16    Q.  Whatever background it would have showed?
17    A.  Right.
18    Q.  But you're not aware of any photographs
19  depicting the area that Blankenship cleared out, what
20  it looked like before he cleared it out?  Are you aware
21  of any photographs in that regard?
22    A.  No.
23    Q.  Okay.
24  Have you -- know of anybody that would be in

Page 30

1  possession of any photographs of the area Blankenship
2  did his work on before he did his work?
3    A.  No.
4    Q.  Before Blankenship did his work, did you
5  ever have -- are you aware that in Illinois, you can do
6  a forestry study and get property described under a
7  forestry plan?
8    A.  No.
9    Q.  Were you aware of that?
10    A.  No.
11    Q.  Okay.
12  Have you ever had the 14 acres looked at by any
13  type of land -- timber purchaser?
14    A.  No.
15    Q.  Prior to Blankenship's work, have you ever
16  had anybody -- are you aware of anybody conducting an
17  inventory of hardwoods on that property -- 14 acres?
18    A.  No.
19    Q.  Okay.
20  Before Blankenship did his property, did the
21  work of '21 -- strike that.
22  Before you discovered the work that Blankenship
23  did in May of 2021, had you planted any trees on that
24  property?

Page 31

1    A.  No.
2    Q.  Before Blankenship did his work -- before
3  you discovered Blankenship's work in May of 2021, had
4  you ever removed any trees from the 14 acre?
5    A.  I may have trimmed some trees around food
6  plots to get sunlight, but not removed any trees, no.
7    Q.  What about trimming trees around your deer
8  stands or tree stands so you can have a better shot?
9    A.  Yeah.  Little shooting lanes and -- just
10  to get a little more light on my food plots, just to
11  make stuff grow a little bit better.
12    Q.  Okay.
13  This property, the 14 acres, as I understand it,
14  there is a levee on the east side of the property?
15    A.  Correct.
16    Q.  To the west of the property -- is that
17  open to the Kaskaskia River?
18    A.  West side?
19    Q.  Let me ask it.  You're taking time -- let
20  me restate the question.
21  The levee's on the east side of the 14 acres.
22  Correct?
23    A.  Yes.
24    Q.  Is there any protection from the Kaskaskia

Page 32

1  River to that property other than the levee that runs
2  on the east side that prevents water going east of your
3  property?
4    A.  No.
5    Q.  So I assume this 14 acres, knowing what
6  the Kaskaskia river can do in certain years --
7  sometimes it's underwater?
8    A.  Yes.
9    Q.  And the -- right there it was.  I was
10  looking at this.  It's O-K-W -- O-K-A-W Bottoms.
11    A.  Right.
12    [Discussion off the record.]
13    [Exhibit 18 marked for identification.]
14  BY MR. BLEYER:
15    Q.  I'll show what's been marked as Exhibit
16  18, which I don't know if you produced that or someone.
17  I printed it off my computer, so someone produced it.
18  It looks like a -- some type of a overview shot
19  of the Butts's farm and the Joe Lucas property.
20    A.  Uh-huh.
21    Q.  Is that correct?
22    A.  Uh-huh.
23    Q.  Is that a yes?
24    A.  Yes.

Page 33

```
1        Q.   And it's got hunt maps layers?  Okay.
2        And in the one part of it, it's got the
3    triangle, for lack of a better word -- no, this says
4    Joe Lucas?
5        A.   Uh-huh.
6        Q.   The -- oh, I didn't notice that up there.
7    That --
8        A.   That's my 27 (indicating photograph).
9        Q.   On Exhibit 18, there are two areas that
10   say Joseph Lucas -- or Lucas, Joseph; correct?
11       A.   Yes.
12       Q.   The area to the top of the page that says
13   on hunt, the triangle, that's the 27 acres?
14       A.   (Indicating photograph.)
15       Q.   Yes?
16       A.   This is the 27, yes.
17       Q.   And then the area that's Lucas, Joseph,
18   that's more like a square to the bottom portion of that
19   page is the 14 acres we're talking about?
20       A.   Yes.
21       Q.   And the double white hashmarks that are
22   running down to the southeast side of your property --
23   is that the levee?
24       A.   Yes.
```

Page 34

```
1        Q.   Okay.
2        Does the levee stop where it stops there next to
3    your name on the 14 acres?
4        A.   No.  It runs all the way --
5        Q.   All the way down the river?
6        A.   Yeah, all the way down.  Uh-huh.
7        Q.   Okay.
8        So between the white double hatched line and --
9    to the west, there's nothing that protects the Butts's
10   farm or your two properties from the Kaskaskia River?
11       A.   Well, there's an old sub-levee here
12   (indicating photograph), but I don't know how much
13   protection that gets.
14       Q.   You say sub-levee.  It's not very sturdy
15   and not very high?
16       A.   Well, I mean, it's a decent-sized levee,
17   but I don't know if it leaks, to be honest with you.
18   But we usually hunt -- this piece here is usually the
19   better piece to hunt.
20       Q.   Okay.  When you say the piece, the 14
21   acres?
22       A.   Correct.
23       Q.   But I'm just saying everything east --
24   west of the levee when the river's high can be flooded?
```

Page 35

```
1        A.   Oh.  Yes.
2        Q.   Okay.
3        And does the -- I realize these red lines,
4    that's what you can do on this hunt application to find
5    out who owns property when you're out trying to figure
6    out where you want to hunt.
7        Does your 14 acres go up next to the levee?
8        A.   I believe there's a small strip of timber
9    that I guess is -- I don't know if it's the Vandalia
10   levee district's ground or what, but actually, that's
11   not all my (indicating photograph) --
12       Q.   So there's a red line around the 14 acres,
13   and there's a piece of ground, it looks like timber,
14   between the red line and the double white hashed;
15   correct?
16       A.   Correct.
17       Q.   And you think that could be the levee
18   district --
19       A.   Right.
20       Q.   But it's not yours?
21       A.   It's not mine.
22       Q.   Okay.
23       A.   Basically how that red line shows it, too,
24   just that little strip of timber there.
```

Page 36

```
1        Q.   Okay.
2        And the bottom of at that 14 acres -- is that
3    the river?
4        A.   This is the river, yes.  It comes down
5    here and bends around like this (indicating
6    photograph).
7        Q.   So the south property line of your
8    property line, the 14 acres, is on the river?
9        A.   Right on the river.  Uh-huh.
10       Q.   Okay.
11       A.   Uh-huh.
12       Q.   I'll make it Exhibit 19.
13       [Exhibit 19 marked for identification.]
14   BY MR. BLEYER:
15       Q.   Do you recognize that?
16       A.   Yes.
17       Q.   Okay.
18       Is that -- do you recognize it as being a plat
19   survey of the 14 acres?
20       A.   Yes.
21       Q.   Okay.
22       And to the east side of that, it shows what
23   appears to be the levee.
24       Is that correct?  It's got markings.  It says
```

Page 37

1  something --
2     A.  Yeah, something levee.
3     Q.  Okay, yeah.
4     And it actually shows some of your property goes
5  through the levee.
6     Do you know or --
7     A.  I don't know.
8     Q.  Okay.  Well -- okay.
9     MR. ST. ONGE:  Has this been produced in
10  the case?  Because I see there's a January 9th, 2024 --
11     MR. BLEYER:  I just got it -- no, I
12  haven't.  I'm sorry.
13     MR. ST. ONGE:  I've never seen this
14  before.  Looks like you haven't either.
15     MR. CUNNINGHAM:  I think DeVore got it.
16     MR. BLEYER:  DeVore got it and just gave
17  it to me.
18     MR. ST. ONGE:  Yeah, I notice it says
19  Silver Lake Group up at the top.  I just -- I've never
20  seen it before, and I guess it's something that DeVore
21  did.
22     MR. BLEYER:  Yes.  And I'm sorry.  He
23  e-mailed it to us Friday the 5th.
24     MR. ST. ONGE:  Yeah.  I didn't get that.

Page 38

1  I don't know if he's -- maybe it's -- he didn't intend
2  it for me.
3     [A recess was taken.]
4  BY MR. BLEYER:
5     Q.  You've got there Exhibit 19 in front of
6  you.  I notice it says like west toe of levee and east.
7     Do you know what the hell it is?  Or I shouldn't
8  say hell on the record, or --
9     MR. BIERMAN:  That's all right.  Britton
10  already did.
11  BY MR. BLEYER:
12     Q.  Do you know what the toe is?
13     A.  The toe?
14     Q.  Do you see where it says west toe of levee
15  and east toe of levee?
16     A.  No.  No, I've never seen this document
17  before.
18     [Interruption by reporter.]
19  BY MR. BLEYER:
20     Q.  I have no idea what that is, but --
21     A.  Me too.
22     Q.  Is your idea where the bottom of the levee
23  is?
24     A.  Prob -- that's my idea, but I don't know

Page 39

1  for sure.
2     Q.  Okay.
3     And I'm not asking for the -- to verify that
4  this is a true and accurate plat survey, because I
5  don't know who did this.  Oh, it says Beyers Land
6  Surveying is.
7     Do you know who Beyers Land Surveying is?  Did
8  you ever --
9     A.  No, sir.
10     Q.  Okay.
11     But generally, that looks like about the general
12  diameter of the 14 acres we're talking about.
13     Correct?
14     MR. ST. ONGE:  Object to the form.  The
15  diameter?
16     MR. BLEYER:  I mean, you know -- I mean,
17  the shape of it, I guess.  I don't know.  I'm sorry.
18  Diameter is not --
19     MR. ST. ONGE:  Perimeter?
20     A.  Perimeter?
21     MR. BLEYER:  Yes, thank you.
22  BY MR. BLEYER:
23     Q.  And at the bottom, it does say the
24  Kaskaskia River comes right up to your property?

Page 40

1     A.  Correct.
2     Q.  Okay.
3     Can you tell -- show you what's been marked as
4  Exhibit 20, which is Lucas's Production 32, which is
5  similar to -- it looks like the Image of 18, but
6  there's no -- I don't know if you guys produced this or
7  not, because it doesn't have a Lucas number on it.
8     MR. ST. ONGE:  That was either DeVore's or
9  yours, because we Bates-labeled ours.
10     MR. BLEYER:  That's what I thought.
11     MR. ST. ONGE:  Yeah.
12  BY MR. BLEYER:
13     Q.  But it looks like it's the same map, isn't
14  it?
15     A.  Yes.
16     [Exhibit 20 marked for identification.]
17  BY MR. BLEYER:
18     Q.  Do you know when this -- the one that's
19  Lucas 32, Exhibit 20 -- when that was taken or when --
20  I shouldn't say when that was taken -- the date that
21  this would be -- this was depicted?
22     A.  No --
23     MR. ST. ONGE:  Object to the form of the
24  question.  What do you mean the date --

Page 41

1  BY MR. BLEYER:
2      Q.   Well, I guess this an aerial photograph, a
3  Google --
4      A.   Uh-huh.
5      Q.   Some type of aerial photograph.
6      Do you know what date it's supposed to represent
7  the picture was taken?  Not the screenshot, but the
8  Google map?
9      A.   No, I do not know.
10     Q.   Okay.
11     Looking at the aerial view -- and can you tell
12  if that was taken before or after you discovered
13  Blankenship's work?
14     A.   After.
15          MR. CUNNINGHAM:  How can you tell --
16     A.   This was all timber.
17          MR. ST. ONGE:  Is there a question?  You
18  whispered it, but --
19  BY MR. BLEYER:
20     Q.   When you say "this," you're talking about
21  the brown -- looks like dirt in the top of the area
22  that's your property; right?
23     A.   The top of the area.  That -- the photo is
24  not very good, first off.

Page 42

1      Q.   Right.
2      A.   But this particular photo -- that's a pile
3  of my trees (indicating photograph).
4      Q.   Take my blue pen and circle where you say
5  pile of your trees.
6      A.   (Marks on document.)
7      Q.   Okay.
8      Put T by it.  Does it work better with black?
9          MR. BLEYER:  Got a Sharpie, Jon?
10          MR. BIERMAN:  I've got just highlighters.
11  BY MR. BLEYER:
12     Q.   So on Exhibit 20 you circled and wrote out
13  to the side "trees," and that is the pile of trees?
14     A.   It came out of this area right here (marks
15  on document).
16     Q.   Take your red -- yellow highlighter and
17  highlight the area where it came out of.
18     A.   (Marks on document.)
19          MR. ST. ONGE:  This is going to show up
20  great --
21          [Discussion off the record.]
22  BY MR. BLEYER:
23     Q.   Now we got a Sharpie.  Go ahead and with
24  the Sharpie circle the tree area on the exhibit.  Make

Page 43

1  sure you're not --
2      A.   (Marks on document.)
3      Q.   And then go ahead -- okay, and then put a
4  square around the area where you said those trees came
5  from that you tried to highlight.
6      A.   (Marks on document.)
7      Q.   Okay.
8      And you did what appears to be a square nature
9  adjacent to the circle.
10     Correct?
11     A.   Correct.
12     Q.   And it looks like a cleared spot.
13     Is that correct?
14     A.   Correct.
15     Q.   Was that -- and that's you believe the
16  area that trees that Joe -- or that Blankenship
17  cleared?
18     A.   Yes.
19     Q.   Okay.
20     You've heard earlier talking about this ditch
21  where this concrete structure was?
22     A.   Uh-huh.
23     Q.   Is that in that square, or is that
24  someplace else?  Or was it in the square, or is it

Page 44

1  someplace else?
2          MR. ST. ONGE:  Object to the form of the
3  question.  You said ditch, but we talked --
4          MR. BLEYER:  The two -- concrete
5  structure.  I'm talking about the concrete structure.
6          MR. ST. ONGE:  Thank you.
7  BY MR. BLEYER:
8      Q.   You've heard a place -- about a concrete
9  structure that Lucas removed?
10     A.   Blankenship.
11     Q.   Too many damn names in this thing.  That
12  Blankenship removed.
13     Is it contained in the square, or is it
14  somewhere else on the property?
15     A.   No, he cleared right just west of the
16  ditch.  The ditch runs north and south.  To the west of
17  that.
18     Q.   Okay.
19     So this west -- the east -- that would be the
20  east line of the square that you marked on Exhibit 20
21  with the black highlighter -- is that generally the
22  area where the ditch -- the drainage ditch was?
23     A.   Yeah, it's right along the drainage ditch.
24  Yes.

```
                                          Page 45
 1        Q.  Okay.
 2        And so this drainage ditch -- there was trees to
 3   the east of this drainage ditch on your property?
 4        A.  To the east?
 5        Q.  Yes.
 6        A.  Yes.
 7        Q.  Do you know how long that drainage ditch
 8   that Lucas -- that Blankenship cleared that had been
 9   there?
10        A.  I have no idea.
11        Q.  How long have you been hunting on the
12   property?
13        A.  Steadily since '16, but a little bit
14   before that, too.
15        Q.  Was there always a ditch there?
16        A.  Yes.
17        Q.  Do you know who owns -- if that ditch is
18   part of the Kaskaskia or the Vandalia water -- or levee
19   district?
20        MR. ST. ONGE:  Objection --
21        A.  It's not on their side.
22   BY MR. BLEYER:
23        Q.  It's not on their what?
24        A.  It's not on their side.  It's not -- that
```

```
                                          Page 46
 1   line would be over here (indicating photograph).
 2        Q.  Right.
 3        A.  Right.  No, this is on my side.
 4        Q.  This ditch that Blankenship printed out --
 5   what does it drain?
 6        A.  I'm taking all of the farm --
 7        MR. ST. ONGE:  Just don't draw on the
 8   other stuff.
 9        A.  Right.
10        The -- I guess all the farm ground from Marlen
11   and north of Marlen all comes -- that ditch runs all
12   the way along here and --
13   BY MR. BLEYER:
14        Q.  Into the river?
15        A.  No, it comes out, and then it goes into a
16   retention pond here, comes out to the back side of me,
17   and then into the river.
18        Q.  Oh, that's right.  Blankenship talks about
19   there's a little pond on the south side of your
20   property?
21        A.  Right.  Right.
22        Q.  So this ditch you talked about -- go ahead
23   on Exhibit 18 that you -- draw with your black
24   Sharpie where the -- because you said it starts up here
```

```
                                          Page 47
 1   and goes down.  Just take your black Sharpie on Exhibit
 2   18 and show me where this ditch from the top to the
 3   bottom --
 4        A.  When it hits me or prior here?
 5        Q.  Starting up at the top of the picture.
 6        A.  Well, I don't know where it runs exactly,
 7   but I'm sure it runs there.  All I can tell you for
 8   sure --
 9        Q.  Let me just interrupt you.
10        So when I'm reading it back, you said it runs
11   there.  You were pointing to the west side of the
12   levee?
13        A.  To the west side of the levee.
14        Q.  Right.
15        MR. ST. ONGE:  On the James Marlen
16   declaration of trust property.
17        A.  Right.  I'm not sure how it runs through
18   the Marlen.  I can tell you where it runs through me.
19   BY MR. BLEYER:
20        Q.  Okay.
21        Mark it on that picture where it runs through
22   you.  And that picture is Exhibit 18.
23        A.  Let's see.  Comes through here.  Retention
24   pond, and then out the backside like so.
```

```
                                          Page 48
 1        Q.  Okay.  Okay.
 2        You've done that on Exhibit 18?  You so marked
 3   on Exhibit 18?
 4        MR. ST. ONGE:  Is that a yes?
 5        A.  I'm sorry?
 6        MR. ST. ONGE:  He's asking you if you
 7   marked --
 8        A.  Yes.  Oh, yes.
 9   BY MR. BLEYER:
10        Q.  Because when I'm reading it back -- that's
11   why I -- I can see what you're doing, but when I'm
12   reading the transcript, I won't be sitting across from
13   you.
14        A.  Okay.  Okay.
15        Q.  Okay.
16        That retention pond, was -- who built that?
17        A.  It was there ever since I've known about
18   it.
19        Q.  Okay.
20        A.  We used to take the kids in there when it
21   was little to shoot wood ducks out of that pond.
22        Q.  Okay.
23        So you've marked where the drainage ditch is on
24   your property, the retention pond -- how does it come
```

Page 49

1  out of the retention pond?  Is there a spillway or a
2  cut, or is it just --
3      A.  Just a cut.
4      Q.  And then is there a ditch from that cut
5  all the way down into the river then?  Down to the
6  river.
7      A.  Yes.
8      Q.  Okay.  Okay.
9      Go ahead and -- on Exhibit 20, go ahead and take
10  the Sharpie and draw the ditch on there, too.
11      A.  The north and south ditch or the new
12  ditch?
13      Q.  The north-south ditch.
14      A.  This one runs right -- (marks on
15  document).
16      Q.  Where's the retention pond there?
17      A.  I don't see a picture of it.
18      Q.  Okay.
19      A.  Should be right in here.
20      Q.  Draw the ditch down to where the retention
21  pond should be.
22      A.  (Marks on document.)
23      Q.  And make a circle where the --
24      A.  (Marks on document.)

Page 50

1      Q.  Okay.  And then it -- okay.
2      Up here, this looks like a field north of your
3  property.
4      A.  Correct.
5      Q.  Is that the Butts's farm?
6      A.  Yes.
7      Q.  And so this ditch runs along the east side
8  of the Butts's field onto your property to the
9  retention pond and on to the river?
10      A.  Not the east side.  The west side.
11      Q.  East side of your property, doesn't it?
12  It runs along the east side of the Butts's farm?
13      A.  Right.
14      Q.  Into your property?
15      A.  Correct.
16      Q.  Near the east side?
17      A.  Correct.
18      Q.  Okay.
19      Did I say something different than that?
20      A.  I thought you said -- we're good.
21      Q.  Whatever.  Okay.
22      So let's -- just so it's clear, the ditch runs
23  along the east side of this farm field, which is the
24  Butts's property, comes into your property, and you've

Page 51

1  marked it, and it runs down to where the circled
2  retention pond is; right?
3      MR. ST. ONGE:  Just object to the form of
4  the question when you were talking about how it runs on
5  the Butts's property.  He said earlier he didn't know.
6  BY MR. BLEYER:
7      Q.  Okay.
8      It starts on the Butts's property.
9      Correct?
10      A.  That ditch -- it may even start on the
11  Lewis property north of that.  I'm not sure where it
12  starts.
13      Q.  But I mean, you -- that's fine.  And if I
14  use the word start, I'm not trying to trick you.
15      The ditch that we're talking about that's been
16  cleared out by Blankenship, you're aware -- I assume
17  you've seen it -- it's located also on the Butts's
18  farm.
19      Correct?
20      A.  Correct.
21      Q.  And it -- wherever it starts north of
22  that, we don't -- you don't know?
23      A.  Correct.
24      Q.  Okay.

Page 52

1      But it does run along that east side of that
2  field on the Butts's property until it comes into your
3  property?
4      A.  Correct.
5      Q.  Okay.
6      And you've put a square on that thing where
7  this -- the trees came from?  I mean --
8      A.  Uh-huh.
9      Q.  -- the area that was cleared for trees?
10      A.  Yes.
11      Q.  Did you have anybody go out and inventory
12  what type of trees were in that pile?
13      A.  No.
14      Q.  Did you inventory the trees that were in
15  that pile?
16      A.  No.
17      MR. ST. ONGE:  You're talking about the
18  pile of trees afterwards?
19  BY MR. BLEYER:
20      Q.  The pile that's in the circle that you've
21  marked on Exhibit 20.
22      MR. ST. ONGE:  Okay.
23  BY MR. BLEYER:
24      Q.  I --

Page 53

1    MR. BIERMAN:  He said no.
2    MR. BLEYER:  Oh, did he?  I'm sorry.
3  Sorry.  I was waiting for him to answer.
4  BY MR. BLEYER:
5    **Q.  Did anybody -- do you have any**
6  **documentation as to the -- counting the number of trees**
7  **that Blankenship removed?**
8    A.  No.
9    **Q.  I saw one picture produced kind of a -- it**
10  **shows a pile of trees, but it's from a distance.**
11    Are you aware of any pictures that as a
12  close-up -- let me finish my question -- close-up
13  picture of the trees that were removed by Blankenship
14  so that someone can identify what type of trees they
15  were?
16    A.  No.
17  **Q.  Okay.**
18  Do you know how many trees were removed?
19    A.  I do not.
20  **Q.  Okay.**
21  Do you know what type of trees were removed?
22    A.  I mean, basically, they're maples, they're
23  sycamores, cottonwoods.
24    **Q.  Things that grow in the river bottom?**

Page 54

1    A.  Right.  River bottom trees.
2    **Q.  Any hardwood trees there?**
3    A.  No.
4    **Q.  Do you know if that -- your property, the**
5  **14 acres, has ever been declared wetlands by any state**
6  **agency?**
7    A.  Not to my knowledge.
8  **Q.  Okay.**
9  Is it included on any USDA map for farming or
10  anything that you're aware of?
11    A.  Not that I'm aware of.
12    **Q.  What about the 27 acres on it?**
13    A.  Not that I'm aware of.
14    **Q.  Is the 14 or 17 -- 14- or 27-acre ever**
15  **been farmed -- grain-farmed by anybody that you know**
16  **of?**
17    A.  No, not that I know of.
18    **Q.  That's right.  That you know of.**
19  You said earlier you don't know how many trees
20  were removed.
21  Is that correct?
22    A.  Yes.
23    **Q.  Don't know what type of trees they were**
24  **specifically, do you?**

Page 55

1    MR. ST. ONGE:  Object to the form of the
2  question.  I think it mischaracterizes his testimony.
3  I believe he did give you --
4    MR. BLEYER:  Okay.
5  BY MR. BLEYER:
6    **Q.  They were -- what -- some sycamores, some**
7  **soft maple?**
8    A.  Maples.  Yep.
9    **Q.  And cottonwoods?**
10    A.  Yep.  Yes.
11  **Q.  Okay.**
12  Anything else?
13    A.  Not that I'm aware of.  I'm not a tree
14  expert.
15    **Q.  Do you know anybody that has any idea how**
16  **many trees were removed?**
17    A.  No.
18  **Q.  Okay.**
19  Do you have any pictures -- or strike that.
20    Were these trees pushed out by root wad and all,
21  or was there any roots or stumps left?
22    A.  I didn't see any stumps.  Not to my
23  knowledge.  I think they were taken out with heavy
24  equipment.  They don't appear to be cut.

Page 56

1    **Q.  You know what I'm talking about, I guess?**
2  **When they bulldoze them out and the root wad is on the**
3  **end of it?  You know what I'm talking about?**
4    A.  Uh-huh.  Uh-huh.
5    **Q.  Is that a yes?**
6    A.  Yes.
7    **Q.  Is that what it seemed like, the trees you**
8  **observed?**
9    A.  It seemed like.
10    **Q.  I assume you've seen ground cleared before**
11  **as a hunter.  They pile them up, root wads at one end,**
12  **and they just keep burning until it all goes away.**
13  **Right?**
14    A.  Uh-huh.
15    **Q.  If no one -- oh, I'm sorry.**
16    [Exhibit 21 marked for identification.]
17  BY MR. BLEYER:
18    **Q.  I'll show you what's been marked as**
19  **Exhibit 21, which is Lucas 28.  That was the picture I**
20  **said I saw that has the pile of trees.**
21    Is that the only picture you're aware of that
22  shows the trees that were removed by Blankenship being
23  piled up on your property?
24    A.  Yes.

14  (Pages 53 to 56)

Page 57

1  Q.  And I -- maybe it's an assumption.
2  The pile of trees -- was it on your property, or
3  was it on the Butts' farm?
4  A.  It looked -- it appeared to be on my
5  property.
6  Q.  Okay.
7  Do you know what since has happened to that pile
8  of trees?
9  A.  No clue.
10  Q.  Well, when you hunt there, is --
11  A.  Oh, it's gone now.
12  Q.  Was it burned, or did the river take them
13  away, or --
14  A.  I don't know.  I went in, and it was
15  nothing about cleared dirt after my conversation with
16  Blankenship.
17  Q.  Okay.
18  So it's your understanding you had the
19  conversation with Blankenship, and then the next time
20  you went there, the trees that are depicted in Exhibit
21, Lucas 28, were gone?
22  A.  They were gone.
23  Q.  You don't know if they burned them, buried
24  them, or --

Page 58

1  A.  No idea.
2  Q.  -- hauled them off?  Okay.
3  [Exhibit 22 marked for identification.]
4  BY MR. BLEYER:
5  Q.  I'll show you what's been marked as
6  Exhibit Number 22, which is Lucas 5.
7  Do you recognize that document?
8  A.  Yes, sir.
9  Q.  What is that document?
10  A.  It's a bid to replace trees.
11  Q.  Okay.
12  From whom?
13  A.  Paul's Tree Service.
14  Q.  And tell me about how you went around to
15  getting Paul's Tree Service to prepare a bid for you.
16  A.  I called him, found out that he was fairly
17  close to Vandalia.  I wanted to see his operations, so
18  I took a ride out there and had a conversation with
19  him.
20  Q.  Where is his place at?  Pleasant Hill?
21  A.  Yeah.
22  Q.  Or Pleasant Plains?
23  A.  Yeah, Pleasant Plains.
24  Q.  Okay.

Page 59

1  Did he come to the property?
2  A.  No.
3  Q.  He -- as far as you know, is Paul's Tree
4  Farm or anyone affiliated with Paul's Tree Farm been to
5  the property?
6  A.  No.
7  Q.  Where did he obtain the information of the
8  trees that he was going to sell you?
9  A.  I sent him pictures.
10  Q.  Of what?
11  A.  Of the damaged area and the open ground
12  that was left.
13  Q.  Okay.
14  A.  And he wrote up the bid from that.
15  Q.  Do you know which pictures you sent him?
16  A.  I can pull them up off my phone.
17  Q.  Well, I assume -- those were pictures you
18  gave to your attorney?
19  A.  Yes.
20  Q.  Okay.
21  And do you know which -- I'll show you what -- I
22  think I've got all of these pictures that were produced
23  here.  Maybe --
24  MR. ST. ONGE:  Just wait for him to show

Page 60

1  you.
2  A.  Okay.
3  MR. ST. ONGE:  You don't need your
4  phone --
5  BY MR. BLEYER:
6  Q.  Here is Lucas 8 through 27.
7  MR. ST. ONGE:  23?  I'm just asking --
8  MR. BLEYER:  I'm just asking him to look
9  through and see which picture he sent to Paul's Tree
10  Service.
11  MR. ST. ONGE:  You're not marking this
12  yet?
13  MR. BLEYER:  Not yet, until he tells me
14  what picture it is.
15  MR. ST. ONGE:  Got it.
16  A.  And then I sent him one video also as
17  well.  Do you have any -- the videos in there or not?
18  MR. ST. ONGE:  No.  There were two videos
19  in the production as well.
20  MR. BLEYER:  Yeah.  He said pictures --
21  MR. ST. ONGE:  But did you hear what he
22  just said?
23  MR. BLEYER:  Yes.  Thank you.
24  A.  This one.  That's the only picture I seen

Page 61

1  that I sent to him --
2  BY MR. BLEYER:
3      Q.   20?  That's --
4      A.   Yes.  Yeah, there's a video, and I have
5  another picture, but I don't see it in your stack.
6      Q.   Can you pull it up and let me look at it?
7      A.   Sure.
8      Q.   But while you're doing that, for
9  clarification, the only picture that's in front of you
10 that you sent to Paul's Tree Service that we've
11 identified today has been Exhibit 20?
12          MR. ST. ONGE:  Is this -- you got to
13 listen to him.
14          Is this the one you're talking about that you
15 sent to Paul's?
16     A.   Yes.
17 BY MR. BLEYER:
18     Q.   So let me ask you a question.
19          You sent Exhibit 20 to Paul's Tree Service?
20     A.   Yes.
21     Q.   And then you're going to find the other
22 picture you sent to him?
23     A.   I got it right here.
24     Q.   Can I look at it?

Page 62

1      A.   Yes, sir.  I'm going to pull it up here
2  for you.
3          MR. ST. ONGE:  Well, let him manipulate
4  it.
5  BY MR. BLEYER:
6      Q.   I'm going to mark your phone as an
7  exhibit -- no, I'm just kidding.
8          The picture, just so -- I don't think it's
9  been -- it's an overhead Google map.
10         MR. CUNNINGHAM:  Do you want to e-mail it
11 to me and I'll have them print it off?
12         MR. BLEYER:  Do you want to e-mail it to
13 John or --
14         MR. ST. ONGE:  Yeah.  Do you want to
15 e-mail it?  Do you want to just take a break?
16         MR. BLEYER:  Yeah.
17         [A recess was taken.]
18 BY MR. BLEYER:
19     Q.   We're back on the record.
20         Mr. Lucas, while we took a break, you e-mailed a
21 picture to your lawyer, he e-mailed it to us, and we
22 printed it out, which we've now marked as Exhibit
23 Number 23.
24         [Exhibit 23 marked for identification.]

Page 63

1      A.   Uh-huh.
2  BY MR. BLEYER:
3      Q.   Which I believe -- we took a break -- that
4  was the picture -- one of the pictures that was on your
5  phone that you sent to Paul's Tree Service?
6      A.   Correct.
7      Q.   Is that correct?
8          That along with exhibit --
9      A.   20, I believe.
10         MR. ST. ONGE:  Here are all --
11 BY MR. BLEYER:
12     Q.   Oh, they are.
13         Along with Exhibit 20.
14         Is that correct?
15     A.   Yes.
16     Q.   And the video that you previously
17 produced?
18     A.   Yes.
19     Q.   Okay.
20     A.   That's what I did with him on the phone,
21 and then I physically went to his nursery and met with
22 him and showed him everything I had on my phone.
23     Q.   What else did you have on your phone?
24     A.   Every picture and video I have of the

Page 64

1  place.
2      Q.   Do you have more than one video?
3      A.   Yes.
4          MR. ST. ONGE:  We've produced two videos.
5          MR. BLEYER:  Okay.
6  BY MR. BLEYER:
7      Q.   More than two videos?
8      A.   I would say -- I think it was two videos.
9      Q.   Good response.  You picked up on what your
10 lawyer said.
11     A.   Well, I can look to go make sure.
12     Q.   No, that was an inside joke, so --
13     A.   No.
14     Q.   I wasn't trying to cast aspersions.  I
15 just was kidding you that --
16     A.   Okay.  Okay.
17     Q.   Do you know -- this overhead shot marked
18 as 23 -- when that was taken?  What date the picture is
19 dated?
20     A.   That -- so that was a live GPS thing.  I'm
21 not a tech guy either, but that's actually where I was
22 standing when I took the picture.
23     Q.   Oh, I see what you're saying.
24     A.   So yeah, I had a GPS, I took a snapshot of

1  that. So it should have a date on it. I can get that
2  for you if you need to know.
3      **Q.  I'm looking at 20 and 23.**
4      A.  Uh-huh.
5      **Q.  I don't see a big area that's like on 20**
6  **where you see areas that are cleared out on 23. That's**
7  **where I'm trying to -- I mean, this area that you've**
8  **put this square around --**
9      A.  Oh.
10     **Q.  -- on 20 that depicted the area where the**
11 **trees were removed -- where is that on 23? I don't see**
12 **it.**
13     A.  I don't see it either. There's your
14 retention pond, though.
15     **Q.  Right, I see that.**
16     A.  And I don't see that on there either. So
17 I don't have an answer for you there.
18     **Q.  Okay.**
19     Back to 20. Can you -- and I don't know if we
20 did. I might have -- can you put an X with your
21 Sharpie where this concrete structure was that
22 Blankenship said he removed? Just an X.
23     A.  Yeah, it's probably -- it's actually in
24 the ditch. (Marks on document.)

1      **Q.  Okay. That's fine.**
2      A.  I'm going to say it's about there.
3      **Q.  Okay.**
4      So -- and you've marked with an X on Exhibit
5  Number 20 where this concrete structure that was
6  discussed Blankenship was removing when he took -- when
7  he and Jim Marlen were talking about the concrete
8  structure that -- and I think Nate talked about it this
9  morning -- go ahead. Whatever it said. That was the
10 structure that they were discussing that was removed.
11 Correct?
12     A.  Correct. Without any permission.
13     **Q.  Okay.**
14     And that's where the X is; correct?
15     A.  Roughly.
16     **Q.  Do you have any idea why Blankenship**
17 **removed --**
18     A.  Those other trees? I'm not --
19     **Q.  He removed the ditch, but why did he**
20 **remove all these trees?**
21     Do you have any idea why he did that?
22     A.  Well, I do now, after listening to his
23 testimony.
24     **Q.  And why is that?**

1      A.  Dug me a new ditch.
2      **Q.  Okay.**
3      A.  Yeah. That's what I said. I mean, if
4  you -- I told Blankenship, I said, I still don't
5  understand, when we did our walkthrough with him, why
6  you had to clear so much timber out on me. If the
7  concrete structure was an issue, if you would have came
8  to me, I would have definitely worked with you, but I
9  don't know why you guys had to clear so much stuff out.
10     Well, after he cleaned it all up and stuff like
11 that, I go back in there, then I got a new ditch that
12 runs east to west.
13         [Discussion off the record.]
14         [Exhibit 24 marked for identification.]
15     A.  Actually, Nate's photo shows the best --
16         MR. ST. ONGE:  Hang on.
17     A.  Oh, sorry.
18 BY MR. BLEYER:
19     **Q.  I'm showing you what's been marked as**
20 **Exhibit 24, which says blue old ditch and orange new**
21 **ditch.**
22     A.  Correct.
23     **Q.  Is that the new ditch you're talking**
24 **about?**

1      A.  Not very much of it, but yes.
2      **Q.  Which picture -- and here -- before I**
3  **mark, would that be -- one of these be better?**
4      A.  Yes, this one would be better. Or Nate's
5  is actually the best picture I got.
6      **Q.  Hand Number 25, which is Lucas 30.**
7          [Exhibit 25 marked for identification.]
8  BY MR. BLEYER:
9      **Q.  What does that -- Exhibit Number 25, Lucas**
10 **Bates Stamp 30, depict?**
11     A.  What does it depict?
12     **Q.  Yeah. We picked that out. You said this**
13 **one shows it better. So tell me for when I read it**
14 **back.**
15     A.  Okay.
16     So this is the new ditch that runs more east
17 than west, and it runs all the way to where he cleared
18 my timber out, and it runs and dumps back into the old
19 ditch.
20     **Q.  Okay.**
21     And on that picture it says old ditch, and then
22 there's two yellow lines in the middle of the picture.
23     Is that the new ditch?
24     A.  That looks yellow to you?

1    Q.   Or orange.  Sorry.
2    A.   Yeah, this is the new ditch.
3    Q.   The orange.
4    A.   Of Nate's.
5    Q.   Which picture of Nate's do you want --
6    I'll show you what has been marked as -- what --
7    26.
8         [Exhibit 26 marked for identification.]
9    BY MR. BLEYER:
10   Q.   It's also Lucas 29, and it's got like two
11   yellow lines in the middle of the picture.
12   Is that the new ditch?
13   A.   Orange.  Yes.
14   Q.   Did I say yellow again?  Two orange lines.
15   A.   Two orange lines.
16   Q.   Okay.
17   A.   That never existed before.
18   Q.   Okay.
19   A.   So after going back in, I'm like okay, now
20   I understand why they cleared so much timber out.  They
21   gave me something I didn't ask for.  They gave me this
22   ditch, too.
23   Q.   The new ditch?
24   A.   The new ditch.

1    Q.   The one that was described -- the
2    east-west ditch?
3    A.   Correct.
4    Q.   Nate said he thought that was originally
5    built in the 1990s.
6    Do you know if --
7    A.   I don't ever remember a ditch there.
8    Ever.
9    Q.   Were you there in the '90s?
10   A.   Well, maybe in '90s it was, but there was
11   no kind of a ditch there when I was there.
12   Q.   So back to Number 20.  You put the X where
13   the structure was, and to the west of that or to the
14   left of it on the picture is the square that you
15   marked, and shows the trees that Blankenship removed.
16   Correct?
17   A.   Correct.
18   Q.   Okay.
19   Are you aware of any information that James
20   Marlen told him to clean that -- clear that area?
21   A.   No.
22   Q.   Any --
23   A.   I don't believe that for a second.  I just
24   think that's untrue.  If Jim would have had a problem

1    with that, he would have came to me and said Joe, I
2    have a problem.  I would have said Jim, what can I help
3    you with?  And we would have worked it out.
4         This unauthorized clearing of all this stuff was
5    not Jim's nature.
6    Q.   Okay.
7    A.   He was a great guy.
8    Q.   Okay.
9    A.   I never had a problem with Jim since 2016
10   and before.  I've known Jim longer than I've known
11   Nate.
12   Q.   Okay.  My question is this.
13   You heard some testimony, and I think they read
14   the testimony, about Blankenship said they met, and Jim
15   says, hey, if that concrete structure is in the way or
16   a problem, take it out.  And I'm paraphrasing it.
17   You heard that testimony --
18   A.   Yes.
19   Q.   Are you aware of any statement made by
20   James Marlen to tell Blankenship to go clean that area
21   that's where the trees were removed?
22   A.   No.
23   Q.   Do you know why Blankenship did it if Jim
24   didn't tell him to do it?

1    A.   I have no idea.
2    Q.   Do you know on whose authority Blankenship
3    went over there and removed all those trees that's
4    depicted in Number 20?
5    A.   I have no idea.
6    Q.   Do you have any information that James
7    Marlen as -- or Nate Marlen as trustee told Blankenship
8    to clear the area that you don't like to be cleared
9    that's depicted in Exhibit 20?
10   A.   One more time.
11   Q.   Are you aware of who gave Blankenship the
12   authorization to go clear that area?
13   A.   No.
14   Q.   You're not telling us that Jim Marlen or
15   Nate Marlen told Blankenship to clean all those trees,
16   are you?
17   A.   I don't know -- no.
18       MR. BLEYER:  Is that a negative question?
19       MR. ST. ONGE:  We all --
20       MR. BLEYER:  I'm going to ask it.
21   BY MR. BLEYER:
22   Q.   Do you have any information that Jim
23   Marlen or Nate Marlen told Blankenship to clean the
24   area that's depicted in Exhibit Number 20 where he

Page 73

1  removed the trees from your property?
2      A.  No.
3      Q.  Okay.
4      The only information you were aware of, that Jim
5  told Blankenship that if that concrete structure needed
6  to be removed, move it?
7      A.  I'm not aware of that.
8      Q.  Okay.
9      You heard Blankenship make that statement?
10     A.  Correct.
11     Q.  Is that the only information you have
12 about Jim Marlen telling Blankenship anything about
13 cleaning anything down at your property, was this
14 concrete structure?
15     A.  One more time.
16     Q.  The only information you have about Jim
17 Marlen saying anything about cleaning anything up on
18 your property was the concrete structure.
19     Is that correct?
20     A.  I didn't hear Jim say that.
21     Q.  No.  You've heard it being testified --
22     A.  Correct.
23     Q.  That's the only information you know that
24 Jim made any statement about doing anything on your

Page 74

1  property, was he told Blankenship he can remove the
2  concrete structure if necessary.
3      Is that correct?
4      A.  According to Blankenship, correct.
5      Q.  Okay.
6      You're not aware of Nate or Jim telling anybody
7  to clean all those trees, are you?
8      A.  No.
9      Q.  Now, I guess we're back to where we are
10 on -- back to Exhibit Number 22 that Bill from Paul's
11 Tree Farm --
12     A.  Danny.
13     Q.  Or the estimate from Paul Tree Farms --
14     A.  Correct.
15     Q.  Why did he want to replace it with
16 hardwoods when you said there was no hardwoods there?
17     A.  Good question.
18     So he actually told me, and I said these guys
19 aren't going to let me replace these with hardwoods.
20 He goes, you pay by the ball.  He says what kind of --
21 the ball size.
22     So each one of these balls are 56 inches.  He
23 says, what kind of trees you want to put in there?
24 Why wouldn't you take the upgrade?  He goes, you want

Page 75

1  maples in there?  I can give you maples.  But they're
2  the same price as the hardwoods.  Why wouldn't you take
3  the hardwoods?
4      I'm like -- again, I'm not a tree expert.
5  That's why I came to you.
6      Q.  How did he --
7      A.  They're all the same price, every one of
8  these trees.
9      Q.  How did he depict the quantity when no one
10 knows how many trees were removed?
11     A.  I went there and showed him my photo album
12 of all the damage and stuff like that.
13     Q.  Right.
14     A.  And he come up with a number of 150, which
15 I -- so brought an arborist with me last week to my
16 farm, and he came up with about the same number.
17 Actually, he came up with a little bit more.
18     Q.  Who was the arborist?
19     A.  Some guy from Missouri.
20     Q.  Okay.  Well, I'll let your lawyer disclose
21 that at the appropriate time.
22     But no one knows how many trees were removed, do
23 we?
24     A.  No.  Counsel, I don't have a tractor to

Page 76

1  undo that thing.
2      Q.  No.
3      A.  I don't even own a tractor.  That pile
4  was -- I don't know how high.
5      Q.  I agree, but I'm just --
6      A.  And how many the river took out, I don't
7  know.  All I know is -- what I can tell you from where
8  I hunt and one of those videos that show, I couldn't
9  see bits and pieces of Marlen's field.
10     Now, he testified there was only 20 trees in
11 there.  There's six standing right in the center, and I
12 got this big, wide, open gap.
13     Q.  But I guess what I'm trying to get to --
14 and that's why I asked you the question about how many
15 trees were removed, do we have pictures of trees, to
16 get some idea --
17     A.  Right.
18     Q.  If in fact any of the defendants are
19 liable to replace those trees, I'm trying to get -- how
20 many trees am I supposed to replace?  That's what
21 I'm -- I mean, I just -- they just picked up these
22 random numbers.
23     A.  I don't think they were random.  Again,
24 I'm not the tree expert.  I showed them what I had on

Page 77

1    my phone, and this is the numbers that he came up with.
2        Q.   Okay.
3        But when you showed him on the phone, there was
4    nothing on the phone or the video you showed him that
5    would depict the number of trees that were actually
6    removed.
7        Is that correct?
8        A.   No --
9            MR. ST. ONGE:  Object to the form of the
10   question.
11       Go ahead.  You can answer it if you understand
12   it.  Go ahead.
13       A.   No, go ahead and ask me one more time.
14   BY MR. BLEYER:
15       Q.   Yeah.
16       I mean, the estimate that he came up with, the
17   number of trees that need to be replaced -- it's not
18   indicative of the number of trees that Blankenship
19   removed, is it?
20           MR. ST. ONGE:  Object to the form of the
21   question.
22       A.   I'm not understanding the question.
23   BY MR. BLEYER:
24       Q.   Okay.  That's a bad question.

Page 78

1        I'm just trying to get -- you've told me earlier
2    that we have no idea how many trees Blankenship
3    removed; correct?
4            MR. ST. ONGE:  Object to the --
5    mischaracterizes his testimony, but go ahead.
6    BY MR. BLEYER:
7        Q.   Do you know how many trees Blankenship
8    removed?
9        A.   I do not.
10       Q.   Okay.
11       I'm trying to get to then why do we come up with
12   like 45 white oaks, 45 something oak.  I mean --
13       A.   So again, he's the tree specialist, not
14   me.
15       Q.   Okay.
16       A.   I showed him what was on my phone, I
17   wanted a tour of his place to look at this stuff and to
18   look at his trees, showed him everything that was on my
19   phone, and these are the numbers that he came up with.
20       Q.   Okay.
21       Have you had anybody estimate the number of
22   stumps that were -- or number of trees taken out?
23       A.   No stumps as far as I can tell.  It was
24   all taken out with heavy equipment.

Page 79

1        Q.   Okay.
2        So --
3        A.   Unauthorized, by the way.  No permission
4    from me, not the Vandalia levee district.
5            MR. BIERMAN:  Joe, just answer the
6    questions.
7        A.   Okay, Jon.
8            MR. CUNNINGHAM:  I thought Nate said that
9    for a minute.
10   BY MR. BLEYER:
11       Q.   So is -- one of the claims you have is
12   under the Illinois Tree Stumpage Act that calculates
13   damage on the number of trees or number of stumps.
14       You don't have any idea how many stumps were
15   removed or trees were removed; is that correct?
16       A.   That's correct.
17       Q.   Okay.
18       [Exhibit 27 marked for identification.]
19   BY MR. BLEYER:
20       Q.   Sir, I'll show you what's -- a Google
21   aerial map that says it's 2015.
22       Do you recognize that to be an aerial map of
23   your property -- the 14-acre property?
24           MR. ST. ONGE:  Is this something that I've

Page 80

1    seen, been produced before, or is this brand-new?
2            MR. CUNNINGHAM:  I think we might have
3    just run those off.
4        A.   I've never seen this before.
5            MR. BLEYER:  I just printed off Google.
6            MR. ST. ONGE:  This is brand-new?
7            MR. BLEYER:  Yeah.
8            MR. ST. ONGE:  Okay.
9    BY MR. BLEYER:
10       Q.   I'm sorry?
11       A.   I haven't seen this before.
12       Q.   I know, but I mean, is that a picture of
13   your property there?  Can you tell that?
14       A.   Yes.
15       Q.   And assuming that Google is correct and
16   it's 2015, that was the -- you were part of the LLC
17   that owned it then.
18       Correct?
19       A.   Correct.
20       Q.   Okay.
21       Can you take my Sharpie and mark -- or first of
22   all, let me ask you this, on that Exhibit 27, the 2015
23   Google map.
24       If I hand you the Sharpie, are you able to show

Page 81

1  me the area that Blankenship cleared sometime in '21?
2      A.  Yes.
3      Q.  Would you do so with this black Sharpie by
4  a circle or a square or whatever you want to do?
5      A.  (Marks on document.)
6      Q.  Okay.
7      So you've marked the area that Blankenship
8  cleared by a black square.
9      Is that correct?
10     A.  Uh-huh.
11     Q.  Is that yes?
12     A.  Yes.
13     Q.  There's some open area that runs east and
14  west.
15     Would that be that east and west ditch?
16     A.  No.
17     Q.  What is that area?
18     A.  That's where one of my food plots is.
19     Q.  But I mean, it goes pretty well -- there's
20  kind of an open area to this little patch over here,
21  east and west across the picture.
22     Do you have any idea what that's all depicting?
23     A.  No, I don't.
24     Q.  Is that the area where this east-west

Page 82

1  ditch is now?
2      A.  East-west ditch is here (indicating
3  photograph).
4      Q.  Go ahead and mark it with a straight line.
5      A.  (Marks on document.)
6      Q.  Okay.  Okay.
7      So the new ditch, east-west, comes out of the
8  Butts's farm across the area that Blankenship --
9      A.  Uh-huh.
10     Q.  -- cleared into the other ditch?
11     A.  Correct.
12     Q.  Okay.  That makes sense.
13     And this other area where the little --
14     A.  And that's a pretty shitty picture, too.
15  Sorry, I shouldn't cuss, but --
16     Q.  I know.  Well, it's 2015.
17     A.  Right.
18     Q.  It was -- well, anyway, the area that's
19  got the little thumbtack in it -- is that the catch
20  pond or the retention pond?
21     A.  Yes.
22     Q.  Okay.
23     I'll show you Exhibit 28 that we just printed
24  off of Google that's supposed to represent 2020.  I'll

Page 83

1  reference to you -- can you -- is that -- can you
2  show -- or strike it.
3      Can you tell that that's -- shows your 14 acres
4  on that 2020 Google map?
5      [Exhibit 28 marked for identification.]
6      A.  Yes.
7  BY MR. BLEYER:
8      Q.  Okay.
9      Can you put a box like you did on Exhibit 27
10  where the area that was cleaned out is?
11     A.  Basically, the dirt area (marks on
12  document).
13     MR. ST. ONGE:  You said you pulled this
14  off Google?
15     MR. BLEYER:  Yes.
16     MR. ST. ONGE:  Okay.
17  BY MR. BLEYER:
18     Q.  That was supposed to be 2020, but I
19  thought all of this happened in 2021.
20     A.  I don't know.
21     Q.  Is that the area that -- where you marked
22  the -- with the black box, is that the area that you're
23  claiming that was -- where the trees were removed?
24     A.  Correct.

Page 84

1      Q.  Okay.
2      And then down here by the word Kaskaskia -- is
3  that the retention pond?
4      A.  Yes.  Right here (indicating photograph).
5      Q.  Okay.
6      And can you mark on that Google map where the
7  drainage ditch that comes from the Butts's farm into
8  your property down to the retainage ditch is?  All the
9  way to the retention pond.
10     A.  And then out to the river.  (Marks on
11  document.)
12     Q.  Thank you.
13     And then also put an X where that concrete
14  structure is on -- was.  Okay.
15     Again, to the east of why Blankenship cut down a
16  bunch -- moved a bunch of trees -- do you have any idea
17  why Blankenship did that?
18     A.  To me, to get the new ditch in.
19     Q.  Why would he want a new ditch?
20     A.  I don't know.
21     Q.  Okay.  Fair enough.
22     I'll just go through these real quick.
23     [Exhibit 29 marked for identification.]
24  BY MR. BLEYER:

1   Q.   Exhibit Number 29, which is Lucas 8 --
2   what's that depict?
3       A.   That's the picture of your ditch, the old
4   ditch, running north and south.
5       Q.   My ditch?  Your --
6       A.   Did I say my ditch?
7       Q.   You said your ditch.
8       A.   Oh.  That's the old ditch running all
9   along the Butts' farm.  This is where it's at on my
10  property.
11      Q.   Okay.
12          [Exhibit 30 marked for identification.]
13  BY MR. BLEYER:
14      Q.   Exhibit Number 30, which is Lucas 9 --
15  what's that?
16      A.   Basically the same picture, just a little
17  different angle.  And it's showing some of the dirt
18  that's pushed up against these trees, and these trees
19  are now dying.
20      Q.   Those are ash trees, aren't they?
21      A.   That, I do not know.
22      Q.   Okay.
23          You knew a few years ago Illinois had all the
24  ash trees die because of all the bore.  You ever see

1   the little purple boxes of people trying to --
2       A.   No.  Huh-uh.
3          So you're saying every one of these trees are
4   ash trees?
5       Q.   I think the dead ones are ash trees.  I'm
6   not an arborist either, but I think they are.
7       A.   Oh.  Right.
8          [Exhibit 31 marked for identification.]
9   BY MR. BLEYER:
10      Q.   Exhibit 31, Lucas 10.
11          What's that?
12      A.   That is the inferior drainage ditch that
13  is already starting to collapse that Blankenship put in
14  so I could have access to my ground.
15      Q.   Okay.
16          That's the ditch --
17          MR. ST. ONGE:  The bridge?
18      A.   The bridge, yes.
19  BY MR. BLEYER:
20      Q.   The bridge that Blankenship talked about?
21      A.   Correct.
22          [Exhibit 32 marked for identification.]
23  BY MR. BLEYER:
24      Q.   Number 32, Lucas 11.

1          What is that?
2       A.   That's a hole looking into his pipe that
3   he put in there.
4       Q.   Okay.
5       A.   I don't know how big of a pipe it was,
6   but --
7          [Exhibit 33 marked for identification.]
8   BY MR. BLEYER:
9       Q.   Okay.
10         Number 33 -- Lucas 12?
11      A.   Same thing.
12         [Exhibit 34 marked for identification.]
13  BY MR. BLEYER:
14      Q.   Number 34, Lucas 13.
15      A.   That's my son Mason in Paul's Tree Farm
16  in -- where is he at -- Pleasant Plains.
17      Q.   I was going to say when I first saw that,
18  I said that didn't look like anything around the
19  Fayette property.
20      A.   Right.
21         [Exhibit 35 marked for identification.]
22  BY MR. BLEYER:
23      Q.   Number 35, Lucas 14.
24      A.   Old ditch, new ditch.

1       Q.   On that Exhibit Number 35, put old ditch
2   with a straight line and the new ditch with X's.
3          Does that make sense?
4       A.   Old ditch with X's?
5          MR. CUNNINGHAM:  No.
6   BY MR. BLEYER:
7       Q.   Either way.  I don't care.  Just tell me
8   what --
9       A.   No, you tell me what you want.
10      Q.   Okay, put the old ditch with a straight
11  line.
12      A.   (Marks on document.)
13          MR. CUNNINGHAM:  Sharpie --
14  BY MR. BLEYER:
15      Q.   And the Sharpie's going bad.
16          And then put little crosshatches with the new
17  ditch.
18      A.   (Marks on document.)
19      Q.   Okay.  Got it.  Okay.
20          [Exhibit 36 marked for identification.]
21  BY MR. BLEYER:
22      Q.   Number 36, Lucas 27.
23      A.   New ditch.
24      Q.   Okay.  Okay.

Page 89

```
 1          Other than the information that you heard
 2   Blankenship say -- testify about that -- or strike
 3   that.
 4          Your first count of your complaint is trespass
 5   the land.
 6          Are you aware of any information that -- did Jim
 7   Lucas trespass onto your land and cause damage to your
 8   land?
 9              MR. CUNNINGHAM:  Jim Marlen.
10              MR. BLEYER:  I mean Jim Marlen.  What did
11   I say?
12              MR. CUNNINGHAM:  Lucas.
13              MR. BLEYER:  Oh, sorry.
14   BY MR. BLEYER:
15       Q.   Jim Marlen trespass on the 14-acre tract
16   to do damage to your land?
17       A.   Not Jim, according to Blankenship when I
18   did my walkthrough with him.
19       Q.   Okay.
20       A.   And I had two other guys with me -- Jon
21   Cripe from SS -- SDDC Farms.
22   BY MR. BLEYER:
23       Q.   Right.
24       A.   And Don Gardner -- we went to the south
```

Page 90

```
 1   end of the property first.
 2          So --
 3       Q.   South end of Lucas property or Marlen
 4   property?
 5       A.   My property.
 6       Q.   Okay.
 7       A.   That was in March of 2022.  And I told
 8   them Blankenship -- let me back up first.
 9          Blankenship said on the phone, hey, we can get
10   this fixed for you, stuff like that.  Meet me, come
11   tell me what you want, and we'll get this taken care
12   of.
13          So I met him at Circle K right there in Vandalia
14   with Jon Cripe and Don Gardner.  We went over to my
15   farm, we're walking down the levee.
16       Q.   Who is Cripe and Gardner?  I think I've
17   heard their names before, but --
18       A.   Jon Cripe is the farm hand for Muddy
19   Bottoms Farm.
20       Q.   Which is --
21       A.   Bob Brinker and Tim Berry's farm.
22       Q.   Okay.
23       A.   And Don Gardner works for them also, or
24   did work for them.
```

Page 91

```
 1       Q.   And it's not the tort teacher that John
 2   Cunningham and I had in law school?
 3       A.   I don't think so.
 4       Q.   Okay.
 5       A.   So anyway, he says whatever -- I've got
 6   all the equipment; we can make this right for you.  And
 7   I'm like, okay.
 8          So we walk down on the south end of the property
 9   first.  We had to wade through water to get there, and
10   I said -- and I realize it's springtime, but that
11   previous fall, I couldn't access my ground in October
12   to bow hunt.  And I'm like, I got to have some kind of
13   a walkway here, a little bit of a crosswalk.
14       Q.   Across the ditch?
15       A.   No.  At the toe of the levee or the bottom
16   of levee.
17       Q.   All right.
18       A.   I never had any problems accessing my
19   ground from there.
20          And then from there, when it comes out of the
21   retention pond, I mean, that's full of water at that
22   time, too, but back even in October it was full of
23   water.  I couldn't access my ground.  There was no big
24   floods.  I'm just taking on a lot more water.
```

Page 92

```
 1          So he goes, take them to the south first.  We
 2   can fix all this.  No problem.  Let me -- good with
 3   that.
 4          So we're walking to the north end.  And he's
 5   apologizing, hey, I'm sorry --
 6       Q.   He being Blankenship?
 7       A.   Blankenship is apologizing saying, I'm
 8   sorry all this happened.  We can fix it.  I was just
 9   following Nate's instruction.
10       Q.   Nate's instruction?
11       A.   Nate's instruction.
12       Q.   Okay.
13       A.   That's what he said.
14       Q.   Okay.
15          You were here for Blankenship's deposition.
16   Right?
17       A.   Yes, sir.
18       Q.   I don't remember hearing him say that
19   during his dep.
20          Did he?
21       A.   No.
22       Q.   Okay.
23          So other than that statement -- is that the only
24   statement Blankenship made about any of the Marlens
```

Page 93

1    talking about coming onto your property?
2         A.   Correct.
3         Q.   Okay.
4         A.   And it was in front of me and two other
5    guys too.  I mean, they were right there.
6         Q.   Do you have any information that Jim
7    Marlen trespassed on your property and caused any
8    damage to it?
9         A.   No.
10        Q.   Do you have any information that Nate
11   Marlen trespassed on your property and caused damage to
12   it?
13        A.   No.
14        Q.   Okay.
15        The only information you have is what
16   Blankenship told you, that I was just doing what Nate
17   told me to do?
18        A.   And that seemed very logical to me.
19        Q.   Well, we're in the law business.  Logic
20   doesn't always play out.
21        A.   Okay.
22        So then if I can continue with that.
23        Q.   Go ahead, yeah.  I'm sorry.
24        A.   So we get to the north end, where all my

Page 94

1    damage is done.  I said you got this ditch twice as
2    wide as it is.  I don't know if you seen the video.  I
3    said there's no way I can even access my ground.  I
4    went over there three times in October.  I'd have to
5    put a boat in just to hunt my ground.  I said this is
6    ridiculous.  We'll take care of it.
7         So I've got a lot more water, my ditch is twice
8    the size as it was, and it's twice as deep as it was.
9         Q.   And so what did Blankenship do to fix it?
10        A.   He said we're going to -- we'll take care
11   of all that.  He didn't fix much.  He gave me the
12   inferior crosswalk -- first of all, let's go to the
13   south end.  He didn't do nothing at the south end.
14        Q.   And you're talking the south end.  Is that
15   where the retention pond goes to the pond, or the south
16   end on the east side of your property?
17        A.   I'm talking -- let me show you on the map.
18        Q.   Might be easier on that plat map if we get
19   back to it.
20        MR. ST. ONGE:  Just find whatever you
21   think is helpful, Joe.
22   BY MR. BLEYER:
23        Q.   Yeah.
24        And you're looking at 28.

Page 95

1         Right?
2         A.   Right.
3         Q.   Okay.  Before you mark, tell me what --
4    show me, and then I might have you mark it too.  But
5    tell me what you want to tell me.
6         A.   Okay, so I have a couple different places
7    to access, one on each side of this retention pond.
8         So we come to the south end --
9         Q.   Put an X there where you were -- X on
10   Exhibit 28 where you and Blankenship and these other
11   two guys --
12        A.   We're walking right down the levee.
13   (Marks on document.)
14        Q.   Okay.
15        And you put an X where you -- at the south end
16   of your property because you're going to tell me
17   something you did down there.
18        A.   Correct.
19        Q.   What did they do down there?  What did you
20   discuss to fix that?
21        A.   Well, we discussed putting a culvert in
22   just on the west side of the levee right there so I
23   could have access there, and then I told him I wanted a
24   culvert over there (indicating photograph).

Page 96

1         Q.   On the ditch that goes from the retention
2    pond to the river?
3         A.   Coming out of the retention pond because
4    the water comes through there real heavy.  So now I've
5    got more water than I ever knew what to do with.
6         Q.   Okay.
7         A.   So his project's working.
8         So yeah, he didn't do anything there.  And he's
9    like, well, I'm going to have to bounce all of this off
10   of Nate, because he's flipping the bill for this.
11        So in his deposition, he said he only produced
12   one -- that's all we talked about, was producing one
13   crosswalk.  Again, I had two other guys with me.
14        Q.   Okay.
15        A.   You can -- happy to ask them.
16        Q.   Are you aware that Nate ever told him he
17   was going to pay Blankenship to fix your property?
18        A.   I only had one five-minute conversation
19   with Nate.
20        Q.   No, I mean -- okay.
21        But did -- other than Blankenship telling you
22   that, are you aware that Nate told Blankenship to go
23   fix it and he would pay for it?
24        A.   No, I'm not aware of that.

Page 97

```
 1        Q.   You're not aware Jim Mar -- was Jim
 2   already passed away by the time this all took place?
 3        A.   No.  According to Nate, he had Stage 4
 4   cancer.  He asked me if I wanted to talk to his dad.  I
 5   said he's got Stage 4 cancer.  I said no, Nate, I don't
 6   need to talk to him.
 7        Q.   When did you -- when's this conversation
 8   with Nate?
 9        A.   May 30 of 2021.
10        Q.   Is that when you heard Nate talk --
11   testify this morning, he said you texted him about
12   what's this and --
13        A.   Well, I had to take a day to cool down
14   first --
15        Q.   Okay.
16        A.   -- because I found my property totally
17   destroyed.
18        Q.   Okay.
19        A.   And I said why would Blankenship -- or I
20   called him --
21        Q.   Called Nate or Blankenship?
22        A.   I called Nate, and I said why would
23   Blankenship be clearing my ground?  And he goes I don't
24   know.  And I said -- he goes, I wasn't there.  And I
```

Page 98

```
 1   said, so let me get this straight, Nate.  I said, if I
 2   would have done this to you, you would be hunting me
 3   down right now.  I said, you just let a guy on your
 4   ground.  Nobody showed him no property lines, no
 5   nothing.  And he says do you want to talk to my dad?  I
 6   got enough of my own problems.
 7        And that was the last time I talked to Nate.
 8        Q.   That was end of May of 2021?
 9        A.   May -- I think it was 29th or 30th of
10   2021.
11        Q.   Okay.  Haven't spoken to him since?
12        A.   Haven't spoke -- everything else is in
13   text message between me and him, and I really don't
14   even want to text message him anything.
15        Q.   Fair enough.
16        But I think just to para -- or to memorialize
17   what you just said, Nate never told you that he told
18   Blankenship to do what Blankenship did, did he?
19        A.   No.  Like I said, my whole deal with Nate
20   after this happened was a five-minute phone
21   conversation, if that.
22        Q.   Fair enough.
23        And you never talked to Jim after this -- you
24   found out.
```

Page 99

```
 1   Right?
 2        A.   He said he was dying, and then he ended up
 3   passing away.  I wasn't going to bother Jim.
 4        Q.   I know that.
 5        A.   Jim was a great guy.  I had a lot of
 6   respect for Jim.
 7        Q.   I keep asking double negatives.
 8        Did you talk to Jim after you found out about
 9   the Blankenship --
10        A.   No.
11        Q.   I know you're getting excited, but you got
12   to let me finish my question before you --
13        A.   I'm sorry.
14        Q.   No, it's for his benefit, not mine.
15        A.   Okay.
16        Sorry.
17        THE REPORTER:  That's fine.
18   BY MR. BLEYER:
19        Q.   So the only -- but -- and Blankenship
20   without question trespassed onto your property?
21        A.   Without question.  With no permission.
22        Q.   Okay.
23        And I asked you earlier about, you got -- one of
24   your allegations in your complaint are the Illinois
```

Page 100

```
 1   Wrongful Tree Cutting Act, and it has to do with
 2   damages and the number of trees that are removed.
 3        Again, you have no idea how many trees were
 4   removed, do you?
 5        A.   I'm just going off the expert.
 6        Q.   Goddamn, why do I keep asking double
 7   negatives?
 8        Do you have any information how many trees were
 9   removed?
10        A.   Just from Paul's Tree Service and his
11   estimate.
12        Q.   That's just what he wants to replace, but
13   do you know how many trees Blankenship removed from
14   your property?
15        A.   No, counselor, I didn't count them.
16        Q.   Okay.
17        And no one at -- are you -- have you
18   commissioned anyone to calculate the number of trees
19   that were removed from your property by Blankenship?
20        A.   Just what Danny Paul gave me.
21        Q.   No, he -- that's what -- to replace them.
22        Did you commission anyone to calculate the
23   number of trees that Blankenship actually removed from
24   your property?
```

Page 101

```
1       A.  The arborist did.  He came up with about
2   the same amount, a little bit more.
3       Q.  When what?
4       A.  The arborist that I had there.
5       Q.  I know.
6       This was last week?
7       A.  Yes.
8       Q.  And he was able to look at it and say how
9   many trees were removed?
10      A.  He gave me an estimate.
11      Q.  Did he tell you what he based that
12  estimate on?
13      A.  To be honest with you, I just got the
14  report not that long ago, I fired it off to my lawyers,
15  and I just read his methodology.  Evidently he went to
16  two different spots, counted trees, and the same --
17  around the same area, density, and that that's the
18  number he come up with, which was pretty dang close to
19  what Paul's Tree Service was saying.
20      Q.  And we've talked about this, but I just
21  want --
22      You don't know what Blankenship did with the
23  pile of trees?
24      A.  No, sir.
```

Page 102

```
1       Q.  Okay.
2       Did Jim Marlen have anything to do to take the
3   pile of trees and dispose of them?
4       A.  Not that I'm aware of.
5       Q.  Did Nate Marlen have anything to do
6   with --
7       A.  Not that I'm aware of.
8       Q.  Okay.
9       Do you use this property -- or strike that.
10      Was the intention to use this property for
11  anything else other than deer hunting?
12      A.  No.
13      Q.  Okay.
14      A.  I don't grow anything on it.  Just deer
15  hunting.  And turkey hunting.  We turkey hunt, too.
16      Q.  Would you rather turkey hunt or deer hunt?
17      A.  I'm a deer hunter now, I guess.
18      Q.  Can't beat a turkey gobbler coming off the
19  roost in the morning.
20      A.  Yeah.
21      Q.  Hell of a lot better than some buck coming
22  through the woods.
23      A.  They're a little easier to hunt in
24  Illinois than Missouri, I can tell you that.
```

Page 103

```
1       Q.  Yes.  Yes.
2       A.  I don't know if they just don't see people
3   or whatever, but they're not much of a challenge over
4   here.  At home, they watch.  You blink, and they're out
5   of there.
6       Q.  I started turkey hunting down by Fort
7   Leonard Wood.  I know exactly --
8       A.  Oh, yeah.  Well, you're in a good area.
9       Q.  How's your deer harvest been since
10  Blankenship removed these trees?
11      A.  Not good.
12      Q.  What do you mean by not good?
13      A.  One youth boy shot one on the 14 acres.
14  My daughter did kill one on the north piece this year.
15  That was it.
16      Q.  Has the north area been affected by the
17  removal of the trees in the 14 acres?
18      A.  Not that I know of.
19      Q.  Okay.
20      A.  I doubt it.
21      Q.  Before the trees were removed, was there
22  any -- was one better to deer hunt than the other --
23      A.  Well, definitely the 14 acres was always a
24  better spot to deer hunt.
```

Page 104

```
1       Q.  Okay.
2       Do you know how big an area that is, that the
3   trees were removed?
4       A.  I think -- I'm guessing about
5   three-quarters of an acre.
6       Q.  Okay.
7       Have you done anything since they were removed
8   and the dirt work done by Blankenship -- planted any
9   trees?
10      A.  No.
11      Q.  Mowed it?
12      A.  No.
13      Q.  Disced it?
14      A.  I did put a food plot up to this ditch
15  right here, so this area right in here (indicating
16  photograph).  I tried to put a food plot in here.  A
17  lot of activity at night.  Not during the day with deer
18  going through.  Right.
19      Q.  The deer -- okay.
20      But I guess I'm getting to -- any of the -- I
21  mean, I've been around bottom ground enough that if you
22  don't do anything after a few years, here come the
23  sycamores, here come the cottonwoods.  Things start
24  growing back.
```

1      Has any of that started growing back yet?
2      A.   Well, there's ragweed in there.
3      Q.   But any of the sycamores or cottonwoods or
4    swamp maples?
5      A.   Not that my -- not that I know of.
6      [A recess was taken.]
7               EXAMINATION
8    BY MR. CUNNINGHAM:
9      Q.   Joe did a good job, so I'm not going to
10   ask you a lot of questions.
11     But just going back to when you first bought
12   into this LLC.  As I understand it, that was in 2006.
13   Right?
14     A.   Somewhere there.  2006, 2008.  I'm not
15   really sure of the date on it, when I got in.
16     Q.   Did you get like a percentage interest in
17   the LLC?
18     A.   Yes.
19     Q.   What was your percentage?
20     A.   Like five percent.
21     Q.   Okay.
22     What did that cost you?
23     A.   I think it was $5,000 or $6,000 out of
24   pocket, and then -- it was like $5,000 or $6,000 out of

1    pocket to get in.
2      Q.   And were you to get any benefit of the
3    farming that was done on those acres?
4      A.   Yeah.  That went to help paying my note.
5      Q.   Well, the whole interest in the LLC cost
6    you $5,000.
7      Right?
8      A.   Correct.
9      Q.   Were you actually supposed to then get
10   some money from the farming operation?
11     A.   The farming operation, yes.  The money
12   that I got from the grain went to pay my note.
13     Q.   The $5,000 note?
14     A.   No.  I forgot what it cost me.  I don't
15   remember exactly how much my five percent thing was.
16   That's what it cost me down, out of pocket.
17     Q.   Oh, I was actually wondering what it cost
18   you, the whole thing.
19     A.   I don't know, off the top of my head.
20     Q.   Like more than $10,000 or --
21     A.   Oh, yeah.  I don't remember, to be honest.
22     Q.   Okay.
23     A.   I hate to even throw a figure out at you.
24     Q.   All right.

1      Did you have it paid off --
2      MR. BIERMAN:  We can find that information
3    and provide it to you.
4      MR. CUNNINGHAM:  Okay.
5    BY MR. CUNNINGHAM:
6      Q.   Did you have the interest paid off by
7    2016?
8      A.   No.
9      MR. ST. ONGE:  You said the interest paid
10   off.  Do you mean the note?
11   BY MR. CUNNINGHAM:
12     Q.   The int -- I guess the five percent
13   interest.  Whatever that interest in the LLC that you
14   had, whether it was five percent --
15     A.   No, I did not own it free and clear.  No.
16     Q.   Okay.
17     And so when you bought the 14 acres in 2016, did
18   you have to come up with some more money?
19     A.   Correct.
20     Q.   And that was like $20,000?
21     A.   Something like that, yes.
22     Q.   Okay.
23     So do you have any estimate at all as to how
24   much money you put into this property?

1      A.   No.
2      Q.   More than $40,000?
3      A.   I really don't know.  I don't even know
4    how to put a number on that.
5      Q.   Okay.
6      How much is the acreage worth, the 14 acres?
7      MR. ST. ONGE:  Object to the form of the
8    question.
9    BY MR. CUNNINGHAM:
10     Q.   If you know.
11     MR. ST. ONGE:  Calls for an opinion.
12     A.   I don't know.  I think there's some farm
13   ground that sold down the road -- gosh, I even got a
14   picture of that.  Early May, $4,000 or $5,000 an acre,
15   something like that.
16   BY MR. CUNNINGHAM:
17     Q.   Farm ground that you could actually farm?
18     A.   Well, some of it was pasture ground too.
19   Actually, the deer-hunting ground was going for more
20   than the farm ground, which I thought was very
21   interesting.
22     Q.   Okay.
23     So you never got an appraisal of what -- the
24   value of your 14 acres, did you?

Page 109

1   A.   No.
2   Q.   And when I'm talking about this interest
3   in the LLC that you might have paid a certain amount
4   for -- you don't know if it was $40,000 -- that
5   includes the 27 acres to the north?
6   A.   Correct.
7   Q.   Okay.
8   So did you yourself harvest any deer in 2023?
9   A.   One.
10   Q.   Where was it?
11   A.   In Missouri.
12   Q.   How about 2022 at the 14 acres?
13   A.   No.
14   Q.   Did you hunt there?
15   A.   Yes.
16   Q.   And why do you -- what did you attribute
17   that to, that you didn't get any deer that year?
18   A.   I think it impacted me on my deer hunting
19   tremendously.  Again, I don't see -- deer don't come
20   through great big gaps.  They had all the cover and all
21   the habitat they needed until it was all cleared out.
22   Q.   Okay.
23   But you had 14 acres, and you think he affected
24   about three-quarters of an acre?

Page 110

1   A.   Uh-huh.
2   Q.   Yes?
3   A.   The main thoroughfare where you put a big
4   permanent box, the permanent stand where you
5   put actually good concrete and put concrete in and put
6   a permanent stand up there so the river wouldn't take
7   it away, yes.
8   Q.   Where was the permanent stand?
9   A.   Just south of where Blankenship's work
10   was.
11   Q.   And it's still in the same location today?
12   A.   Yes.
13   Q.   Okay.
14   A.   It's on one of them videos.
15   Q.   All right.
16   So if we're going to try to figure out what your
17   property looked like before 2021, you don't have any
18   pictures, so it would have to be by some type of Google
19   images or something available outside of what you have
20   available.
21   Correct?
22   A.   Correct.
23   Q.   And you guesstimated three-quarters of an
24   acre, but did anybody ever actually measure the size of

Page 111

1   the area of trees that Blankenship removed?
2   A.   The arborist.
3   Q.   He took physical measurements?
4   A.   Yes.
5   Q.   Okay.
6   How was he doing that?
7   A.   I guess he had a tape roll, 300-foot tape
8   roll.
9   Q.   So he didn't have one of those wheeled
10   measuring things that surveyors use?
11   A.   No.
12   Q.   Yeah.  He had a roll of measuring tape?
13   A.   Correct.
14   Q.   Okay.
15   Who was involved in helping him with that?
16   A.   Him and another tree company.
17   Q.   So who's the other tree company that was
18   there?
19   A.   Tree Surgeons.  Jason Soln.  S-O-L-N.
20   Q.   Why was Jason there?
21   A.   Actually, Jason did some tree work for me,
22   and he says -- he said he wasn't a licensed arborist,
23   but he knew a licensed arborist.  But he's done some
24   work for me at my house.

Page 112

1   MR. BIERMAN:  Can I -- I hate to do this,
2   but I think I want to help you out a little, straighten
3   it out.
4   MR. CUNNINGHAM:  Sure.
5   MR. BIERMAN:  He's talking about the
6   arborist who came last week.
7   MR. CUNNINGHAM:  Right.  Right.
8   MR. BIERMAN:  Okay.  I just wanted to make
9   sure you didn't think we were talking about the
10   estimate.
11   MR. CUNNINGHAM:  Yeah, I think I picked up
12   on that.
13   MR. BIERMAN:  Okay.  Sure.
14   BY MR. CUNNINGHAM:
15   Q.   Because the other one never came to your
16   house --
17   MR. BIERMAN:  Correct.
18   BY MR. CUNNINGHAM:
19   Q.   -- that Paul's Tree Service?
20   A.   No.
21   Q.   So Jason Soln has done some tree work for
22   you, he's not an arborist.  So did he line up the
23   arborist?
24   A.   Correct.

1    Q.   And those two used the tape measure to
2    measure how much much -- how much area did --
3        A.   Correct.
4        Q.   And then did they put that in the report,
5    the size of the area that was affected?
6        A.   Yes, I believe.
7        Q.   Now, you said earlier, I believe, that if
8    Jim Marlen wanted that concrete structure removed and
9    he approached you about that, you wouldn't have had an
10   issue?
11       A.   I would have definitely worked with him
12   for sure.  I wouldn't have let him clear as many trees
13   out as he did.
14       Q.   I'm talking about the concrete structure
15   now, not the trees.  Just the concrete structure.
16           If Jim wanted that removed because
17   Blankenship said drainage needed to be --
18       A.   Well, sure.  Yeah, I tried -- I'm trying
19   to be --
20           MR. ST. ONGE:  Let him answer the
21   question -- ask the question.
22       A.   I'm sorry.
23   BY MR. CUNNINGHAM:
24       Q.   So if Blankenship told -- just

1    hypothetically, if Blankenship tells Jim Marlen, hey,
2    you know, this concrete structure needs to be removed
3    to improve the drainage, would you have had an issue
4    with that?
5            MR. ST. ONGE:  Objection.  Calls for
6    speculation.
7    BY MR. CUNNINGHAM:
8        Q.   You can answer.
9        A.   So --
10           MR. ST. ONGE:  Yes, you can answer.  I'm
11   stating an objection for the record.
12       A.   So tell me -- ask me the question again,
13   please.
14   BY MR. CUNNINGHAM:
15       Q.   Would you have allowed him to remove it if
16   Jim said, hey, you know, Blankenship says we need to
17   remove this concrete structure to improve the drainage?
18           Would you have allowed that to occur?
19           MR. ST. ONGE:  Same objection.  Go ahead.
20       A.   Yes.
21   BY MR. CUNNINGHAM:
22       Q.   And you wouldn't have anticipated that
23   that was going to entail removal of all these trees
24   that ultimately got removed?

1        A.   Right.
2        Q.   Okay.
3        A.   So all the questions -- I mean, nobody
4    came to me and asked me anything.  I just went and
5    discovered it a mess.
6        Q.   Yeah, I understand.
7            But what I'm getting at is, if all you knew is
8    that a concrete structure needed to be removed to
9    improve drainage, you wouldn't necessarily believe that
10   a bunch of trees were going to have to be removed at
11   the same time.
12           Correct?
13       A.   Correct.
14       Q.   So in other words, if Mr. Blankenship told
15   Jim Marlen that, hey, I need to remove this concrete
16   structure, do you know of any facts that would indicate
17   to Jim that, well, that's going to necessarily involve
18   taking out a bunch of Mr. Lucas's trees?
19           MR. ST. ONGE:  Object to the form of the
20   question.  Calls for speculation.
21   BY MR. CUNNINGHAM:
22       Q.   You can answer.
23       A.   Okay.  So every time he says that, I get
24   thrown off.

1        Q.   I always tell my clients, if there's an
2    objection, ask the question be asked again.
3            So what I'm getting at is, are you aware of any
4    facts that would indicate to Jim Marlen that he should
5    have known that removal of this concrete structure
6    would also entail removal of a bunch of your trees?
7            MR. ST. ONGE:  Same objection.
8        A.   I don't know what he knew.
9    BY MR. CUNNINGHAM:
10       Q.   But you wouldn't have known that, if
11   somebody told you the concrete structure needed to be
12   removed.
13           Right?
14       A.   I think it could have been done in a way
15   that my property wasn't destroyed.
16       Q.   And a bunch of trees weren't removed?
17       A.   Right.
18           MR. BIERMAN:  I want to just remind the
19   witness once again to just answer the question asked.
20       A.   Okay.
21   BY MR. CUNNINGHAM:
22       Q.   Now, you heard Mr. Blankenship's testimony
23   that Nate never instructed him to go onto the property
24   and remove the concrete structure.

Page 117

1    Correct?
2        A.   Correct.
3        Q.   **All right.**
4        And the only information you have that causes
5    you to question that is you met with Blankenship on
6    another occasion in '22 when you were talking about
7    repairs, and he said something about Nate's
8    involvement.
9        Correct?
10       A.   Correct.
11       Q.   **And what exact words did he say?**
12       A.   He said sorry about all this, I was just
13   going on Nate's instruction.
14       Q.   **So he never told you what Nate's**
15   **instructions were.**
16       Correct?
17       A.   Correct.
18       Q.   **He never told you at any time that Nate**
19   **instructed him to remove a single tree, did he?**
20       A.   No.
21       Q.   **Okay.**
22       So if Blankenship hadn't just made that general
23   statement to you out there that, you know, this was
24   something that was done on Nate's instructions, would

Page 118

1    you have sued Nate?
2        MR. ST. ONGE:  Objection.  Calls for
3    speculation.  Go ahead.
4        A.   Would I have sued Nate if --
5    BY MR. CUNNINGHAM:
6        Q.   **If Blankenship had not made that**
7    **instruction -- or made that general statement to you**
8    **that, yeah, I'm sorry, I was doing this on Nate's**
9    **instructions.**
10       Would you have sued him?
11       MR. ST. ONGE:  Objection.
12       A.   No.
13   BY MR. CUNNINGHAM:
14       Q.   **And so if Blankenship's testimony from his**
15   **deposition is correct, that Nate never told him**
16   **anything about the removing of this structure or going**
17   **onto your property -- if that testimony in his**
18   **deposition is true, then do you know of anything else**
19   **that Nate did wrong?**
20       A.   No.
21       Q.   **Okay, I'm about done.**
22       And you said one other thing that I wanted to
23   follow up on.
24       When Blankenship told you that, sorry about

Page 119

1    this, I was following Nate's instructions -- that that
2    seemed logical to you, what do you mean by that?
3        A.   I just can't believe they would have put
4    him in, turned him loose on the property without nobody
5    showing him any lines or anything like that.  They just
6    turned the guy loose with heavy equipment?  It just
7    doesn't seem right to me.
8        Q.   **Okay.  Okay.**
9        That's the only -- that's what you meant by
10   that?
11       A.   Correct.
12       Q.   **Not because of the relationship you had**
13   **with Nate or anything like that?**
14       A.   I tried to be a good neighbor.
15       Q.   **You and him got along fine before this.**
16   **Right?**
17       A.   No problems.
18       Q.   **And the same questions with regard to**
19   **the -- Jim Marlen.**
20       If all that Jim Marlen said to Blankenship was
21   if you need to remove that concrete structure to
22   improve drainage, go ahead, would you have thought that
23   Jim did anything that warranted, you know, a lawsuit?
24       A.   If they would have just removed the

Page 120

1    concrete structure?
2        Q.   **Yes.**
3        MR. ST. ONGE:  Listen to the question.
4        A.   Repeat it, please.
5    BY MR. CUNNINGHAM:
6        Q.   **If Jim simply said to Blankenship, hey, if**
7    **you need to remove that concrete structure to improve**
8    **the drainage, go ahead and remove it -- if that was the**
9    **conversation -- nothing about trees or anything else --**
10   **I mean, in that -- in your mind, would you have thought**
11   **well, geez, I'm going to sue Jim for that?**
12       MR. ST. ONGE:  Object to the form of the
13   question.
14       Do you understand it?
15       A.   No, I don't.
16       MR. ST. ONGE:  Okay.
17   BY MR. CUNNINGHAM:
18       Q.   **Okay.**
19       Would you think that would be something that is
20   just for inappropriate for Jim to say that, you know,
21   that if you need to remove that concrete structure that
22   I put in, go ahead and remove it?  Is that something
23   you would have had a problem with?
24       A.   If I would have been come and asked for it

Page 121

1    before it happened?  Is that what you are saying?
2         Q.   I'm not even asking you what you -- if you
3    were asked.  I'm just kind of putting you in Jim's
4    position now.  He's got somebody telling him that this
5    concrete structure needs to be removed to improve
6    drainage, and Jim says, okay, take it out, but there's
7    no discussion about removing trees or anything else --
8    I mean, do you think that that would have been
9    inappropriate for Jim to say if it needs to be taken
10   out, go ahead and take it out?
11        MR. ST. ONGE:  Objection.  Calls for an
12   opinion on -- incomplete hypothetical.
13        Go ahead.
14   BY MR. CUNNINGHAM:
15        Q.   You can answer.
16        A.   I can answer?
17        Q.   Yeah.
18        A.   I'm still confused on the question.
19        MR. ST. ONGE:  Subject to my objection, so
20   I don't have to say it again.  Why don't you ask it.
21        MR. CUNNINGHAM:  Okay.
22   BY MR. CUNNINGHAM:
23        Q.   I mean, do you have a problem with Jim
24   saying, hey, if you need to remove it, go ahead and

Page 122

1    remove it?  Do you have a problem with Jim saying that?
2        A.   If he would have called me.
3        Q.   Well, I mean, even if he didn't call you,
4    if he's -- you mean him, being Blankenship would have
5    called you?
6        A.   If Jim or Blank -- somebody would have
7    asked for permission first.
8        Q.   All right.
9        But regardless of whether they asked for
10   permission first, you don't have a problem with the
11   fact that the concrete structure was removed, do you?
12        A.   Again -- no, I don't have a problem with
13   that.
14        Q.   It's the trees; right?
15        A.   Oh, the trees for sure.
16        MR. CUNNINGHAM:  That's all I have.  Thank
17   you.
18        A.   Right.
19        MR. ST. ONGE:  Take a short break, and I
20   may have a couple questions.
21        MR. BLEYER:  Can I just ask one question?
22        MR. ST. ONGE:  Oh.
23              EXAMINATION
24   BY MR. BLEYER:

Page 123

1        Q.   And I don't want to go into anything
2    specific.
3        One of the prayers for relief is attorneys'
4    fees.
5        Are you paying your attorneys by the hour, or do
6    you have a contingency fee for your recovery?
7        A.   I don't have any -- I have a deal with a
8    friend of mine that's actually paying my attorneys'
9    fees, and he told me -- well, I took a loan from him.
10        Q.   Who's this friend?
11        A.   Tim Berry.
12        Q.   Do you pay interest on that loan or do you
13   just --
14        A.   No, we haven't worked that out yet.
15        Q.   So Tim Berry is paying your attorneys to
16   prosecute this case for you?
17        A.   Correct.
18        Q.   Is it by the hour?
19        A.   I have no idea.
20        Q.   Do you have an agreement with these
21   attorneys that are here today?  Did you sign any type
22   of attorney agreement to prosecute this suit, or is
23   that Tim Berry that's got the agreement with them?
24        A.   Tim Berry's flipping the bill for it.  If

Page 124

1    I lose, I owe Tim the money for it.
2        Q.   Okay.
3        Is it by the hour, or --
4        A.   I don't know, counselor.
5        MR. BLEYER:  Okay.
6        MR. ST. ONGE:  Okay.  Take a little break?
7        Go ahead.
8              EXAMINATION
9    BY MR. CUNNINGHAM:
10        Q.   Well, let me ask you this.
11        Was Tim Berry the one who encouraged you to file
12   the lawsuit?
13        A.   No.  I was already thinking about doing it
14   anyway.
15        Q.   How did it come up then that he was going
16   to pay your attorneys' fees?
17        A.   He said if you want -- if you're not happy
18   with the work that Blankenship did to try to rectify
19   this thing, I've got a lawyer for you.  And I will make
20   you the loan.  I will go ahead and pay for it.  And if
21   you win, you can -- all I want's my money back.  If you
22   lose, you're going to have to owe me the money.
23        Q.   Why would he make you that deal?
24        A.   He's just a good friend.

1    Q.   How much -- I mean, was there a limit on
2  how much he was going to --
3    A.   No.
4    Q.   -- front here?
5    A.   Huh-uh.  I have no idea.  I don't know
6  what that number is.
7    Q.   Okay.
8    And it wasn't contingent on the outcome?  He
9  didn't say if you lose, don't worry about paying me
10 back?
11   A.   No.  No.  It's a loan.  I'm well aware of
12 that.
13   Q.   Is there anything in writing?
14   A.   No.
15   Q.   And did you come to him at any time and
16 say, hey, I can't afford to file a lawsuit?  Can you
17 help me out with this?
18   A.   No.
19   Q.   If -- and he said if you have a problem
20 with what Blankenship did, then I'll have a lawyer for
21 you -- I have a good lawyer for you?
22   A.   Uh-huh.
23   Q.   Yes?
24   A.   Yes.

1    Q.   What did he say about the Marlens?
2    A.   Well, we categorize them together.  It's
3  Marlen and Blankenship.
4    Q.   Do you know if there's any animosity
5  between Berry and the Marlens?
6    A.   Oh, yeah, I'm sure there.
7    Q.   How long -- how far back does that go?
8    A.   I don't know.  On and off.
9    Q.   Before this work by Blankenship?
10   A.   Yes.
11   MR. CUNNINGHAM:  Okay.
12   MR. BLEYER:  Is that animosity over duck
13 hunting?
14   A.   Yeah.  And water.
15   MR. BLEYER:  Okay.
16   MR. CUNNINGHAM:  That's all I have.
17   MR. ST. ONGE:  Okay.  Take a little break.
18   [A recess was taken.]
19   MR. ST. ONGE:  You guys -- any other
20 questions?
21   MR. BLEYER:  No.
22   MR. ST. ONGE:  Okay.
23   I have a couple questions for you, Joe.
24   A.   Okay.

1                EXAMINATION
2  BY MR. ST. ONGE:
3    Q.   You mentioned this arborist and his
4  methodology.
5    Can you explain to us what that methodology was?
6    A.   He divided the ground I believe into two
7  sections and measured it, counted the trees that were
8  in.
9    Q.   Okay.
10 So he had some control areas that were wooded?
11   A.   Right, that were undisturbed.
12   Q.   Okay.
13 And how many of those did he have?
14   A.   Two.
15   Q.   And he measured the trees in those areas?
16   A.   Correct.
17   Q.   And he determined how many trees were in
18 fact in those areas?
19   A.   Correct.
20   Q.   Okay.
21 And did he compare those to the cleared area
22 then?
23   A.   Yes.
24   Q.   Okay.

1    And did you tell him that those areas that he
2  counted were similarly dense to the area that was
3  cleared?
4    A.   Correct.
5    Q.   Okay.
6    So he estimated what the cleared area of density
7  was based upon two separate areas that were similarly
8  dense?
9    A.   Right.
10   Q.   And he came up with a number of what for
11 the area that had been cleared?  How many -- what was
12 that estimate as to how many trees were there?
13   A.   Total was like 166.
14   Q.   And what did Mr. Paul come up with?
15   A.   150.
16   Q.   So they were pretty close?
17   A.   Correct.  Yes.
18   Q.   And Mr. Paul came up with 150?
19   A.   Yes.
20   Q.   You were asked a couple of questions about
21 why Blankenship would dig a new ditch.
22   Do you have any -- and you didn't talk with Mr.
23 Blankenship about why he dug that ditch, did you?
24   A.   No, I did not.

Page 129

1    Q.   So you don't actually know?
2    A.   Correct.
3    Q.   Do you have any idea of why he might have?
4        MR. CUNNINGHAM:  Objection.  Speculation.
5    A.   Yeah, sure.  Because the Marlen's farm
6    wasn't draining properly.
7    BY MR. ST. ONGE:
8    Q.   Okay.
9        So it would help drainage on his property?
10   A.   Correct.
11   Q.   Would it also benefit the Marlen trust
12   that owned that property?
13   A.   Absolutely.
14       MR. BLEYER:  Show my objection to
15   speculation.
16   BY MR. ST. ONGE:
17   Q.   You mentioned -- or you gave some
18   testimony about pulling out the structure and what you
19   might have done if Jim Marlen had come and talked to
20   you about it.
21       Do you remember that testimony?
22   A.   Yes.
23   Q.   Okay.
24       Now, would you be able to remove the structure

Page 130

1    and widen and elongate the ditch without taking out a
2    bunch of trees?
3    A.   No way.  No.
4    Q.   Why?
5    A.   Equipment is too big, and it's heavily
6    wooded.
7    Q.   So the removal of the concrete structure
8    and the widening and extension of the ditch required
9    large machinery?
10   A.   Correct.
11       MR. BLEYER:  Show my objection to
12   foundation.  He said he didn't know anything about
13   operating heavy equipment.
14   BY MR. ST. ONGE:
15   Q.   It would have required equipment; correct?
16   A.   Oh, yes.
17   Q.   And could you have gotten that equipment
18   in there without taking out a bunch of trees?
19       MR. BLEYER:  Same objection.
20   BY MR. ST. ONGE:
21   Q.   Go ahead.
22       Could you have gotten that equipment in there
23   that you needed to do that excavation work without
24   removing trees?

Page 131

1    A.   No.
2    Q.   Are you familiar with the legal concepts
3    of respondeat superior?
4    A.   No.
5    Q.   How about the law and doctrine of agency?
6    A.   No.
7    Q.   You don't know the particulars of those
8    legal doctrines?  Is that correct?
9    A.   No.
10   Q.   Is that correct?
11   A.   What's that?
12   Q.   You don't know the particulars of those
13   legal doctrines?
14   A.   No.
15   Q.   Okay.
16       And you said in your testimony earlier that you
17   had a problem with the trees in particular and them
18   having been removed.
19   A.   Yes.
20   Q.   Was it just the trees that you had a
21   problem with in regards to what happened on your
22   property?
23   A.   Not just the trees.  You know, being able
24   to access my ground.

Page 132

1    Q.   Okay.
2        Does it have something to do with the ditch?
3    A.   Well, sure.
4    Q.   Okay.
5        And what's the problem with the ground apart
6    from the trees?  I mean, what happens to the ground
7    that you have a problem with?
8    A.   It was destroyed.
9    Q.   And the removal of the concrete
10   structure -- that's part of the problem.
11       Correct?
12   A.   Yes.
13   Q.   And the widening of the ditch -- is that
14   also a problem?
15   A.   Widening, deepening, yes.
16   Q.   This photograph that's Exhibit 28 -- it's
17   been represented that this is from -- this is an aerial
18   shot from -- showing what the ground looked like in
19   2020.
20       Does that look correct to you?
21   A.   No.
22   Q.   And why do you say that?
23   A.   Because everything is already cleared out.
24   I've got the same picture on my phone, almost identical

Page 133

1   to it.
2       Q.   And what date does that show?
3       A.   Can I look?
4       Q.   Sure.
5       A.   September 24th, 2023.
6       MR. ST. ONGE:  Okay.  We'll get you a copy
7   of that and send that to you.
8   BY MR. ST. ONGE:
9       Q.   And that's a screenshot on your phone?
10      A.   Yes.
11      MR. CUNNINGHAM:  '23?
12      MR. ST. ONGE:  Yes.
13      MR. CUNNINGHAM:  He's comparing it to
14  2020 --
15      MR. ST. ONGE:  The photograph on his phone
16  that shows it as 2023 is identical to --
17      MR. CUNNINGHAM:  Oh, I see.
18      MR. ST. ONGE:  -- what is shown on Exhibit
19  28, which you represented is from 2020.
20      MR. CUNNINGHAM:  Well, in our defense, I'm
21  relying upon an associate who gave me that today.  So
22  we'll have to verify.
23      MR. ST. ONGE:  Okay.
24      A.   So I'm sending this to you now?

Page 134

1   BY MR. ST. ONGE:
2       Q.   No, we'll do that afterwards.
3       A.   Okay.
4       Q.   Now, you heard Blankenship testify at his
5   deposition that there was a meeting between Nate
6   Marlen, Jim Marlen, and Blankenship before this
7   activity took place on your property.
8       Correct?  Do you remember that testimony?
9       A.   Correct.  Yes.
10      Q.   You weren't in that meeting, were you?
11      A.   No.
12      Q.   And as far as what happened, what was said
13  at that meeting, would Blankenship be in a better
14  position to testify about what was said during that
15  meeting than you?
16      A.   I wasn't there.
17      Q.   Right.
18      So he'd be in a better position to say what was
19  said --
20      A.   Absolutely.  Yes.
21      Q.   You were asked some questions also about
22  the conversation that you and Blankenship had when you
23  walked your property.
24      Do you remember that testimony?

Page 135

1       A.   Yes.
2       Q.   Okay.
3       And Blankenship said to you -- and correct me if
4   I'm wrong -- I believe you said, I'm sorry about all of
5   this, I was just following Nate's instruction.
6       A.   Yes.
7       Q.   And you were asked questions, well, you
8   don't actually know what the instruction was.
9       But from the conversation that you had with
10  Blankenship, was it clear to you what that instruction
11  was?
12      MR. BLEYER:  Just show an objection to
13  speculation.
14      MR. CUNNINGHAM:  Object to speculation.
15      MR. BLEYER:  Sorry, John.
16      MR. CUNNINGHAM:  No, just joining you.
17  BY MR. ST. ONGE:
18      Q.   Go ahead.
19      A.   Go ahead.
20      Q.   Was it clear what that instruction was?
21      MR. BLEYER:  Same objection.
22      A.   Well, yeah.
23  BY MR. ST. ONGE:
24      Q.   What was it?

Page 136

1       A.   Clear my ground.
2       Q.   And clear the ground in connection with
3   doing what?
4       MR. BLEYER:  Same objection.
5       A.   Digging ditches, removing trees.
6       MR. ST. ONGE:  Okay.
7   I don't have any other questions.
8       EXAMINATION
9   BY MR. CUNNINGHAM:
10      Q.   I have just, I think, a couple.
11      You sat through Blankenship's deposition.
12      And did he ever mention that any of Marlens
13  asked him to create an east-west ditch or do anything
14  on an east-west ditch?
15      A.   No, he never said anything to me about it.
16  No.
17      Q.   Okay.
18      You never overheard that that was said to anyone
19  else?
20      A.   Yes.
21      Q.   Blankenship never told you or anyone else
22  that any of the Marlens asked him to create an
23  east-west ditch or modify an east-west ditch.
24      Right?

Page 137

```
1    A.   Yes.
2    Q.   Okay.
3         So whether it benefits the Marlens or not that
4    Blankenship did that work, you don't have any evidence
5    that Blankenship was directed by the Marlens to do that
6    work?
7    A.   No.
8         MR. CUNNINGHAM:  All right.
9    That's all I have.  Thank you.
10              EXAMINATION
11   BY MR. ST. ONGE:
12   Q.   Well, one question that -- just to follow
13   up on that question.
14        The question was, do you have any indication
15   that the Marlens directed Blankenship to do the work.
16        I mean, you did testify that Blankenship told
17   you that he was following Nate's instruction?
18   A.   Nate's instruction.
19        MR. ST. ONGE:  All right.
20              EXAMINATION
21   BY MR. CUNNINGHAM:
22   Q.   Let me ask --
23        That wasn't one of the instructions that
24   Blankenship testified about in the deposition?
```

Page 138

```
1    A.   I didn't know Blankenship from Adam.
2    Q.   Right.
3         But you sat in on his deposition.
4    Right?
5    A.   Right.
6    Q.   Okay.
7         And he never mentioned that he was instructed
8    to do anything about an east-west ditch.
9    Right?
10        MR. ST. ONGE:  I mean, I would object that
11   the transcript will say one way or the other.
12   BY MR. CUNNINGHAM:
13   Q.   Go ahead.
14        MR. ST. ONGE:  Go ahead if you remember.
15   A.   Do I remember what?  I'm sorry.
16   BY MR. CUNNINGHAM:
17   Q.   Do you remember any testimony from
18   Blankenship that he was asked to create an east-west
19   ditch by anyone?
20   A.   No.  I discovered that when I went in and
21   discovered all the trees were gone.
22        MR. CUNNINGHAM:  All right.  Thank you.
23        MR. BLEYER:  Do you waive?
24        MR. ST. ONGE:  We'll read and sign.
```

Page 139

```
1         MR. BIERMAN:  Oh, you want to read?
2         THE REPORTER:  I'm sorry, what did you
3    say -- waive?
4         MR. ST. ONGE:  No, we'll read and sign.
5    [2:14 p.m.]
6
7         [SIGNATURE RESERVED.]
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 140

```
1              C E R T I F I C A T E
2
3         I, Mark Arndt, a Certified Shorthand Reporter
4    and Certified Court Reporter, do hereby certify that
5    JOSEPH LUCAS, prior to the commencement of the
6    examination, was sworn by me on January 10, 2024, to
7    testify the truth, the whole truth and nothing but the
8    truth.
9         I DO FURTHER CERTIFY that the foregoing is a
10   true and accurate transcript of the proceedings as
11   taken stenographically by and before me at the time,
12   place and on the date hereinbefore set forth.
13        I DO FURTHER CERTIFY that I am neither a
14   relative nor employee nor attorney nor counsel of any
15   of the parties to this action, and that I am neither a
16   relative nor employee of such attorney or counsel, and
17   that I am not financially interested in this action.
18
19
20        _____
21        MARK ARNDT, CSR, CCR, RPR
22        CSR NO. 084-004711
23        CCR NO. 1398
24
```

Page 141

```
 1
 2
 3          I, Joseph Lucas, the witness herein,
 4   having read the foregoing testimony of the pages of
 5   this deposition, do hereby certify it to be a true and
 6   correct transcript, subject to the corrections, if any,
 7   shown on the attached page.
 8
 9
10
11          _____
12                Joseph Lucas
13
14
15
16
17   Sworn and subscribed to before me,
18   This _____ day of _____, 202_.
19
20
21   _____
22        Notary Public
23
24
```

Page 142

```
 1         DEPOSITION ERRATA SHEET
 2
 3   Page No._____Line No._____Change to:_____
 4
 5   Reason for change:_____
 6   Page No._____Line No._____Change to:_____
 7   _____
 8   Reason for change:_____
 9   Page No._   _Line No.      _Change to:_____
10   _____
11   Reason for change:_____
12   Page No._____Line No._____Change to:_____
13   _____
14   Reason for change:
15   Page No._____Line No._____Change to:_____
16   _____
17   Reason for change:_____
18   Page No._____Line No._____Change to:_____
19
20   Reason for change:_____
21
22   SIGNATURE:_____DATE:_____
23        Joseph Lucas
24
```